**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**ANDREW DOE**                                                                      **PLAINTIFF**

**V.**                                                 **CIVIL ACTION NO.: 3:18cv138 DPJ -FKB**

**THE UNIVERSITY OF MISSISSIPPI, ET AL**                               **DEFENDANTS**

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

COMES NOW Plaintiff Andrew Doe, by and through undersigned counsel, and submits his Memorandum in Opposition to Defendants' Motion to Dismiss. In support thereof, the Plaintiff submits the following:

**RELEVANT PROCEDURAL BACKGROUND**

The Plaintiff's Complaint in this matter seeks declaratory and injunctive relief, as well as monetary damages, for Defendants' breaches of contractual and legal duties and obligations owed to the Plaintiff, in violation of the U.S. Constitution and Title IX of the Education Amendments Act, associated with a discriminatory investigation and subsequent suspension of the Plaintiff from the University of Mississippi.  [Doc. 9] The Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6) which is currently pending before the Court.  [Doc. 33] Additionally, a Motion for Preliminary Injunction and supporting memorandum of law filed by the Plaintiff is also pending before the Court. [Doc. 42, 47, 48] While the Motion to Dismiss seeks dismissal of Plaintiff's Complaint in its entirety, the Motion for Preliminary Injunction sets forth arguments as to why there is a substantial likelihood that the Plaintiff will prevail on the merits of his claims. *Id.* To the extent the Plaintiff's Motion for Preliminary Injunction and supporting memorandum of law discuss the viability of the Plaintiff's claims, those arguments are incorporated herein by reference.

1

## FACTS

For purposes of the Defendants' Motion to Dismiss, the Plaintiff's well-pleaded allegations are to be accepted as true. Defendants acknowledged this in their motion and provided a three-page supplemental discussion of the factual background regarding this case, including several misleading statements. Specifically, the Defendants state that on the night in issue, "Roe became obviously intoxicated." [Doc. 34, pgs. 1-2]. In support of this assertion the Defendants rely on pages 14 – 15 of the Second Amended Complaint. *Id.* However, there is nothing on the cited pages to lead to the conclusory assertion that Roe was "obviously intoxicated". [Doc. 9, pgs. 14-15]. Rather these pages indicate Roe drank champagne and later engaged in consensual sex with Doe. *Id.* Additionally, the Defendants reference a police report for their contention that Roe "was unable to clearly state to a physician whether she believed she had been sexually assaulted." [Doc. 34, pg.2.] However, a full reading of the referenced report reveals that Roe *repeatedly* told her physician that she did not think she had been sexually assaulted. [Doc. 33, Exhibit B – 2]. The report also states Roe told her physician that the decision to have sex was a mutual decision. *Id.*

## STANDARD OF LAW

A motion to dismiss pursuant to Rule 12(b)(1) should be granted "when the court lacks the statutory or constitutional power to adjudicate the case." *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015) (*quoting Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). "When ruling on the motion, the district court may rely on the complaint, undisputed facts in the record, and the court's resolution of disputed facts." *Morris v. Thompson*, 852 F.3d 416, 419 (5th Cir. 2017), *cert. denied*, No. 17-4, 2017 WL 2870054 (U.S. Oct. 2, 2017) (*citing Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A motion to dismiss under rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982).   The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Campbell v. Wells Fargo Bank,* 781 F.2d 440, 442 (5th Cir.1986). A district court may not dismiss a complaint under rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).  "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."  *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 601 (1969).

## <u>ARGUMENT</u>

## I.     <u>THE PLAINTIFF'S TITLE IX CLAIMS ARE PROPERLY BEFORE THIS COURT AND ARE NOT SUBJECT TO DISMISSAL PURSUANT TO FED.R.CIV. P. 12(b)(1) or (6)</u>

Title IX of the Education Amendments Act of 1972 is a comprehensive federal law that provides, in relevant part, "No person in the United States shall, on the basis of sex, be excluded from participation, in be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *See* 20 U.S.C.§§ 1681-1688 (1994).  Title IX applies to all aspects of education programs or activities operated by recipients

3

of federal financial assistance. Congress enacted Title IX with two principal objectives in mind: to avoid the use of federal resources to support discriminatory practices in education programs, and to provide individual citizens effective protection against those practices. *See Cannon v. University of Chicago*, 441 U.S. 677, 704, 99 S. Ct. 1946, 60 L.Ed.2d 560 (1979).

**A.   <u>The State defendants are recipients of federal funds and operate educational programs or activities.</u>**

The term "recipient", as used with respect to Title IX,  is defined as  "any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and that operates an education program or activity that receives such assistance, including any subunit, successor, assignee, or transferee thereof."  *See* 65 Fed. Reg. 52866 (2000).

In their Motion to Dismiss, all Defendants except for the University of Mississippi assert that they are not subject to Title IX as they are not recipients of federal funding.  [Doc. 33]  The Plaintiff acknowledges that Tracy Murry and Honey Ussery are not recipients of federal funds operating educational programs or activities.  However, the State of Mississippi, IHL, the Board of Trustees of IHL and the University of Mississippi can all be identified as recipients of federal funding for covered educational programs.

The Department of Justice recognizes that many programs have two (or more) recipients of federal funds, as is the case herein.  The primary recipient directly receives the federal financial assistance, then distributes the federal assistance to a subrecipient to carry out a program.  Both a primary recipient and a subrecipient must comply with Title IX.  *See Title IX Legal Manual, The United States Department of Justice (2015)*; *See also Graves v. Methodist Youth Servs., Inc.,* 624 F. Supp. 429 (N.D. Ill. 1985). In the Department of Justice's Title IX Manual, the Department of

Justice advises that "it is important to remember that determinations as to what constitutes a covered education program must be made as broadly as possible." *Id.*

Under Mississippi law, the University of Mississippi is an arm of the State of Mississippi. *See Miss. Code Ann.* § 37–115–1 *et seq.* (1972)*; Jagnandan v. Mississippi State University*, 373 So.2d 252 (Miss. 1979), *Coleman v. Whipple,* 191 Miss. 287, 2 So.2d 566 (1941).  The Board of Trustees of the State Institutions of Higher Learning was constitutionally created by the enactment of Article 8 § 213- A of the Mississippi Constitution.

According to the State of Mississippi Institutions of Higher Learning financial statements, significant federal funds were received by the State of Mississippi and IHL from the federal government as grants and/or passed through the IHL in 2017.  [Doc. 42, Exhibit "U"] These monies include financial aid from the Department of Education and the U.S. Department of Health and Human Services, in an amount of $705,376,473.000, as well as millions in research and development related awards.  *Id.*

Within his Complaint, Plaintiff recognized and articulated the roles of the State of Mississippi, IHL, the Board of Trustees of IHL, the University and the official capacity defendants ("State Defendants").  Plaintiff pled the receipt of funding sufficient to establish recipient status for purposes of Title IX and included allegations detailing the specific roles of the arms of the State in the receipt and oversight of these funds.  [Doc. 9, ¶¶ 2, 3, 9, 17 – 37].

**B.** **The Eleventh Amendment does not bar suit against the State for an alleged violation of Title IX.**

The U. S. Supreme Court has held that Congress abrogated states' Eleventh Amendment immunity under Title IX.  See *Franklin v. Gwinnett*, 503 U. S. 60, 112 S. Ct. 1028, 117 L.Ed.2d 208 (1992), discussing the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U. S. C. § 2000d-7. In *Pederson v. Louisiana State University*, the United States Court of Appeals for the

Fifth Circuit further addressed the fact that the Eleventh Amendment does not bar an appellant's suit against a state university for an alleged violation of Title IX. *Pederson v. Louisiana State University*, 213 F.3d 858, 875 (5th Cir. 2000). In so doing, the Court discussed the provision within 42 U.S.C. § 2000d-7(a)(1) that provides: "[a] state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in federal court for a violation of… Title IX of the Education Amendments of 1972." *Id.* In enacting § 2000-7 Congress "permissibly conditioned [a state university's] receipt of Title IX funds on an unambiguous waiver of [] Eleventh Amendment Immunity, and that, in accepting such funding, [the university] has consented to litigate [private suits] in federal court." *See Litman v. George Mason Univ.*, 186 F.3d 544 at 555 (4th Cir. 1999), *cert. denied,* 528 U. S. 1181, 120 S. Ct. 1220, 145 L.Ed.2d 1120 (2000).

Title IX is a federal spending program that "operates much in the nature of a contract: in return for federal funds, the states agree to comply with federally imposed conditions." *Litman v. George Mason Univ.*, 186 F.3d 544, 551; *See also Rosa H. v. Sanelizario Independent School District,* 106 F.3d 648, 654 (5th Cir. 1997) (Title IX is spending clause legislation, and as a statute enacted under the spending clause, Title IX generates liability when the recipient of federal funds agrees to assume liability). In enacting Title IX, Congress "condition[ed] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the government and the recipient of funds." *Gebser v. Lago Vista Indep.School Dist.*, 524 U. S. 274, 286, 118 S. Ct. 1989, 1997, 141 L.Ed.2d 277 (1998); *See also Litman*, at 551-552.

**C. Private individuals have an implied right of action under Title IX and damages may be available in such lawsuits**

Title IX suits by private individuals are permissible and injunctive relief is a valid remedy for a violation of Title IX by a University. *See Franklin v. Gwinnett County Public Schools,* 503

U.S. 601, 12 S.Ct. 1028, 117 L.Ed.2d 208 (1992)   In addition, "The award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is also fully consistent with and in some cases even necessary to the orderly enforcement of the statute." *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).  The Supreme Court has also ruled that monetary damages are an available remedy in private actions brought to enforce Title IX for alleged intentional violations. See *Franklin*, 503 U.S. at 72-75; *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 630-31, 104 S. Ct. 1248, 79 L.Ed. 568 (1984).   The Court placed great reliance on the "longstanding rule" that where a federal statute provides for a right to bring suit, federal courts "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *See Franklin,* at 66.  The Court examined congressional intent and noted that when Title IX was enacted, Congress was silent on the subject of a private right of action, but Congress acted in the context of the prevailing presumption in favor of all available remedies. *Id.*  Congress added 42 U.S.C.§2000d-7 through the Rehabilitation Act Amendments of 1986, to abrogate the States' Eleventh Amendment immunity in suits under statutes such as Title VI and § 504 and Congress added 42 U.S.C. §2000d-4a under the Civil Rights Restoration Act to restore the broad scope of programs covered by these statutes. *See U.S. Department of Justice, Title IX Manual* (2015) (discussing *Franklin* and 42 U.S.C. § 2000-d).

   D. **Injunctive Relief can be granted by the Defendants**

   The parties agree that under certain circumstances, a federal court may enjoin state officials to conform their conduct to federal law.   *Ex parte Young* provides that injunctive relief is appropriate where there is some connection between the officers/ individuals responsible for enforcement of the act (or specific duty to enforce the statute) and a threat of non-performance. *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L. Ed. 714 (1908).

In their Motion to Dismiss, the Defendants assert that there is no ongoing disciplinary proceedings pending against the Plaintiff to warrant injunctive relief.  However, Fifth Circuit case law provides that, "[A] request for reinstatement is sufficient to bring a case within the *Ex parte Young* exception to Eleventh Amendment immunity, as it is a claim for prospective relief designed to end a continuing violation of federal law." *See Jones v. Texas Juvenile Justice Dept.* 646 Fed.Appx. 374 (5th Cir. April 21, 2016) *citing Nelson v. Univ. of Tex. at Dall*., 535 F.3d 318, 324 (5th Cir.2008). *Accord Kobaisy v. Univ. of Miss.,* 624 Fed.Appx. 195, 198 (5th Cir. 2015) (claims against state officials for prospective injunctive relief, such as a request for reinstatement, are not barred by sovereign immunity).  In order to have suffered an injury-in-fact, a plaintiff is not required to apply to, and be rejected by, another school. Rather, he can pursue a claim for injunctive relief provided he alleges a "real and immediate threat of future injury" that is not merely conjectural.  *See K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir.2010); *See also Hays v. LaForge*, 113 F.Supp.3d 883, 325 Ed. Law Rep. 845 (N.D.Miss. 2015) (*Ex parte Young* allows Plaintiff's Section 1983 claim for prospective injunctive relief in the form of reinstatement as division chair against Defendant in his official capacity)

In addition to the fact that the Fifth Circuit unquestionably allows for a claim for prospective injunctive relief in the form of reinstatement, courts in other circuits have also found that the reinstatement of a student is considered prospective injunctive relief. In *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299, 307 (6th Cir. 1984), *cert denied*, 469 U. S. 1113 (1985), the Sixth Circuit Court of Appeals reinstated a medical student to the medical college as a form of prospective injunctive relief.  In *Back v. Hall*, the U. S. District Court for the Eastern District of Kentucky found that prospective injunctive relief in a § 1983 action is available as against a state official in federal court where that state official is the individual who can reinstate an employee.

*See Black v. Hall*, 2006 WL 2844144 (E.D.KY). In *Gies v. Flack*, the U.S. District Court for the Southern District of Ohio found that a plaintiff's request for a declaration that the defendants violated his due process rights constituted prospective equitable relief because the declaratory judgment was, in effect, part and parcel of the request for injunctive relief. *See Gies v. Flack*, 495 F.Supp.2d 854 (S.D. Ohio 2004)

**E.  The Plaintiff has pled sufficient facts to maintain his Title IX claim**

Multiple methods for proving a violation of Title IX have been recognized by the Courts. Title IX claims arising from disciplinary hearings can be analyzed under the "Erroneous Outcome Standard", "Selective Enforcement Standard", "Deliberate Indifference Standard" and/or the "Archaic Assumption Standard". *See Doe v. University of the South*, 687 F.Supp.2d 744, 756 (E.D.Tenn. 2009) *citing Mallory*, 76 Fed.Appx. 634, 181 Ed. Law Rep. 428 (2003).

Under the erroneous outcome standard, a plaintiff attempts to demonstrate that he was innocent of the charges that were presented and wrongfully found to have committed an offense in an educational institutions' disciplinary proceedings. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2nd Cir. 1994). An erroneous outcome exists when an innocent person was wrongfully found to have committed an offense because of his or her gender. *Id.* "[P]laintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding…. However, **the pleading burden in this regard is not heavy.  For example, a complainant may allege evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of the complainant or witnesses, particular strengths of the defense, or other reasons to doubt the veracity of the charge.  A complainant may also allege particular procedural flaws effecting the proof."** *See Yusuf v. Vassar College,* 35 F.3d, 709, 715 (2nd Cir. 1994) (emphasis added).  In

addition, a complainant needs to allege circumstances that suggest a gender bias was a motivating factor behind the erroneous finding.  *Id.*

The gender bias element of an erroneous outcome claim can be established by direct evidence, such as discriminatory remarks made by administrators who participated in the disciplinary process, or through circumstantial evidence, such as dissimilar treatment of male and female respondents or a pattern in which men who are accused of sexual assault are "invariably found guilty."  *See also Univ. of Cincinnati*, 2015 WL 728309, at *14.  Stated succinctly, in order to state an erroneous outcome claim under Title IX, a plaintiff must plead two elements: (1) facts sufficient to cast doubts about the outcome of the disciplinary hearing, and (2) a casual connection between the flawed outcome and gender bias.  *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 250 (2d Cir.1995).  Plaintiff has satisfied these elements.

Alternative ways for establishing liability under Title IX are through a selective enforcement theory or a deliberate indifference theory.  Under the selective enforcement theory, a plaintiff must show he was singled out for punishment because of his sex. A showing of deliberate indifference, "requires the plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct."  *See Gebser v. Lagovista Independent School District*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1988).  Under the deliberate indifference standard, a plaintiff must demonstrate that the educational institutions challenged misconduct was motivated by sex-based discrimination.  Allegations of a causal connection in the case of university disciplinary cases can be the kind that are found in Title VII cases and may include such things as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision making that also tend to show the influence of gender."  *Id.*  In addition, "statements

reflecting bias by members of the tribunal, may suffice both to cast out on the accuracy of the disciplinary adjudication and to relate the error to gender bias." *Id.*

Within his Complaint Plaintiff has articulated evidentiary weaknesses, procedural flaws and gender bias.  Plaintiff detailed specific procedural flaws that occurred during the training, investigative and disciplinary process within his Complaint.  [Doc. 9, ¶¶ 63 – 87, 91 – 120, 165 - 167] The Complaint includes factual allegations that the University's policies and procedures were applied differently to males and females [Doc. 9, ¶ 174]; that exculpatory evidence in favor of males is not fully considered and that men are presumed guilty.  [Doc. 9 ¶ 175].  Plaintiff has pled allegations that Ussery failed to address Bethany Roe's statements that she did not initially believe she was raped [Doc. 9, ¶ 67]; Ussery failed to correctly report exculpatory statements; Ussery's failure to address forensic police evidence in her report *Id.*; and Ussery failed to interview certain witnesses *Id.*  Furthermore, female students such as Bethany Roe were not subjected to the same standards as male students, such as the Plaintiff.  Even though the Plaintiff had been drinking alcohol on the evening in question and his female companion was physically on top of him during sex, the female was neither investigated or subjected to disciplinary hearings.

Although the Defendants have argued Plaintiff has not alleged any statements by tribunal members or University staff that evidence gender bias, a review of the pleadings shows otherwise. Paragraph 72 expressly states that unbeknownst to Doe at the time of the hearing, one of the female panel members had mocked the defenses of men accused of sexual assault.  [Doc. 9, ¶ 72] Additionally, Plaintiff has set forth allegations that, pursuant to the delegation of authority by one or more of the Defendants, Honey Ussery wrote the University policies and implemented training programs that deny male student due process and which are biased in favor of female complainants.

The training that was provided by the University and Ussery was inequitable and further exacerbated the denial of due process against Doe.  Training given to the University Judicial Council and Appellate Consideration Board members provides that just because an individual does not protest or resist sexual activity their silence and lack of resistance does not constitute consent. It provides that when both parties are intoxicated, findings are to be made in favor of the complainant, who is typically female.  University Judicial Council members are trained that complainants sometimes don't believe they are victims.  The training also advises that, in some circumstances, both parties may have been intoxicated.  In such case, determinations are to be made "for the Complainant…".  Further training materials advise the panel members that "victims" sometimes withhold facts and lie about details, question if they've truly been victimized and "lie about anything that casts doubt on their account of the event."  ***"Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning."*** *Doe v. Brandeis,* 177 F.Supp.3d 561 (D.Mass. March 2016).

In 2017, the University of Pennsylvania had training materials that were like those used by the University of Mississippi.  The materials instructed that "the fact that a complainant recounts a sexual assault somewhat differently from one retelling to the next may reflect memory processes rather than inattentiveness or deceit."  *See Doe v. The Trustees of the University of Pennsylvania*, U.S.D.C. for the Eastern District of Pennsylvania, Case No.: 2:16-cv-05088-JP, [Doc. No. 59] (Sept. 13, 2017).   When a male student who had been disciplined for sexual misconduct raised concerns regarding the University's training materials and sought injunctive relief from the District Court, the court found that the training was "so biased that it may violate Title IX by discriminating against males."   *Id.*   That same type of gender bias permeates the University of Mississippi's training materials and Title IX program.

In addition to her roles developing policy and training for the University, Ussery was permitted conduct the investigation into the allegations against Andrew Doe and determine the credibility of the witnesses she interviewed. Ussery provided the University Judicial Council with summarized portions of the interviews she conducted. Doe was not permitted to be present during the interviews, nor could he ask questions about the alleged statements. The report submitted by Ussery contained nothing but these summaries of witness statements. Ussery clearly knew of the statements by Roe to the hospital physician and what was recorded in the police report, but she did not try to interview either. Likewise, Ussery did not interview the cab driver, Doe's roommates or anyone who went to the party with Doe and Roe. Additionally, Ussery did not include any of the text messages between Doe and Roe within her report.

The Plaintiff's allegations are further supported by the affidavits that were filed with the Plaintiff's Motion for Preliminary Injunction and references to other ongoing lawsuits alleging sex based discrimination against men by the University of Mississippi in its Title IX proceedings. [Doc. 42, 47, 48]

## II.     THE PLAINTIFF'S CONSITUTIONAL CLAIMS ASSERTED PURSUANT TO 42 U.S.C.§ 1983 ARE PROPERLY BEFORE THIS COURT AND ARE NOT SUBJECT TO DISMISSAL PURSUANT TO FED.R.CIV.P. 12

In an effort to obtain dismissal of the Constitutional claims asserted against the State, the Defendants make a multitude of arguments. For clarification, the Plaintiff does not dispute that the State of Mississippi and arms of the State are not persons for purposes of monetary damage awards under 42 U. S. C. § 1983. Plaintiff is not seeking monetary damages from the State and official capacity defendants for the Constitutional claims asserted. However, as set forth more fully below, the Plaintiff *is* seeking declaratory and injunctive relief against these Defendants with respect to the Constitutional claims. In addition, the Plaintiff is seeking declaratory, injunctive and

monetary relief from Defendants Ussery and Murry, individually, for the violation of his Constitutional rights.

   **A.  Plaintiff's constitutional claims seeking declaratory and injunctive relief from the State and official capacity defendants are not prohibited.**

   In *Ex parte Young,* the U.S. Supreme Court held that suits against public official for injunctive relief constitute a narrow exception to the Eleventh Amendment. See *Ex parte Young,* 209 U. S. 123, 28 S. Ct. 441, 448, 52 L.Ed. 714 (1908)   Years later, in *Eldeman v. Jordan,* the Court held that the outlay of public funds to affect prospective injunctive relief is, an inevitable consequence of the principle announced in *Ex parte Young*. *Eldeman v. Jordan,* 415 U. S. 651, 653, 94 S. Ct. 1347, 39 L.Ed.2d 662 (1974).  Subsequently, the Court held that "it is beyond dispute that federal courts have jurisdiction over suits who enjoin state officials from interfering with federal rights."  *See Shaw v. Delta Airlines, Inc.*, 463 U. S. 85, 96 n.14, 103 S. Ct. 2890 (1983) (*citing Ex parte Young*, 209 U. S. at 160-62)   Injunctive relief consists of a court order requiring the state and its actors to do or not to do a specific action and to ensure that the parties do not continue to act in a harmful and irreparable manner until further judicial proceedings take place. The *Ex parte Young* exception allows a federal court to issue prospective injunctive and declaratory relief compelling the state officials to comply with federal law.  *See E.G. Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994).

   In an injunctive or declaratory action grounded on federal law, a state's immunity can be overcome by naming state officials as defendants. *See Kentucky v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (*citing Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)).   Furthermore, under the *Ex parte Young* doctrine, a private individual may sue individual state officers in federal court to obtain prospective relief from an ongoing violation of federal law. The purpose of the *Ex parte Young* doctrine is to

enable federal courts to uphold federal rights and hold state officials responsible to the supreme authority of the United States. *See AT&T Communs. v. BellSouth Telecomms. Inc.*, 238 F.3d 636, 643 (5th Cir. 2001) ("Additionally, the Supreme Court has for nearly a century allowed suits against state officials for prospective injunctive relief to end a continuing violation of federal law under the doctrine of *Ex parte Young*.")

The Defendants do not dispute that Chancellor Vitter could carry out the injunctive relief requested by the Plaintiff. [Doc.33] However, they contend that the other Defendants could not. However, as pled by the Plaintiff, the members of the Board of Trustees of State Institutions of Higher Learning, the Commissioner of Higher Learning and both Tracy Murry and Honey Ussery, have duties and responsibilities related to policy development, ensuring compliance with the law and the day-to-day administration of disciplinary proceedings.   [Doc. 9, ¶¶ 2, 3, 9, 17-37, 182]

### B.   The relief sought by the Plaintiff triggers an exception under *Ex parte Young*.

The Plaintiff is seeking the prospective injunctive relief of requiring the state officials to comply with the due process clause of the Fourteenth Amendment of the United States Constitution, cease any ongoing disciplinary action against the Plaintiff and to remove the finding of "Responsible" from his academic records until this case is resolved on the merits.  In their Motion to Dismiss, the Defendants incorrectly argue that Plaintiff Doe fails to meet *Ex parte Young's* requirement that the requested relief be prospective in nature. "[A] request for reinstatement is sufficient to bring a case within the *Ex parte Young* exception to Eleventh Amendment immunity, as it is a claim for prospective relief designed to end a continuing violation of federal law." *Jones v. Texas Juvenile Justice Dept.* 646 Fed.Appx. 374 (5th Cir. April 21, 2016) citing *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 324 (5th Cir.2008). *Accord Kobaisy v. Univ. of Miss.*, 624 Fed.Appx. 195, 198 (5th Cir. 2015) ("Section 1983 claims against state officials for

prospective injunctive relief under § 1983 [sic], such as Kobaisy's request for reinstatement, are not barred by sovereign immunity.") In order to have suffered a constitutional injury-in-fact, a plaintiff is not required to apply to, and be rejected by, another school. Rather, he can pursue his claim for injunctive relief provided he alleges a "real and immediate threat of future injury" that is not merely conjectural. *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir.2010); *See also Hays v. LaForge,* 113 F.Supp.3d 883, 325 Ed. Law Rep. 845 (N.D.Miss. 2015) (*Ex parte Young* allows Plaintiff's Section 1983 claim for prospective injunctive relief in the form of reinstatement as division chair against Defendant in his official capacity)   Additionally, the *Ex parte Young* exception to Eleventh Amendment immunity allows the plaintiff's § 1983 claims for prospective injunctive relief to proceed against the individually named defendants. *Yul Chu*, 901 F.Supp. 2d at 775. *See Wiggington v. Univ. of Miss*., Civil Action No. 3:15-cv-00093-NBB Doc # 40 (N.D. Miss. September 30, 2016)

### C.   Plaintiff has pled viable Fourteenth Amendment Claims

Within his Complaint, the Plaintiff has asserted violations of his Fourteenth Amendment substantive and procedural due process rights, as well as his right to equal protection under the law.  [Doc. 9, ¶¶ 155 – 180].  These claims were asserted pursuant to the procedural vehicle of 42 U.S.C. § 1983.  With respect to these constitutional claims, the Plaintiff is not seeking monetary relief from the State Defendants.  However, he is seeking declaratory and injunctive relief which can be effectuated by the official capacity parties.  Furthermore, he is seeking monetary relief from the individuals.

### Due Process Claims

The Fourteenth Amendment of the U.S. Constitution provides that no person shall be deprived of life, liberty, or property without due process of law.  *U.S. Const. Amend. XIV, § 1.4.*

"The requirements of due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972).  To be entitled to the procedural protections of the Fourteenth Amendment, the Plaintiff must demonstrate that his dismissal from the University deprived him of either a liberty or a property interest. *See Bd. of Curators of Univ. of Mo. v. Harrowitz,* 435 U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

In his Complaint, Plaintiff raised allegations that both his liberty and property interests were violated by the actions of the Defendants.  [Doc. 9, ¶¶ 155 - 169].  A student's continued enrollment in a public university is deemed a protected property interest.  *Rendell-Baker v. Cohn*, 457 U.S. 830, 837, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982).  Furthermore, where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, a liberty interest in implicated.  *See Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).  Additionally, a reputational liberty interest has been invoked as a protected interest in school discipline cases.  *See Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

"[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct."  *See Plummer v. University of Houston,* 860 F.3d 767, 344 Ed. Law Rep. 710 (5th Cir. 2017) *citing Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961). "[T]he interpretation and application of the Due Process Clause are intensely practical matters and ... 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' " *Id*., citing *Goss*, at 578 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Each situation demands different procedural protection. *See Matthews v. Eldridge*, 424 U.S. 319, at 334.

At a minimum, a student facing suspension is entitled to "the opportunity to be 'heard at a meaningful time and in a meaningful manner.'" *Cummins*, at 446, quoting *Mathews,* at 333. Universities must "at least" provide notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker. *Id.*, *citing Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 565–66 (6th Cir. 2011).

Herein the Plaintiff has asserted specific factual averments related to the deprivation of his substantive and procedural due process rights.  He has alleged facts sufficient to show his property and liberty interests in his education and the deprivations of such interests by the Defendants.  The allegations within the Complaint include reference to the procedural inadequacies the Plaintiff was subjected to during both the investigative and disciplinary proceedings, including the misapplication of the proper procedural standards for determination.  These allegations include, in part:

> • The University's policies and practices, both facially and as applied, have caused the Plaintiff to suffer constitutional injuries. The Plaintiff was not allowed the opportunity to be heard in a meaningful time and in a meaningful manner and likewise was deprived of fundamental substantive rights.  [Doc. 9, ¶¶ 112 – 121, 155 – 180]

> • The Plaintiff did not meet with Ussery regarding the matter and was never provided with any specifics regarding the allegations by Ussery, nor was he asked to identify potential witnesses or submit any evidence.  [Doc. 9, ¶ 65.]

> • The investigative report submitted by Ussery contained summaries of student interviews prepared by Ussery and copies of police reports relating to the event.  [Doc. 9, ¶ 66]. However, it did not address the highly exculpatory statements made by Bethany Roe to her physician or the police.  Furthermore, it did not evidence any attempt by Ussery to interview the responding officers, persons who attended the pre-game party with Roe and Andrew Doe, persons the couple spent time with at the party or the cab driver who took Roe and Doe to the fraternity party and back to Doe's apartment.  There was no assessment of any text messages or phone calls between Doe,

Roe, the cab driver or Roe's roommate. The written report simply summarized statements attributed to Roe's friends who were not present at the date party with Doe and Roe that evening, nor present when Doe and Roe engaged in mutually consensual sexual activity. [Doc. 9, ¶ 67].

- No recorded, handwritten or typed statements (sworn or unsworn) from any of the witnesses were included with Defendant Ussery's report. The report did not address nor contain Roe's medical records which clearly indicated Roe did not believe she was raped. Similarly, copies of relevant and exculpatory text messages were not included. [Doc. 9, ¶ 68].

- At the intake meeting with Tracy Murry the Plaintiff was asked why the Title IX proceeding was going forward in light of the fact that Bethany Roe confirmed the sexual activity in issue was mutually consensual. Murry responded that "things seem pretty black and white". [Doc. 9, ¶ 69].

- While the University's Sexual Assault Response Guidance Resources for the Accused states that the accused student "is afforded due process and is not assumed to be responsible by the board," this does not occur. While the University of Mississippi's Sexual Misconduct policy DSA.SC.200.075 provides that "[t]he standard of proof for all cases involving sexual misconduct will be based upon the University's established standard of preponderance of the evidence." The training provided to the University's Appellate Consideration Board does not instruct panel members upon the proper standard of proof. [Doc. 9, ¶ 97] Instead of instructing members of the definition of "preponderance of the evidence" standard, the training given to panel members advises that they "just need to have some evidence to justify the outcome" (emphasis added) and should only consider an appeal if there is overwhelming evidence in the other direction. *Id.*

- The hearing before the University Judicial Council was scheduled for March 31, 2017. Prior to the hearing, the Plaintiff was not informed that he had the right to know the identity of the panel members or the right to challenge a panel member. No one with the University was assigned to advise the Plaintiff, advocate on his behalf or otherwise guide him through the investigative and hearing process. [Doc. 9, ¶ 70].

- When the Plaintiff arrived for his hearing, he learned that all panel members had not yet been selected. [Doc. 9, ¶ 71]. The hearing was delayed in order for the University to find a third panel

19

member. *Id.* Approximately fifteen minutes before the hearing began, one of the panel members was presented with the case file for the first time. *Id.*

• Unbeknownst to the Plaintiff, one of the female panel members selected to preside over his hearing had previously mocked the defenses raised by men accused of sexual assault. [Doc. 9, ¶ 72]. The University and Defendant Murry facilitated and acquiesced in the placement of a panel member who had known, public, and demonstrated gender bias in the context of sexual misconduct proceedings in favor of female students against male students. *Id.*

• While waiting for the hearing to begin, Defendant Murry informed the Plaintiff that multiple attempts had been made to contact Bethany Roe, but that Roe did not want to have anything to do with the proceeding. [Doc. 9, ¶ 73]. As such, the proceeding went forward in her absence.

• While the purported guarantee provided by the University's "University Conduct Process" provides that "[a]s the parties present information for the panel's consideration, members of the hearing panel (including the chair), the respondent, and the complainant, when applicable, may ask questions of the parties and other witnesses concerning the information presented or other information pertinent to the charge" - - in custom policy and practice, a respondent is not allowed to do so. The Plaintiff has alleged that he was not able to confront his alleged accuser or **any** witness at any time. [Doc. 9, ¶¶ 73, 74]

• The Plaintiff was not allowed to subpoena witnesses to attend the hearing, nor have a representative speak on his behalf. [Doc. 9, ¶ 74]. Neither Bethany Roe nor **any** of the witnesses interviewed by Ussery were present at the hearing. *Id.* Ussery's report summarizing her interviews with Roe's friends was given to the Council by Murry. However, the Plaintiff was denied any and all opportunity to question the witnesses and/or Ussery. *Id.* Ussery's report summarizing unsworn witness statements, was taken at face value without regard for completeness or accuracies of the summaries, contradictions by witnesses or any opportunity for cross-examination of the witnesses or Ussery by Doe or the hearing panel. *Id.*

• The Plaintiff was the only person who testified at the hearing. The Plaintiff testified that the sexual activity between himself and Bethany Roe was consensual. The Plaintiff also

provided the Council with additional exculpatory evidence.  [Doc. 9, ¶ 75].

•     The Plaintiff provided the University Judicial Council a written summary of a statement provided the owner of Randall's Taxi Service in Oxford, Mississippi, and the results of a polygraph examination he had taken.  The statement from the taxi driver indicated that on the night in issue he drove the Plaintiff and Bethany Roe from a pre-game party to a fraternity party and then from the fraternity party to the Plaintiff's residence.  On the ride to the Plaintiff's residence, the Plaintiff and Roe were "making out" in the backseat.  The driver never heard Roe object and noted that upon arrival at the Plaintiff's residence, Roe did not hesitate to go inside. The Council was informed that the interaction between the two led the taxi driver to believe that the couple was about to have sex. [Doc. 9, ¶ 76-77].

•     The polygraph report that was provided to the University Judicial Council discussed the polygraph examination of the Plaintiff that was performed by a trained investigator and polygraph examiner the day before Doe's hearing.  The polygraph examiner who conducted the examination previously worked as the Chief and Program Manager of the Federal Bureau of Investigation Polygraph Unit at F.B.I. Headquarters in Washington, D.C.  and has over 25 years investigative experience with the F.B.I.   The report indicated that in response to questions about whether or not Doe forced Bethany Roe to have sex with him, the Plaintiff's answers were consistently "No," and no deception was indicated.  [Doc. 9, ¶ 78].

•     Despite being presented with the Plaintiff's testimony, the statement of taxi driver and polygraph test results, the University Judicial Council only asked three questions during the hearing. [Doc. 9, ¶ 79].  One of these was a request for the Plaintiff to explain why Bethany Roe would have made up the allegations.  *Id.*

•     The University Judicial Council met for approximately 15 minutes before issuing an initial determination against the Plaintiff. [Doc. 9, ¶ 80].  When the Plaintiff returned to the hearing room, he learned a male panel member had been permitted to leave prior to the end of the proceeding.  *Id.*  The two remaining panel members, inclusive of the female who exhibited a pre-existing bias, issued a finding of "Responsible" against Andrew Doe and expelled him from the University.  These panel members offered no explanation for their finding at the hearing.  *Id.*

- The initial determination letter advised the Plaintiff of the "Responsible" finding but did not provide a rationale for the finding or any discussion of inculpatory or exculpatory evidence considered by the University Judicial Council.  [Doc. 9, ¶  81].  Additionally, the letter did not offer an explanation for the severe sanction of expulsion.  [Doc. 9, ¶ 82].

- When the University modified the disciplinary sentence given to Andrew Doe from an expulsion to a suspension until fall 2020, no explanation for the modification of the finding or the severity of the disciplinary action was provided.  [Doc. 9, ¶ 83.]

- The University's determinations were rendered without proper consideration of exculpatory evidence or the contradictions between the allegations and Bethany Roe's statements to her doctor in the presence of law enforcement.  [Doc. 9, ¶ 84]. In addition, the sanctions issued against the Plaintiff did not take into consideration the fact this was the first allegation made against him, he was a good student and he did not pose a threat to Bethany Roe. *Id.*

In almost every proceeding "where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).  In *Flaim v. Ohio,* the Sixth Circuit Court of Appeals held that accused students must have the right to cross-examine adverse witnesses "in the most serious of cases." *Flaim v. Ohio*, 418 F.3d 629, 636, 200 Ed.Law Rep. 614 (6th Cir. 2005).  The Court alluded to what "the most serious of cases" might entail: If a case "resolve[s] itself into a problem of credibility, cross-examination of witnesses might . . . be [] essential to a fair hearing." *Id.* at 641 (*quoting Winnick*, 460 F.2d at 549.)  Andrew Doe's case is presented as a classic he-said/she-said credibility assessment.

"The ability to cross-examine is most critical when the issue is the credibility of the accuser." *Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 605 (D. Mass. 2016). Cross-examination takes aim at credibility like no other procedural device. *Id*, citing *Craig*, 497 U.S. at 846; *Watkins*, 449 U.S. 341, at 349. A cross-examiner may "delve into the witness' story to test the witness'

perceptions and memory." *Id*, citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 s. Ct. 1105, 39 L. Ed. 2d 347 (1974). He may "expose testimonial infirmities such as forgetfulness, confusion, or evasion . . . thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Id*, *Craig*, 497 U.S. at 847 (citation and brackets omitted). He may "reveal [] possible biases, prejudices, or ulterior motives" that color the witness's testimony. *Davis*, at 316.

In *Doe v. Cincinnati*, an accused arrived at a Title IX hearing and learned that his accuser and other witnesses would not be present. *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 711 (S.D. Ohio 2016). The University of Cincinnati reviewed a Title IX report that contained summarized statements from an accuser and witnesses, all of which would have been considered hearsay if introduced in court. The panel in *University of Cincinnati* found John Doe Responsible and suspended him for two years. John Doe sought relief through the District Court. His motion for preliminary injunctive relief focused solely on defendants' failure "to permit John Doe to confront his accuser." Doe maintained that the University could not constitutionally find him responsible for sexually assaulting Roe without "any opportunity to confront and question" her. The District Court agreed. The court held, "In this case, the [] Hearing Committee was given the choice of believing either Jane Roe or Plaintiff, and therefore, cross-examination was essential to due process." *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 711 (S.D. Ohio 2016). Although the University's Code of Conduct permitted absent witnesses who are "unable" to attend a hearing to provide notarized statements, the statement of Roe was not notarized. Such a "significant and unfair departure [] from an institution's own procedures can," the court explained, "amount to a violation of due process." *Id*. (quoting *Furey v. Temple Univ.*, 730 F. Supp. 2d 380, 396–97 (E.D. Pa. 2010) (brackets omitted)). The fact that Doe could have submitted written questions to the

Committee Chair, which the Chair could have put to Roe, had she appeared at the hearing, did not convince the district court otherwise. *Id*. at 712.

On appeal, the Sixth Circuit Court of Appeals affirmed the district court's decision. *Id.* In so doing, the Court of Appeals stated, "the due process clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process. Here, the university's disciplinary committee necessarily made a credibility determination in finding John Doe responsible for sexually assaulting Jane Roe given the exclusively 'he said/she said' nature of the case." *Id.* The failure, "to provide any form of confrontation of the accuser made the proceeding against John Doe fundamentally unfair." *Id.* The court reasoned that because the hearing committee had been given the choice of believing either Jane Roe or John Doe, cross-examination was essential to due process. *Id.* "Few procedures safeguard accuracy better than adversarial questioning. In the case of competing narratives, 'cross-examination has always been considered a most effective way to ascertain truth.'" *Doe v. Univ. of Cincinnati*, 233 F. Supp. 704, citing *Watkins v. Sowders*, 449 U.S. 341, 349 (1981) (footnote omitted); *see also Maryland v. Craig*, 497 U.S. 836, 846, 110 S. Ct. 3157, 111, L. Ed. 2d 666 (1990) (cross-examination "ensur[es] that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings"). Although John Doe could have submitted written questions to the committee chair which the chair could have then put to the accuser, this did not convince the court that Doe's due process rights were not violated. *Id*., at 712. John Doe was found to have demonstrated a strong likelihood of success on the merits of his due process claim and the remaining preliminary injunctive factors were found to have weighed in favor of granting preliminary relief. *Id*

In addition to his procedural due process claims, the Plaintiff has also asserted viable substantive due process claims.   The substantive component of due process bars certain governmental actions regardless of the fairness of the procedures that were sued to implement them.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (discussing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  The bad faith dismissal of a student following adjudication by a biased disciplinary panel or other failure to exercise professional judgment may also be sufficient to state a due process claim.  *See Clemons v. Eastern Kentucky University*, 2006 WL 1464617 (E.D. Ky. 2006) and *Alcorn v. Vaksman*, 877 S.W.2d 390, 91 Ed. Law Rep. 1201 (Tex. App. Houston 1994) (*writ denied* June 29, 1995;  *See e.g. Thomas v. Gee*, 850 F.Supp. 665, 91 Ed. Law Rep. 577 (S.D. Ohio 1994).   Additionally, "[f]ormalistic acceptance or ratification of [a] request or recommendation as to the scope of punishment, without independent [] Board consideration of what, under all the circumstances, the penalty should be, is less than full due process." *See Lee v. Macon Cnty. Bd. of Educ*., 490 F.2d 458, 460 (5th Cir. 1974); *See also e.g. Seal v. Morgan*, 229 F.3d 567, 579 (8th Cir. 2000) (holding that even though a school board afforded the student multiple hearing, the student's substantive due process rights were violated because the board did not complete a full factual investigation)

The academic dismissal of a state university student was found to constitute a potential violation of the student's substantive due process rights where there was evidence that an insufficient investigation was conducted prior to the student's dismissal.  *See Guse v. University of South Dakota*, 2011 WL 1256727 (D.S.D. 2011).  In *Guse*, summary judgment on behalf of the university dean was denied in a case where a first-year student was dismissed, as the student proved that substantial evidence did not support the decision to dismiss her in violation of the Fourteenth Amendment's due process requirements.  *Id.*

**Equal Protection Claims**

In addition to asserting valid due process claims, Andrew Doe has also asserted valid Equal Protection claims within his Complaint.  The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is essentially a requirement that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To establish a violation of the Equal Protection Clause, a plaintiff must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose. *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 272–74, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davi*s, 426 U.S. 229, 239–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). A plaintiff must establish that he was treated differently than a similarly situated individual and that the acts of the government official in question were motivated by improper considerations, such as sex bias or the desire to prevent the exercise of a constitutional right. *See Bryan v. City of Madison,* 213 F.3d 267, 276 (5th Cir. 2000).

In his Complaint, the Plaintiff alleged the Defendants violated his constitutional rights by depriving him of equal protection under the laws.  [Doc. 9, ¶¶ 170 - 180]  Defendants Murry and Ussery acted intentionally, willfully, recklessly and/or with callous and deliberate indifference to the Plaintiff's constitutional rights.  In support of this contention, Plaintiff asserted:

> • The application of University policies and procedures was applied differently to males than to females and male students were not afforded the same protections as female students with respect to Title IX investigations and /or Student Disciplinary proceedings relating to sexual conduct.  [Doc. 9, ¶¶ 100 – 105, 140 – 142]

> • When the University, Defendant Ussery and Defendant Murry were confronted with allegations of sexual misconduct

involving female-male sexual activity, males are presumed guilty and exculpatory evidence is not fully considered.  When both parties are under the influence of alcohol, the male is presumed guilty of sexual misconduct event when the female voluntarily participated or initiated it.  [Doc. 9, ¶ 175].

•      Despite the fact that both the Plaintiff and Bethany Roe voluntarily went out with each other on December 2, 2018; voluntarily drank alcohol together and voluntarily "hooked up" with each other, Roe was assumed to have been assaulted even after she told police that her sexual activity the Plaintiff was mutually consensual.  [Doc. 9, ¶ 176].  Plaintiff, the male, was disciplined for engaging in sexual intercourse with Roe while she was under the influence, but Roe was not disciplined for engaging in sexual intercourse with the Plaintiff. *Id.*

•      Although the Plaintiff, a male, was required to attend the University Judicial Hearing, Bethany Roe, a female, was not required to do so and did not attend.  [Doc. 9, ¶ 177]. University policy provides that the failure to appear can lead to an adverse inference and possible disciplinary action, yet no adverse inference was made with respect to Roe and Roe was not disciplined. *Id.*

•      Tracy Murry and Honey Ussery both knew that Bethany Roe had initially advised medical personnel and law enforcement that the sexual activity between herself and the Plaintiff was mutually consensual, yet they proceeded with disciplinary proceedings against Doe.  [Doc. 9, ¶ 178].

•      Tracy Murry refused to apply the rules of conduct equally to Plaintiff, a male, as to female students.  [Doc. 9, ¶ 179].  Murry allowed a bias member of the judicial panel to preside over the hearings involving the Plaintiff and allowed a panel member to leave before a finding was made.   When inequities and procedural errors were raised, Murry took no action.  *Id.*

All evidence presented to the hearing panel clearly indicated that both the Plaintiff, a male, and his female companion consumed alcohol on the night in question.  The University chose to pursue disciplinary action against the Plaintiff, a male, but not against Bethany Roe, a female, even though both individuals had been drinking alcohol and the Plaintiff told the hearing panel the Complainant (Roe) initiated much of the sexual activity.  In *Doe v. Miami Univ.,* 882 F.2d 579 (6th

27

Cir. 2018), the male Plaintiff raised the issue that Miami University initiated an investigation into his conduct, but not his female counterpart's, as evidence of decision making on the basis of a student's gender.  The Sixth Circuit Court of Appeals found that the plaintiff had sufficiently plead circumstantial evidence of gender discrimination.  *See Doe v. Miami*, 882 F.2d 579 (6th Cir. 2018, citing *Brown Univ.,* 166 F. Supp. at 189, *Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201, 1210 (S.D. Ind. 2016).  The court found that a school acts in a discriminatory manner when it finds that both a male and a female student are intoxicated and engage in sexual activity, yet choses to only discipline one of the students.  *Id.*

Furthermore, as pled by the Plaintiff, on September 22, 2017, the U.S. Department of Education, Office of Civil Rights released a notice addressing the ongoing deprivation of rights for many college students who have been accused of sexual misconduct.  [Doc. 9, ¶ 118]  The Office of Civil Rights advised that certain procedures for resolving sexual misconduct complaints at universities lacked the most basic elements of fairness and due process and are overwhelmingly stacked against the accused.  *Id.*  The Defendants were aware of the Department of Education's pronouncement and concerns about what was characterized as the denial of "the most basic of due process rights", yet consciously and deliberately elected not to modify their unconstitutional policies or practices and/or rectify the erroneous determinations and disproportionate sanctions issued to Andrew Doe and other males.  [Doc. 9, ¶ 119]  Specifically, on October 10, 2017, the University issued a written statement advising it would not be making any changes to policy, procedure or to Title IX cases.  [Doc. 9, ¶120]  The University and Defendants Murry and Ussery purposefully and deliberately chose not to address the unlawful policies and practices of their offices or further consider Doe's pending discipline.  Other male students at the University were subjected to the same deliberate indifference to their due process and equal protections rights and

continuing gender bias.  [Doc. 9, ¶ 87]  Herein, Plaintiff has pled factual allegations which, if proven to be true, would merit success with respect to his Fourteenth Amendment claims.

### D.  **Defendants Murry and Ussery are not entitled to immunity pursuant to the Eleventh Amendment.**

To the extent Defendants Murry and Ussery assert an Eleventh Amendment immunity defense, such defense is wholly without merit.  Eleventh Amendment immunity of any kind does not extend to individual defendants Tracy Murry and Honey Ussery, in their individual capacities. *See Ellis v. Mississippi Department of Health*, No: 4:07-cv-81, 2008 WL 2007153, at *6 (N.D. Miss. May 8, 2008). The claims asserted against Murry and Ussery, individually, do not represent a suit against the governmental entity for which they are associated.  *See Kentucky v. Graham*, 473 U. S. 159, 165 (1985)

### E.  **Tracy Murry and Honey Ussery are not entitled to Qualified Immunity.**

Defendants Murry and Ussery, in their individual capacities, have raised a defense of qualified immunity.  Importantly, a qualified immunity defense does *not* apply to injunctive relief. *See Wood v. Strickland*, 420 U.S. 308, 308, 95 S. Ct. 992, 994, 43 L. Ed. 2d 214 (1975).  Qualified immunity only shields government officials "from liability for *civil damages* insofar as their conduct does not violate clearly established statutory or constitutional rights."  *See Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); See *also Hafer v. Melo*, 502 U. S. 21, 31, 116 L.Ed.2d 301 (1991) (individual employees of the state government may be sued in their individual capacities for damages, declaratory or injunctive relief)  As such, the defense of qualified immunity is presumed to have been raised with respect to the request for civil damages. In this case, however, the Plaintiff has pled sufficient allegations to survive a Rule 12 assertion of qualified immunity with respect to monetary damages as well.

A Rule 12(b)(6) motion for qualified immunity challenges the sufficiency of the Plaintiff's allegations to establish the deprivation of a clearly established constitutional right. *See Franklin v. North Central Narcotics Task Force* (S.D.Miss. December 20, 2016), Slip Copy 2016 WL 7378215 *citing Pardue v. Jackson Co., Miss.,* 2015 WL 1867145 (S.D. Miss. Apr. 23, 2015); *Salcido v. Univ. of S. Miss.*, 2013 WL 2367877, *1 n.1 (S.D. Miss. May 29, 2013). Defendants appear to be asserting their qualified immunity argument pursuant to Rule 12 and given the nature of the parties' arguments and the procedural posture of the case, a Rule 12 analysis is implicated.

"If qualified immunity is raised in a motion to dismiss, 'it is the defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness.' " *Senu-Oke v. Jackson State Univ.*, 283 F. App'x 236, 239 (5th Cir.2008) (*quoting Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)). To determine if an individual is entitled to qualified immunity, a court applies a two-step analysis. A Court must consider, in the light most favorable to the plaintiff, whether the plaintiff has alleged facts that, if proven, would establish that the official violated the plaintiff's constitutional rights. *Id.* at 238 (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Additionally, a Court must consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question. To make this determination, a court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions. *Freeman*, 483 F.3d at 411. As discussed above, the Plaintiff has pled viable due process and equal protection claims. As such, the issue for the Court becomes whether or not the alleged actions of Murry and Ussery, if proven to be true, could be found to have been objectively unreasonable. They certainly were.

Plaintiff has alleged that Murry and/or Ussery failed to conduct a thorough and impartial investigation of the allegations brought against him, failed to conduct and ensure a timely adjudication process and made credibility and evidentiary assessments with respect to the parties and witnesses that were not based upon substantive evidence.  [Doc. 9]  Plaintiff asserted that Murry and Ussery failed to obtain and/or consider relevant exculpatory evidence during the course of the investigation and exhibited a gender bias toward males, failed to provide a rationale for the ultimate decision to discipline Doe and failed to afford Doe the presumption of innocence required as a matter of law and they did not take into consideration the substantial weight of the evidence available when making a determination as against the Plaintiff.  *Id.*

In his Complaint, Plaintiff set forth factual pleadings that would establish a deliberate disregard for his Constitutional rights by both  Ussery and Murry.   Both Murry and Ussery knew of Bethany Roe's admissions to her physician and at least one police officer wherein she repeatedly stated that the sexual activity between herself and the Plaintiff was consensual.  [Doc. 9]  Despite this, Ussery did not address the admission in her report and Murry allowed the proceedings against the Plaintiff to continue.  *Id.*  IAs pled by the Plaintiff, Ussery has excluded exculpatory evidence from reports relating to other males accused of sexual misconduct.  [Doc. 9, ¶ 93], trained panel members to find for complainants (predominately female) when both parties are intoxicated [Doc. 9, ¶ 94], trained panel members to consider complainants as victims, even when they don't believe they are [Doc. 9, ¶ 95], and to ignore lies and inconsistencies by (predominately female) complainants.  [Doc. 9, ¶ 96] Panel members are taught to use the lowest standard of proof possible and the training material prepared and/or used by Ussery and Murry misstates what the standard is.  According to the training material, the preponderance of evidence standard to be used is described as simply finding "some evidence to justify the outcome."   [Doc. 9, ¶ 97]

Within his Complaint, the Plaintiff has asserted that Ussery has made public statements indicating she has never seen a case of "regret sex" or a false accusation of sexual assault in any situation where an actual respondent has been named.  [Doc. 9, ¶ 103] Additionally, during the source of another investigation in 2017, Ussery learned a female student had tried to set up a male student and offered to perform oral sex on him.  [Doc. 9, ¶ 104] The female went to the male student's room and had sex with him.  *Id.*  Throughout the investigation, Ussery referred to the female as the "victim".  *Id.* In this same case, Ussery told a witness she had no obligation to the male student who was under investigation.  *Id.*  The University's Appellate Consideration Board found Ussery had presented the case in a biased manner.  [Doc. 9 ¶ 104]

As detailed above, Tracy Murry is also alleged to have knowingly and deliberately deprived the Plaintiff of his Constitutional rights.  Murry withheld information from the Plaintiff during their initial meeting and allowed the proceedings to continue even when he knew that Bethany Roe had said the sexual activity was consensual.  [Doc. 9, ¶176-178]  Murry presented the case to the panel in a bias format and failed to apply the proper rules to the proceedings.  [Doc. 9, ¶179]   When presented with information regarding the likely denial of due process to the Plaintiff and other males at the University, Murry and Ussery affirmatively elected to ignore the information.  *Id.*  This deliberate disregard is sufficient to overcome a Rule 12 qualified immunity defense.

III.   **THE PLAINTIFF HAS STATED A VALID BREACH OF CONTRACT CLAIM AND THE CLAIM IS PROPERLY BEFORE THIS COURT**

Within the Complaint, Plaintiff specifically alleged that he contracted with the State of Mississippi and the University of Mississippi for enrollment at the University of Mississippi and valid consideration was given for the enrollment agreement.  [Doc. 9, ¶ 182].  As part of this agreement, the University, IHL (through its Board of Trustees and/or the Commissioner of Higher

32

Education) and the State, contracted to provide the Plaintiff with access to the University's undergraduate programs, continued education and a degree and diploma.  *Id.*  Plaintiff further alleged that these Defendants breached contractual obligations to him by failing to abide by the terms of the contract and the provisions of Title IX, by subjecting him to gender bias, and by the adoption and implementation of unconstitutional customs, policies and practices in the implementation of Title IX at the University.  [Doc. 9, ¶ 183] Plaintiff's contract with the State of Mississippi and the University is not in his possession, but should be available through discovery.

In *Cig Contractors v. Mississippi State Building Commission*, 399 So.2d 1352 (Miss. 1981), the Mississippi Supreme Court recognized that the state waives its immunity from suit for a breach of contract when it enters into a contract.  In holding that the defense of sovereign immunity was not available to the State when sued by for breach of a contract, the Court stated:

> The general rule is that when the legislature authorizes the state's entry into a contract, the state necessarily waives its immunity from suit for a breach of such contract. 81A C.J.S. States § 172 (1977). Where the state has lawfully entered into a business contract with an individual, the obligations and duties of the contract should be mutually binding and reciprocal. There is no mutually or fairness where a state or county can enter into an advantageous contract and accept its benefits but refuse to perform its obligations.

*Id.* at 1355. Herein, the Plaintiff herein has not asserted a breach of implied contract, and specifically indicated such in his Complaint. [Doc. 9, ¶ 185].  Accepting the allegations of the Complaint as true, the Plaintiff has a legitimate claim of entitlement to continuing education and ultimately a degree, but for the Defendants' breach of contract.

## IV.   THE PLAINTIFF'S CLAIMS ARE NOT PRECLUDED BY HIS DECISION TO LITIGATE IN FEDERAL COURT

The last argument the Defendants raise in support of their Motion to Dismiss, is that the Plaintiff should be precluded from asserting his claims in federal court because the ruling of the

hearing panel should have been appealed to state circuit court pursuant to Mississippi Code 11-51-95.  This argument is flawed in that it does not differentiate between an administrative proceeding relating to an employment decision such as was discussed in the *Smith v. University of Mississippi* decision cited by the Defendants and the type of student disciplinary proceeding the Plaintiff was subjected to.

Miss. Code Ann. § 11-51-95 provides, "Like proceedings as provided in Section 11-51-93 may be had to review the judgments of all tribunals inferior to the circuit court, whether an appeal be provided by law from the judgment sought to be reviewed or not. However, petitions for a writ of certiorari to the circuit court for review of a decision of a municipal civil service commission created under Section 21-31-1 *et seq.* or Section 21-31-51 *et seq.* shall be filed within thirty (30) days after the entry of the judgment or order of the commission.' *See* Laws 1984, Ch. 521, § 5, eff. July 1, 1984. Miss. Code Ann. § 11-51-93 provides that:

> All cases decided by a justice of the peace, whether exercising general or special jurisdiction, may, within six months thereafter, on good cause shown by petition, supported by affidavit, be removed to the circuit court of the county, by writ of certiorari, which shall operate as a supersedeas, the party, in all cases, giving bond, with security, to be approved by the judge or clerk of the circuit court, as in cases of appeal from justices of the peace; and in any cause so removed by certiorari, the court shall be confined to the examination of questions of law arising or appearing on the face of the record and proceedings. In case of an affirmance of the judgment of the justice, the same judgment shall be given as on appeals. In case of a reversal, the circuit court shall enter up such judgment as the justice ought to have entered, if the same be apparent, or may then try the cause anew on its merits, and may in proper cases enter judgment on the certiorari or appeal bond, and shall, when justice requires it, award restitution. The clerk of the circuit court, on the issuance of a certiorari, shall issue a summons for the party to be affected thereby; and, in case of nonresidents, he may make publication for them as in other cases.

Miss. Code Ann. § 11-51-93, MS ST § 11-51-93.     In order for Miss. Code 11-51-95 to be applicable to the Plaintiff, the Court would necessarily have to conclude that the student disciplinary panel constituted "a state agency acting in a judicial capacity" that provided Plaintiff. "an adequate opportunity to litigate".  Not only does this argument run afoul of the Supremacy Clause, but it is directly in conflict with the other legal positions espoused by the Defendants. Within their Motion to Dismiss, the Defendants have attempted to justify the denial of due process by arguing that "Judicial Council proceedings are not court proceedings". [Doc. 34, pg. 16].  They have asserted that the Plaintiff was not entitled to the same due process protections as a litigant in court, that determinations in a student disciplinary hearing can be made based on hearsay evidence, and the disciplinary proceedings "do not require formal rules of evidence or… the procedural protections of a trial." [Doc. 34, pgs. 16-17].  Furthermore, the Defendants argue they do not have to use a burden of proof that is commensurate with a court of law. *Id.* The disciplinary proceedings were not conducted by agency administrators or administrative judges, but by a student led panel, and cannot be equated to an administrative proceeding such as a hearing before the State Personnel Board of Review.  Furthermore, the Defendants' argument does not recognize that Plaintiff Doe is not trying to *appeal* the disciplinary decision issued against him. Rather, he is suing for a denial of his Constitutional rights and a violation of Title IX.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff respectfully requests this Court DENY the Defendants' Motion to Dismiss Second Amended Complaint in its entirety.

RESPECTFULLY SUBMITTED, this, the 28th day of June, 2018.

Respectfully submitted,

**ANDREW DOE**

By: */s/  Michelle T. High*
     Michelle T. High

35

J. Lawson Hester (MSB # 2394)
lhester@pbhfirm.com
Michelle T. High (MSB #100663)
mhigh@pbhfirm.com
Pettis, Barfield & Hester, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi 39211
P.O. Box 16089
Jackson, Mississippi 39236-6089
Telephone: 601-987-5300
Facsimile: 601-987-5353

## CERTIFICATE OF SERVICE

I, Michelle T. High hereby certify that I have this day filed the foregoing document electronically with the U.S. District Court, Southern District of Mississippi Clerk of Court's PACER/ECF system which gives electronic notice to the following:

> J. Cal Mayo, Jr.
> cmayo@mayomallette.com
> Paul B. Watkins, Jr.
> pwatkins@mayomallette.com
> J. Andrew Mauldin
> dmauldin@mayomallette.com
> Mayo Mallette PLLC
> P.O. Box 1456
> Oxford, Mississippi 38655
> **COUNSEL FOR DEFENDANTS**

SO CERTIFIED, this the 28th day of June, 2018.

> */s/ Michelle T. High*
> Michelle T. High