**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**ANDREW DOE**                                               **PLAINTIFF**

**V.**                                    **CIVIL ACTION NO: 3:18cv138 DPJ -FKB**

**STATE OF MISSISSIPPI, ET. AL.**                    **DEFENDANTS**

<u>**MEMORANDUM OF AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ALL LIABILITY ISSUES AND ALL CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

Plaintiff Andrew Doe submits this Memorandum of Authorities in Support of his Motion for Partial Summary Judgment on the issue of Defendants' liability, pursuant to Fed. R. Civ. P. 56, and for declaratory and injunctive relief pursuant to Fed. R. Civ. P. 57 and 65.  Specifically, Doe seeks a determination of liability, declaratory and injunctive relief against the Defendants for gender-based discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq*., and for violations of the due process and equal protection clauses of the Fourteenth Amendment to the U.S. Constitution brought pursuant to 42 U.S.C. § 1983.  Doe reserves for jury or subsequent judicial determination the issues of damages, monetary relief and attorney's fees to remedy emotional, mental, and economic harms he has suffered.[1]

I. Statement of Material Facts

Andrew Doe began attending the University of Mississippi in August 2016. *See* Exh. 5 [2]

---

[1] This memorandum and the motion which it supports address those points of law and claims which this Court allowed to proceed in its Order on Defendants' Motion to Dismiss, which was granted in part and overruled in part. See Exhibit "3"

[2] All Exhibits ("Exh.") refer to exhibits filed with Plaintiff's Motion for Partial Summary Judgment. Exhibits containing a hyphenation (e.g., Exh.12-3) refer to cumulative deposition exhibits submitted as part of composite Exhibit 12 on ECF.

In November 2016, Bethany Roe invited him to attend her sorority formal with her. *Id.* Several weeks later, Doe invited Roe to his fraternity's Christmas party. *Id.* Roe immediately accepted. When Roe was told details of the party, including the fact that alcohol would be provided to each couple, she responded, "oh damn that sounds fun!" *Id.* On the evening of the party, Doe and Roe went to a pre-party function together, then took a cab from the pre-party to Doe's fraternity house. *Id.* While at the fraternity party, the two drank champagne, socialized and "made out" (i.e., kissed heavily). *Id.*

While doing so, Roe put her hands into Doe's pants and informed him, for the first time, that her friends were on the way to pick her up, so they needed to "make it quick". *Id.; Exh,12-3.* Roe initiated the removal of Doe's clothing by unbuckling his belt and untucking his shirt. *Id.* Doe then unbuttoned his own shirt, took his pants off, and climbed into bed with his underwear on. *Id.; Exh. 12-3.* Once Doe was in bed, Roe climbed on top of him and began kissing him again. *Id.; Exh. 12-3.* Roe assisted Doe in the removal of his underwear. *See* Exh. 5; 12-3. Roe got off of Doe to remove her own underwear, then climbed back on top of him. *Id.* When Doe unsuccessfully attempted to guide his semi-erect penis into Roe, she grabbed his

penis and guided it into herself.  *Id.* ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

As the couple was having consensual sex, Roe's friends arrived at the apartment complex. *See* Exh. 5, 12-3.  When the couple realized this, Doe got up and went to the bathroom to wash his hands, while Roe started to dress. *Id.*  As Doe washed his hands, Roe walked up behind him and jokingly grabbed his naked buttocks. *Id.*  Doe then put on shorts and escorted Roe downstairs. *Id.* The two kissed goodnight and Doe asked Roe if he could call her again.  She said, "yes". *Id.*  Once Roe left, Doe went to sleep on his couch. *Id.;* Exh. 13, pp. 157-58.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████  ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████▌

---

[3] The identity of this physician was not made known to Doe during the Title IX process, and was only subsequently identified as Preston Carr Gallaher, M.D.

A representative of the University's Title IX Office was at the hospital while Roe was there, and the University opened a Title IX investigation.  Honey Ussery, the University's Title IX Coordinator, first emailed Doe to advise that he had been named in a Title IX investigation approximately two months after the night in issue.  *See* Exh. 12-1.  Ussery and Doe never met in person, nor did Ussery provide Doe with any specifics regarding the allegations against him. Furthermore, Ussery did not ask Doe or his attorney about potential witnesses or evidence. *See* Exh. 4, pp. 110-114; Exh. 5. When Doe was asked to attend an "intake meeting", it was with Tracy Murry, Director of Student Affairs and Conflict Resolution for the University. *Id.*  ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████  Murry notified Doe of the charges and scheduled a disciplinary hearing before a three-member panel of the University Judicial Council. The panel, comprised of E. J. Presley,

4

█████████, and E.J. Edney, held a hearing on ██████████, at which Murry served as the Hearing Officer. *See* Exh 12-3; Exh. 5. When Doe arrived for the hearing, the University did not yet have a full panel selected. *Id.* The hearing was delayed so that a third panel member, E.J. Presley, could be found. Presley was sent the case file materials *one minute* before the hearing was scheduled to begin (i.e, 2:59 pm on ██████████). *See* Exh. 12-3, Exh. 5, Exh. Exh.7, pp. 73-76; Exh. 12-10; Exh. 12-12, Exh. 12-13. Immediately before the hearing, Murry first informed Doe that Roe would not be attending as she wanted nothing to do with the hearing. *See* Exh. 5

The disciplinary hearing went forward despite the fact Bethany Roe did not attend. *See* Exh. 5; 12-3; 7, p. 71. Honey Ussery left, so she could not be cross-examined; thus, Doe was the only witness in attendance at the hearing. *Id.* A summary of what individual witnesses allegedly told Ussery was provided to the panel in her Title IX report. *See* Exh, 12-3  At the start of the hearing, Murry told the panel ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

Doe appeared, testified, and denied responsibility, admitting that he and Roe had both consumed alcohol, were intoxicated, and that he and Roe had mutually consensual sexual intercourse on ███████████. Doe was found by the panel to have been a credible witness. *See* Exh. 5; 12-3.  During the hearing, Doe attempted to provide the panel with a polygraph report and an investigative summary of statement given by the cab driver who took Doe and Roe to Doe's apartment.  *See* Exh. 5; 12-3; 8, p. 50; 7, p. 58; 9, p. 59-60; 12-15; 13, p. 110; 10, pp. 220-25. ██

████████████████████████████████████████████████████

██████████████████████████████████████ ██

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████ However, the female panel member, ██

██, scowled at Doe throughout the hearing.  *See* Exh. 5. The only documentary evidence received by the panel was the Title IX report prepared by Honey Ussery.  *See* Exh. 5, 12-3; 10, p. 147; 12-14.

After the short hearing (the entire transcript of which consists of only ten (10) pages of evidentiary substance) -- and after an even more truncated period of deliberation, the panel found Doe responsible and expelled him from the University. *See* Exh. 5, 12-3; 12-29.  No rationale for this decision or for the severity of the sanction was provided.  *Id.*   Doe appealed the board's decision, and on ███████████, the Appellate Consideration Board upheld the finding that Doe

was responsible but changed the sanction levied from expulsion to suspension until ████.[4] *See* Exh. 5, 12-30; 13, p. 116 with Depo. Exh 15; 12-16, 12-17.

## II. <u>Argument and Applicable Law</u>

### A.  <u>The Procedural Standards</u>

Fed. R. Civ. P. 56 mandates the granting of summary judgment in favor of the moving party when he demonstrates that there is no genuine issue of material fact precluding the granting of judgment in his favor. FED. R. CIV. P. 56. When presented with a summary judgment motion, the court is to "examine each issue in the light most favorable to the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). The moving party must demonstrate that summary judgment is justified; the non-moving party must then show that a genuine issue of material fact exists as to that issue. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Once the moving party makes a prima facie showing as to the absence of a genuine issue of a material fact, the opposing party cannot rest on the allegations of the pleadings, but must instead set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 274-75 (5th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249)

### B.  <u>The Regulatory Framework</u>

The background of this controversy is the promulgation by the United States Department of Education, Office of Civil Rights ("OCR"), of a circular that offered "guidance" on how universities must respond to complaints of sexual misconduct on campus. See United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter, (2011) *See* Exh. 12-31. The circular was not adopted according to notice-and-comment

---

[4] Supplemental and additional material facts having specific relevance to the Title IX claims, due process claims, equal protection claims, and prayers for declaratory and injunctive relief are included herein below in the respective sections which follow.

rulemaking procedures;1 its extremely broad definition of "sexual harassment" has no counterpart in federal civil rights case law; and the procedures prescribed for adjudication of sexual misconduct are heavily weighted in favor of finding guilt. Institutions of higher learning, like the University of Mississippi, flocked to embrace the "guidance," and the University purports to have applied the Dear Colleague guidance in the context of the Andrew Doe Title IX proceedings. *See* Exh. 4, p. 125 [5] As noted in the *Plummer v. University of Houston,* 860 F.3d 767, 344 Ed. Law Rep. 710 (5th Cir. 2017)(E. Jones, dissenting) decision by the Fifth Circuit Court of Appeals, "…[t]hese policies were developed by bureaucrats in the U.S. Department of Education and thrust upon educators with a transparent threat of withholding federal funding. Viewed as a whole, the procedures raise serious questions about the sufficiency of … University … procedures to adjudicate fully and fairly charges of sexual misconduct that will affect the students' future lives as surely as criminal convictions." *Id.*, *Plummer*, (E. Jones Dissenting) ("For this reason, it is a hollow claim that the procedures are owed particular deference as products of "institutions of higher learning.")

In the 2011 Dear Colleague Letter, universities were advised to use the lower, preponderance of the evidence standard in adjudicating accusations of sexual misconduct on campus. *See* Exhibit 12-31. The 2011 Dear Colleague Letter and associated 2014 guidance not only required schools to adopt a minimum standard of proof when administering student discipline, but also discouraged cross examination. *Id.* In response to real or perceived pressures from outside sources, the University implemented policies, practices and customs that were designed to support female complainants and curtail the rights of the accused, who were predominantly male. *Id., See also* Exh. 4, 12-2; 12-4, 12-5, 12-7; 12-22; 12-23; 12-24; 12-25; 12-27; 12-28; 12-33.

---

[5] From a federal government database, it is estimated that between 20,000 and 25,000 complaints of sexual misconduct have been filed based on the "guidance" and thousands of students' discipline cases adjudicated using procedural standards far less demanding than those accorded most defendants. See K.C. Johnson & Stuart Taylor, Jr., *The Campus Rape Frenzy* 9-10 (Encounter Books 2017).

The 2011 Dear Colleague Letter did not afford fundamental constitutional rights to individuals, and in 2017, the OCR recognized concerns with the Letter. On September 7, 2017, Betsy DeVos, the U.S. Secretary of Education, announced that "rule by letter is over." *See* ECF Doc. 42-10; Exh. 12-11. In a public address, DeVos addressed concerns raised by members of academia that the approach pushed by OCR for the previous several years exerted improper pressure on universities to adopt Title IX procedures that do not afford fundamental fairness to all students. *Id.* Secretary DeVos advised that she thought the professors who raised these concerns were right. She described the Title IX investigatory system as failed and responsible for the implementation of policy without even the most basic safeguards. *Id.* On September 22, 2017, OCR released a letter stating that the 2011 and 2014 guidance documents had led to the deprivation of rights for many students and had denied fair process to accused students. *See* ECF Doc. 42-11. The Department expressly stated that it will not rely on the withdrawn documents any further. *Id.*

The Defendants were presented with the U.S. Department of Education's concerns about due process violations in University investigations such as the ones conducted at the University of Mississippi. In addition, concerns regarding both gender bias and a lack of due process being afforded to male respondents by the Title IX office were raised by other men.[6] While the University's written policy indicates the Title IX office will evaluate each case to determine if the overall response of the University satisfies the requirements of Title IX, this was not done. *See* Exh. 12-5; 12-4; 12-24. On October 10, 2017, the University officially announced it was not changing its policies. *See* ECF Doc 42-13. On May 19, 2020, new regulations relating to Title IX were published in the Federal Register. *See* Nondiscrimination on the Basis of Sex in Education

---

[6] See *John Doe v. University of Mississippi*, In the United States District Court for the Southern District of Mississippi; Civil Action No. 3:18 cv 63-DPJ-FKB and *Richard Kenneth Thomas v. University of Mississippi*, In the United States District Court for the Northern District of Mississippi; Civil Action No. 3:18 cv 62 GHD- RP.

Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026-01, 2020 WL 2525707 (May 19, 2020) (to be codified at 34 C.F.R. § 106, effective Aug. 14, 2020).   The regulations are intended to set forth clear legal obligations and procedural due process protections that must be incorporated into federal funding recipient's grievance processes to ensure fair and reliable factual determinations when a recipient investigates and adjudicates a formal complaint of sexual harassment. *Id.*, at 30030.

The regulations require, in part, that recipients adopt a grievance process that: treats complainants and respondents equitably by recognizing the need for complainants to receive remedies where a respondent is determined responsible and for respondents to face disciplinary sanctions only after a fair process determines responsibility; objectively evaluates all relevant evidence both inculpatory and exculpatory, and ensures that rules voluntarily adopted by a recipient treat the parties equally; requires Title IX Coordinators, investigators, decision-makers, and persons who facilitate informal resolutions to be free from conflicts of interest and bias and trained to serve impartially without prejudging the facts at issue; and presumes the non-responsibility of respondents until conclusion of the grievance process. *Id.*, at 30053.   Written notice of the allegations must be provided to both parties. *Id.*; *See* 34 C.F.R. §106.45(b)(2) Additionally, when conducting investigations of formal complaints, the investigations must be done in a manner that keeps the burden of proof and burden of gathering evidence on the recipient while protecting every party's right to consent to the use of the party's own medical, psychological, and similar treatment records;  provides the parties equal opportunity to present witnesses and other inculpatory and exculpatory evidence;  does not restrict the parties from discussing the allegations or gathering evidence;  gives the parties equal opportunity to select an advisor of the party's choice;  requires written notice when a party's participation is invited or expected for an

interview, meeting, or hearing;  provides both parties equal opportunity to review and respond to the evidence gathered during the investigation; and sends both parties the recipient's investigative report summarizing the relevant evidence, prior to reaching a determination regarding responsibility.  *See* 34 C.F.R. §106.45 (b)(5)(i)-(vii)    Live hearings with cross-examination conducted by the parties' advisors is required at postsecondary institutions. In addition, a decision-maker who is not the same person as the Title IX Coordinator or the investigator is required to reach a determination regarding responsibility by applying the standard of evidence the recipient has designated in the recipient's grievance process for use in all formal complaints of sexual harassment.    Written determinations explaining the reasons for the outcome must be simultaneously sent to the parties. *See* 34 C.F.R. §106.45 (b)(6)

One of the issues considered by the Department of Education was that, "…in the absence of regulations explaining what fair, equitable procedures compliant with constitutional due process consist of, [federal funding] recipients have … at times employ[ed] procedures incompatible with constitutionally guaranteed due process and principles of fundamental fairness, and lacking impartiality and reliability."  *See* 85 Fed. Reg. 30026-01, 30048, 2020 WL 2525707 (May 19, 2020) (to be codified at 34 C.F.R. § 106, effective Aug. 14, 2020). "The § 106.45 grievance process prescribed in the final regulations is consistent with constitutional due process guarantees and conceptions of fundamental fairness." *Id*. While not effective until August 2020, the Department of Education's regulations set forth a framework from which the Court can rely in assessing whether or not the Defendants violated the rights of Andrew Doe.

C. Defendants' violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et. seq*.

Title IX of the Education Amendments of 1972, provides, in relevant part:

> No person in the United States shall on the basis of sex, be
> excluded from participating in, be denied the benefits of, or
> be subjected to discrimination under any education program
> or activity receiving federal financial assistance.

Title IX of the Education Amendments of 1972, codified at 20 U.S.C. §1681, *et seq.*  Title IX applies to all public and private educational programs and institutions and to all aspects of education programs or activities operated by recipients of federal financial assistance. Herein, the State of Mississippi, IHL and the University of Mississippi are recipients and/or subrecipients of federal funds for the purpose of Title IX. *See* ECF Doc. 42-21; Exh. 11, pp. 33-36; Exh. 22, pp. P-134-35.  Under Mississippi law, the University of Mississippi is an arm of the State of Mississippi. *See Miss. Code Ann.* § 37–115–1 *et seq.* (1972); *Jagnandan v. Mississippi State University*, 373 So.2d 252 (Miss. 1979), *Coleman v. Whipple,* 191 Miss. 287, 2 So.2d 566 (1941). The IHL Board of Trustees was constitutionally created by the enactment of Article 8 § 213- A of the Mississippi Constitution and reviews and approves Title IX policies for use at the University of Mississippi. *See* Exh 12-34; 11, pp. 142-46.

According to IHL financial statements, significant federal funds were received by the State of Mississippi and IHL from the federal government as grants and/or passed through the IHL in 2017. *See* ECF Doc. 42-21; Exh. 11, pp. 33-36; Exh. 22, pp. P-134-35. These monies include financial aid from the U.S. Department of Education and the U.S. Department of Health and Human Services, in an amount of $705,376,473.000, as well as millions in research and development related awards. *Id.*  As a condition of receipt of such federal funds, these Defendants and the Board of Trustees of IHL, the Chancellor and the Commissioner of Higher Education are imbued with the responsibility to insure the policies, procedures, programs and activities at the University of Mississippi are administered in a lawful and non-discriminatory manner. *See* ECF Doc. 42-21; Exh. 11, pp. 33-36, 142-46; Exh. 22, pp. P-134-35; Exh 12-34.

Multiple methods for proving a violation of Title IX have been recognized by the Courts. Title IX claims arising from disciplinary hearings can be analyzed under the "Erroneous Outcome Standard", "Selective Enforcement Standard", and "Deliberate Indifference Standard." *See Doe v. University of the South*, 687 F.Supp.2d 744, 756 (E.D.Tenn. 2009) *citing Mallory,* 76 Fed.Appx. 634, 181 Ed. Law Rep. 428 (2003). An erroneous outcome exists when an innocent person was wrongfully found to have committed an offense because of his or her gender. *Id.* Herein, Doe demonstrates under all three forms of analysis that he was erroneously found responsible for sexual misconduct and that his gender played a role in this finding. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2nd Cir. 1994). Additionally, Doe provides the Court with "…particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding…. Such allegations include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf v. Vassar College*, 35 F.3d 709, 714-15 (2d Cir. 1994). The gender bias element of Doe's erroneous outcome claim is further established through circumstantial evidence, such as dissimilar treatment of male and female respondents or a pattern in which men who are accused of sexual assault are "invariably found guilty." *See also Univ. of Cincinnati*, 2015 WL 728309, at *14.

Utilizing the selective enforcement theory, Doe can also show he was singled out for punishment because of his sex. (i.e., that regardless of his culpability, the severity of the penalty and/or the university's decision to initiate proceedings was affected by the charged student's gender) *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994). Furthermore, as a recipient of federal funding, the University can be held liable for intentional discrimination on the basis of sex or for its deliberate indifference to discrimination against or harassment of a student on the basis

13

of sex. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).  A showing of deliberate indifference, "requires the plaintiff (here, Doe) to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *See Gebser v. Lagovista Independent School District*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1988). Under the deliberate indifference standard, a plaintiff must demonstrate that the educational institutions challenged misconduct was motivated by sex-based discrimination.  Deliberate indifference has been recognized in the context of official refusal to conduct a thorough investigation in *Columbia Univ.*, 831 F.3d at 49–50, 52–53, 56–57. Deliberate indifference to constitutional rights is a very high standard of misconduct, *See Sanches v. Carrollton-Farmers Branch Ind. Sch. Dist.,* 647 F.3d 156, 169–70 (5th Cir. 2011), yet Doe easily meets this burden.  Allegations of a causal connection in university disciplinary cases can be the kind that are found in Title VII cases and may include such things as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision making that also tend to show the influence of gender." *Id.* In addition, "statements reflecting bias by members of the tribunal, may suffice both to cast out on the accuracy of the disciplinary adjudication and to relate the error to gender bias." *Id.*

1.  <u>Systemic Gender Discrimination and the University's Patterns of Decision-Making</u>

The University Judicial Council and previous proceedings evince gender bias against Andrew Doe as part of a pattern of decision-making whereby the disciplinary procedures governing sexual assault with penetration claims are discriminatorily applied so as to almost invariably result in a finding of responsibility on the part of the respondent male students. See Exh. 12-26,12-27, 12-28; 12-29; Exh. 11, pp. 48-86.  Furthermore, when heterosexual couples engage in sexual activity while [both are] under the influence of alcohol at the University of Mississippi,

males will be found [r]esponsible for sexual misconduct and females will be considered "victims". *Id.*; *See also* Exh. 12-2; *See* Exh. 12-7; 4, pp. 305-306.  At the time of Andrew Doe's hearing, the University required heightened discipline of either suspension or expulsion in cases where a student was found responsible for engaging in sexual assault with penetration.  *See* Exh. 11, p. 29, lines 7-17; Exh. 11, p. 30, lines 3-13.  While the University made a distinction between sexual assault cases involving penetration and other Title IX cases, and required any student found responsible for sexual assault with penetration to be expelled or suspended, the University did not differentiate between the standard of care it applied in those cases. *Id.,* p. 31, lines 7 - 19.

As evidence of the effect of the policies and procedures employed by the Defendants which establish dissimilar treatment of male and female respondents or a pattern in which men who are accused of sexual assault are almost invariably found guilty or responsible when accused of sexual misconduct/sexual assault with penetration, the following statistics are shocking. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████     ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  The University clearly recognized and supported vastly different levels of discipline between cases involving touching of the genitalia versus cases with even the slightest insertion, whether that insertion be by finger, penis or another object. *Id*., page 103. This

policy and practice effectively differentiated between the sanctions imposed for manual stimulation of a penis versus manual stimulation of a vagina.  *Id.*, Exh. 11, p. 107, lines 8-21.[7]

Significantly, the University acknowledged that while it could have modified its policies so as to allow for lesser sanctions when findings of  sexual assault with penetration sanctions are made, and still be acting within parameters of existing guidelines, it continues to distinguish sexual assault cases that include allegations of penetration from all others, without affording heightened due process protections. *See* Exh. 11, p. 115, line 14-116, line 3; Exh. 4, pp. 125-29.

2.      The Disciplinary Tribunal and Flawed Disciplinary Process

Doe's disciplinary hearing was replete with actions depriving Doe of fundamental due process.  ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

██████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ ██████████████████████████. *See* Exh. 12-14; 12-8; Exh. 4, pp. 219, line 6 - 223, line 1;  Exh. 5; Exh. 6. These were conscious, deliberate actions on the part of Ussery, which limited the hearing panel's access to material and exculpatory information.  Ussery also did not obtain information from ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

██████████████ ████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

        Discovery and the evidentiary record before this Court establish that the hearing itself was

truly a farce of a proceeding and afforded Doe no meaningful due process.   The panel members

who had been trained by Ussery, had inadequate training and understanding to reach anything

other than an erroneous result.[9] ███████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

     ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

_____

█ ███████████████████████████████████████████████████

████████████████████████████████████



███████████████████████████████████████████████

███████████████████████████████   ██████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

     In terms of denial of due process for Doe, panel member ████████████ presents equal if not greater concerns. The presence of an allegedly biased panel member raises a due-process problem. "[A] biased decisionmaker [is] constitutionally unacceptable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  Unknown to Doe, who had no knowledge of his right to challenge a panel member, much less any opportunity to determine the propriety of any panel member or whether pre-existing bias existed (*See* Exh. 5), ████████████████████████████████

████████████████████████   See Exh. 8, pp. 72-77) ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



In sum, the three-member hearing panel, whether by virtue of inadequate or biased training, or a misunderstanding of the material facts and applicable guidance, reached an erroneous result in finding Doe responsible and in imposing discipline.  In so doing, the panel has been revealed to have utilized gender bias and inconsistent and inequitable standards in determining responsibility for male and female complainants and respondents.

 a. The Conflicted University Title IX Coordinator, Gender-Biased Inadequate Training, and Gender-Biased Investigation

 1. The Title IX Coordinator's Conflicts of Interest

In addition to her roles developing policy and training for the University, Ussery was permitted by the Defendants to assume many inherently conflicting roles, such as those condemned in *Plummer*.   Even the Dear Colleague Letter admonishes universities that "[t]he Title IX coordinator should not have other job responsibilities that may create a conflict of interest. *See* Exh. 12-31, at 7.  Ussery was allowed to unilaterally conduct the investigation into the allegations against Doe; determine the identity and credibility of the witnesses she interviewed; provide the University Judicial Council hearing panel with only her summarized portions of the interviews she

conducted, inclusive of her advocative summary of the victim-complainant's contentions (Doe was not permitted to be present during the interviews, nor could he ask questions about the alleged statements.); and unilaterally determine the relevancy and content of the inculpatory or exculpatory information to be provided in her report to the University Judicial Council hearing panel. *See* Exh. 4, pp. 50, 133, 137-139, 163-165, 173-175, 188-189; Exh. 8, pp. 44, 63.  Pursuant to the delegation of authority by the State, Ussery wrote the University policies and implemented training programs that deny male student due process and which are biased in favor of female complainant; Ussery developed the content of and personally provided the Title IX training, inclusive of training on the hearing procedures, evidentiary issues, burden of proof, and available forms of discipline, to all persons who were to serve on serve University Judicial Council hearing panels, inclusive of Doe's panel. *See* Exh. 4, p. 35, 69-70.    Ussery unilaterally determined whether or not a Title IX complainant's charge of sexual misconduct should be referred to the Office of Student Conduct for a disciplinary hearing – which in a case such as Doe's, almost invariably results in a finding of responsibility; and further, Ussery served as a witness (either in person or through her report) at disciplinary hearings in front of the very persons she had trained to decide these matters.  *See* Exh. 4, pp. 50-51, 85-86, 137-138; Exh. 8, pp. 16-19, 39, 63.   To the extent Ussery's multiple roles substantially lessened the hearing panels' factfinding and adjudicatory autonomy, the integrity of the process was compromised. *See*, e.g. *Brandeis Univ.*, 177 F.Supp. 3d at 606.

    2.   <u>Gender-Biased and Inadequate Training</u>

The Title IX training that was provided by the University and Ussery was inequitable and further exacerbated the denial of due process against Doe. Training given to the University Judicial Council (from whose ranks the three-member hearing panel that decided Doe's case were drawn) and Appellate Consideration Board members provides that just because an individual does not

protest or resist sexual activity their silence and lack of resistance does not constitute consent. *See* Exh. 12-2.

The Title IX training affording to prospective hearing members and provided by Honey Ussery, promotes both gender bias against a male respondent and materially contributes to a fundamental denial of due process to an accused male in the context of a sexual misconduct/sexual assault with penetration case.  Starting with the premises admitted and agreed to by Honey Ussery and Defendants that 92 percent (%) of sexual assault allegations are true. *See* Exh. 12-7; 4, p. 306, and that the female student is most likely to be the "victim" and at the "highest risk" for a penetrative sexual assault, *See* Exh. 4, p. 305, the Title IX training slides follow suit.  The training itself, is embodied in a PowerPoint slide presentation prepared, through Defendants' delegated authority, by Honey Ussery.[10]   The training materials, to the detriment of male respondents such as Doe, favor the female complainant over the male respondent in material ways.  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████  Her training materials further emphasize the gender disparity and its effect upon due process afforded to Doe and other males.  In a non-exhaustive summary, the training materials (a) complainants are referred to as "survivors"; (b) these case are identified as "different" inasmuch as there is a desire to protect student when they are most often subject to these "crimes" and are at the highest risk and there is limited access to the justice system for these "crimes"; (c) the training indicates that the Title IX report will be thorough and complete, when in reality it does not include all exculpatory evidence for Doe as the accused male respondent; (d) in Doe's case, the only party

---

[10] It bears note that Ussery is a former criminal prosecutor who handled prosecution of crimes against women. *See* Exhibit "4", p. 170.

making inconsistent statements was Roe, and the training indicates that such inconsistencies should not equate to being untruthful; and (e) the training inappropriately refers to complainants as "victims," thereby implying the veracity of the allegations, while referring to respondents in the context of potentially not fitting a rapist stereotype. The training also inappropriately advises that in the case of a penetrative sexual assault only, either suspension or expulsion is to be imposed if there is a finding of responsibility; lesser sanctions are not an option. Finally, the training emphasizes that the hearing panel members should use their Title I report, thereby underscoring the prejudice to Doe and other males if the report does not contain all exculpatory evidence. The anti-male respondent gender bias implicit in these training materials could not be more self-evident. Contrary to the standard espoused in the University of Mississippi' "Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning." *Doe v. Brandeis*, 177 F.Supp.3d 561 (D.Mass. March 2016).

In 2017, the University of Pennsylvania had training materials similar to those used by the University of Mississippi, which instructed that "the fact that a complainant recounts a sexual assault somewhat differently from one retelling to the next may reflect memory processes rather than inattentiveness or deceit." See *Doe v. The Trustees of the University of Pennsylvania*, U.S.D.C. for the E.D. of Penn., Case No.: 2:16-cv-05088-JP, [Doc. No. 59] (Sept. 13, 2017). When a male student who had been disciplined for sexual misconduct raised concerns regarding the University's training materials and sought injunctive relief from the District Court, the court found that the training was "so biased that it may violate Title IX by discriminating against males." *Id.* That same type of gender bias permeates the University of Mississippi's training materials and Title IX program.

### 3.      The Gender-Biased Investigation

The Defendants did not weigh the evidence in Andrew Doe's favor and excluded exculpatory evidence from their consideration.  Furthermore, the sanction that was issued against Doe was arbitrarily imposed without any explanation or rationale by the University. In sexual misconduct cases at the University, male students, inclusive of Doe, are discriminated against solely on the basis of their sex.  Male students are implicitly guilty and female complainants are assumed to be victims.  The Defendants had knowledge that the policies of the University were in violation of Title IX, biased against male students accused of sexual assault and void of due process protections, yet deliberately failed to remedy the situation.

Although Ussery admitted that Doe's case was about alcohol intoxication and the capacity or incapacity of Roe to consent to sexual intercourse and while Ussery clearly knew of the exculpatory statements and admissions by Roe to the hospital physician and three law enforcement officers, she did not so much as attempt to interview *any* of these four persons to substantiate and develop exculpatory evidence. ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████Given such unbridled discretion to discriminate against

male respondents such that exculpatory evidence was/is not fully developed and presented for consideration, it is not surprising that men such as Doe are almost invariably found responsible in cases of sexual assault with penetration at the University. *See* Exh. 26, 27, 28

Furthermore, it is significant that the University of Mississippi does not hold female students such as Bethany Roe subject to the same standards as male students. Even though Doe had been drinking alcohol on the evening in question and Roe, his female companion, was the instigator and aggressor with regard to the sexual intercourse in question, Roe was neither investigated nor subjected to disciplinary hearings. Furthermore, unbeknownst to Doe at the time of the hearing, one of the female panel members had mocked the defenses of men accused of sexual assault.

D. Defendants' violations of the substantive and procedural due process clauses of the Fourteenth Amendment to the U.S. Constitution.

The Fourteenth Amendment of the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. Amend. XIV, §1.4. Pursuant to the Fourteenth Amendment, Andrew Doe possesses a property interest in his status as a student at the University and his education, as well as a liberty interest in his reputation. 42 U.S.C. §1983 creates a private cause of action for persons who are denied a federal constitutional or statutory right by a "person" acting under color of state law. The Defendants are state actors who owe Doe protections consistent with the Fourteenth Amendment

The concept of procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir.

1961). "…[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury." 435 U.S. at 266, 98 S. Ct. at 1054 (citations omitted). *See also Caine v. Hardy*, 943 F.2d 1406 (5th Cir. 1991) (en banc). "To be entitled to the procedural protections of the Fourteenth Amendment, a Plaintiff must demonstrate that his dismissal from the University deprived him of either a liberty or a property interest. *See Bd. of Curators of Univ. of Mo. v. Harrowitz,* 435 U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Herein, Doe raised allegations that both his liberty and property interests were violated by the actions of the Defendants. [Doc. 9, ¶¶ 155 - 169]. Doe's continued enrollment in a public university is a protected property interest. *Rendell-Baker v. Cohn*, 457 U.S. 830, 837, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982). Furthermore, where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, a liberty interest in implicated. *See Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

The substantive component of due process bars certain governmental actions regardless of the fairness of the procedures that were sued to implement them. *See County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (discussing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The bad faith dismissal of a student following adjudication by a biased disciplinary panel or other failure to exercise professional judgment may also be sufficient to state a due process claim. *See Clemons v. Eastern Kentucky University*, 2006 WL 1464617 (E.D. Ky. 2006) and *Alcorn v. Vaksman*, 877 S.W.2d 390, 91 Ed. Law Rep. 1201 (Tex. App. Houston 1994) (*writ denied* June 29, 1995); Additionally, "[f]ormalistic acceptance or ratification of [a] request or recommendation

as to the scope of punishment, without independent [] Board consideration of what, under all the circumstances, the penalty should be, is less than full due process." *See Lee v. Macon Cnty. Bd. of Educ.*, 490 F.2d 458, 460 (5th Cir. 1974)  The academic dismissal of a state university student has been found to constitute a potential violation of the student's substantive due process rights where there was evidence that an insufficient investigation was conducted prior to the student's dismissal. *See Guse v. University of South Dakota*, 2011 WL 1256727 (D.S.D. 2011). A dismissed student can succeed on a substantive-due-process claim if he shows "that the university's decision was not careful and deliberate." *Guse v. Univ. of S.D.*, No. 08-4119, 2011 WL 1256727, at *13 (D.S.D. Mar. 30, 2011) (citing *Schuler v. Univ. of Minn.*, 788 F.2d 510, 516 (8th Cir. 1986)).

Through the Defendants' use of a flawed investigative, hearing and appellate process, Doe was deprived of his property and liberty interests.  The wrongful expulsion of Doe (and/or other male students) from a public university, cannot logically be said to be reasonably related to a legitimate governmental interest. See *Williams v. Tex. Tech. Univ. Health Sciences Ctr.*, 6 F.3d 290, 294 (5th Cir. 1993); *see Pham v. Univ. of La. at Monroe*, 194 F. Supp. 3d 532, 546 (W.D. La. 2016) ("The substantive due process analysis asks whether Defendants' conduct was so arbitrary as to shock the conscience.").

Generally, the amount of process due in university disciplinary proceedings is based on a sliding scale that considers three factors: (a) the student's interests that will be affected; (b) the risk of an erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (c) the university's interests, including the burden that additional procedures would entail.  *Id.* (citing *Mathews*, 424 U.S. at 335)  In *Plummer*, the Fifth Circuit examined whether two students received due process during a

university disciplinary proceeding regarding alleged sexual misconduct, 860 F.3d at 773, and applied the *Mathews* factors.

As in *Plummer*, in this matter involving Andrew Doe, "the first and third *Mathews* factors are easily identified" in this case.  On the one hand, [Doe] ha[s] a liberty interest in [his] higher education [and] [t]he sanctions imposed by the University could have a 'substantial lasting impact on [his] personal li[f]e[], educational and employment opportunities, and reputation[] in the community *Id.* (quoting *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016)) (additional citations omitted). "On the other hand, the University has a strong interest in the educational process, including maintaining a safe learning environment for all its students, while preserving its limited administrative resources." *Id.*  Here, Doe's due-process claim turns on "the second *Mathews* factor—the risk of erroneously depriving [his] interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Id.* at 774.

Under the second *Mathews* factor, the "amount of process constitutionally required in state university disciplinary proceedings will vary in accordance with the particular facts of each case." *Id.* at 774 n.8. Restated, "… [w]hether a state university has provided an individual student sufficient process is a fact-intensive inquiry and the procedures required to satisfy due process will necessarily vary depending on the particular circumstances of each case. *See Dixon*, 294 F.2d at 158.  As noted by Edith Jones in her dissenting opinion in *Plummer*, "Put in terms of the *Mathews* balancing test, *Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976), the students' interests in preserving their educational status and reputations in the face of serious sexual misconduct charges were compelling. See *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp.3d at 622 ("[P]laintiff's lost opportunity to continue with his post-secondary education, coupled with the possibility that he may be unable to pursue meaningful educational opportunities

elsewhere while his name remains associated with sexual misconduct, inevitably affects plaintiff's professional prospects. . . . an adjudication of responsibility for sexual misconduct carries a . . . powerful stigma," such that robust due process is required.); *Brandeis Univ.*, 177 F. Supp.3d at 602 ("Certainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings.") "[T]he interpretation and application of the Due Process Clause are intensely practical matters and ... 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' " *Id.*, citing *Goss*, at 578 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Each situation demands different procedural protection. *See Mathews v. Eldridge*, 424 U.S. 319, at 334. At a minimum, a student facing suspension is entitled to "the opportunity to be 'heard at a meaningful time and in a meaningful manner.'" *Cummins*, at 446, quoting *Mathews,* at 333.  Here, the Defendants did not afford Doe meaningful or constitutionally adequate due process.

(1) The manner in which the Judicial Council and Appellate Consideration Board members are trained, conducted hearings, and adjudicated responsibility and discipline violated Doe's due-process rights.

This is a consent-based case in which the victim did not appear before the hearing panel, yet there was an assumption consistent with the instructions provided by Ussery's training materials, that an assault occurred. The panel had been trained to ignore certain alleged deficiencies in the investigation and official report. Such training, coupled with the alleged deficiencies in the investigation, the scales were tipped against Doe to such a degree that further procedural safeguards may have lessened the risk of an erroneous deprivation.

The factual and legal support for this due process deprivation is discussed above in the Title IX section of this memorandum under the headings of "The Disciplinary Tribunal and Flawed

Disciplinary Process," "The Title IX Coordinator's Conflicts of Interest," and "Gender-Biased and Inadequate Training."   These factual and legal matters, inclusive of those contained in the Statement of Facts portion of this memorandum, are equally applicable to Doe's denial of due process and are incorporated here in full by reference. However, as a supplemental point adding insult to constitutional injury, is the fact Tracy Murry not only serves in his official role, as well as the disciplinary hearing officer, but he also undertook to provide information to the hearing panels regarding University "precedent" in imposing sanctions and serves as an advisor to these boards and to "guide" them in the deliberative process.   More disturbing is that in the case of Doe and his appeal, and while appeals are strictly "on the record" – Murry undertook to provide supplemental information regarding the case facts to the Appellate Consideration Board outside the record.   These actions were not made known to Doe, in further deprivation of his due process rights. *See* Exh. 8, p. 29, 1-3; 10, pp. 210-215; Exh. 12-18; 12-19.

(2) <u>Doe was not permitted to cross-examine any witnesses, including Bethany Roe, in violation of his due process rights.</u>

In almost every proceeding "where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The Sixth Circuit Court of Appeals has held that accused students must have the right to cross-examine adverse witnesses "in the most serious of cases." *Flaim v. Ohio*, 418 F.3d 629, 636, 200 Ed.Law Rep. 614 (6th Cir. 2005). The Court alluded to what "the most serious of cases" might entail: If a case "resolve[s] itself into a problem of credibility, cross-examination of witnesses might . . . be [] essential to a fair hearing." *Id*., at 641 (quoting *Winnick*, 460 F.2d at 549.) "The ability to cross-examine is most critical when the issue is the credibility of the accuser." *Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 605 (D. Mass. 2016). Cross-examination takes aim at credibility like no other procedural device. *Id*, citing *Craig*, 497

U.S. at 846; *Watkins*, 449 U.S. 341, at 349. A cross-examiner may "delve into the witness' story to test the witness' perceptions and memory." *Id*, citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 s. Ct. 1105, 39 L. Ed. 2d 347 (1974). He may "expose testimonial infirmities such as forgetfulness, confusion, or evasion . . . thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Id*., *Craig*, 497 U.S. at 847 (citation and brackets omitted). He may "reveal [] possible biases, prejudices, or ulterior motives" that color the witness's testimony. *Davis*, at 316.

In *Doe v. Cincinnati*, an accused arrived at a Title IX hearing and learned that his accuser and other witnesses would not be present. *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 711 (S.D. Ohio 2016). The University reviewed a Title IX report that contained summarized statements from an accuser and witnesses. Subsequently, the panel found Doe responsible and suspended him for two years. John Doe sought relief through the District Court. His motion for preliminary injunctive relief focused solely on defendants' failure "to permit John Doe to confront his accuser." Doe maintained that the University could not constitutionally find him responsible for sexually assaulting Roe without "any opportunity to confront and question" her. On appeal, the Sixth Circuit Court of Appeals affirmed the district court's decision. *Id*. In so doing, the Court of Appeals stated, "the due process clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process. Here, the University's disciplinary committee necessarily made a credibility determination in finding John Doe responsible for sexually assaulting Jane Roe given the exclusively 'he said/she said' nature of the case." *Id*. The failure, "to provide any form of confrontation of the accuser made the proceeding against John Doe fundamentally unfair." *Id*. The court reasoned that because the hearing committee had been given the choice of believing either Jane Roe or John Doe, cross-examination was essential to due

process. *Id.* "Few procedures safeguard accuracy better than adversarial questioning. In the case of competing narratives, 'cross-examination has always been considered a most effective way to ascertain truth.'" *Doe v. Univ. of Cincinnati*, 233 F. Supp. 704, citing *Watkins v. Sowders*, 449 U.S. 341, 349 (1981) (footnote omitted)

Andrew Doe's case involves a classic he-said/she-said credibility assessment.  Because neither Roe nor any other witnesses appeared at the hearing, Doe was not permitted to cross-examine the witnesses whose statements led to his discipline.  It is problematic in terms of due process that there was no "confrontation" of Roe who never appeared, could not be deposed, and was never investigated for her lascivious advances toward Doe.  (See, e.g., *Plummer*, p. 22 (E. Jones dissenting)

To assess the possible impact of cross-examination, it is important to understand the factual context. Doe was found responsible under the University's Policy which requires consent for all sexual activity and states that "an incapacitated person is not able to give consent." Sexual Misconduct Policy [42-14] at 4; Exh.12-14 The policy defines incapacitation as follows: "Someone is incapacitated when he or she cannot understand who, what, when, where, why, or how, with respect to the sexual interaction." *Id.*, at 5. The parties agree that Doe and Roe were intoxicated on the night of their encounter, but Roe's level of intoxication doesn't indicate that she did not know the "who, what, when, where, why, or how" of the encounter. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████

Herein, the Court can consider the Sixth Circuit's reasoning on the value of cross-examination under the second *Mathews* factor—i.e., "the risk of erroneously depriving" Doe's interests by conducting the hearing without cross-examination, and the "probable value, if any" of providing cross-examination. *Plummer*, 860 F.3d at 774. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

(3) The Title IX Coordinator, Honey Ussery, failed to conduct a thorough and impartial investigation of the allegations brought against Doe.

The process deployed against Doe was fundamentally flawed because of (a) the absence of evidence from Bethany Roe; (b) the conflicting roles played by Ussery and Murry; (c) the preponderance standard for adjudicating quasi-criminal conduct (for which no actual criminal charges were brought), compounded by (d) the deference that Ussery and Murry insisted was due by the hearing panels to her/his position. Doe incorporates here the factual and legal statements set forth above in the sections addressing the Title IX Coordinator's Conflicts of Interest and the Gender Biased Investigation, which are incorporated herein by reference.

(4) The burden of proof utilized by the Defendants fails to conform to the requirements of due process.

In Doe's case, just as in all other Title IX matters inclusive of sexual assault with penetration, the Defendants rely on the lowest standard of proof in law, the preponderance of the evidence. In the context of the quasi-criminal charges and discipline imposed upon Doe and other males, the integrity of the resulting decisions may be questioned and discredited. See *Plummer*, pp. 23-25. Elevating the standard of proof to clear and convincing, a rung below the criminal

burden, would maximize the accuracy of factfinding.[11] Permitting counsel to represent the students would have resulted in more efficient hearings. Adopting some or all of the foregoing safeguards would not significantly impede the disciplinary process. The Defendants' interests should lie in impartially adjudicating these quasi-criminal sexual misconduct allegations. Unlike plagiarism, cheating, or vandalism of university property, the ramifications of a finding of sexual assault -by a University is much more long-lasting and stigmatizing in today's society. The University has no significant expertise in this area; indeed, as noted above, its policies and procedures derive directly from the Dear Colleague Letter, not from inherently educational decisions. Further, to the extent that Defendants' eliminate confrontation, cross-examination and counsel participation, due process denials result.

The University's Sexual Misconduct Policy in effect at the time of Doe's hearing explains that "[t]he standard of proof for all cases involving sexual misconduct will be based upon the University's established standard of preponderance of the evidence." Sexual Misconduct Policy [42-14] at 8; Exh. 12-14. This preponderance standard violates due process. *See Doe v. DiStefano*, No. 16-CV-1789-WJM-KLM, 2018 WL 2096347, at *6 (D. Colo. May 7, 2018) (noting unsettled nature of the law). The only circuit that appears to have addressed the issue did so in an unpublished opinion that found no due-process violation when a university used the preponderance standard in a school disciplinary proceeding. *See Cummins*, 662 F. App'x at 449. However, Judge Edith Jones made a forceful argument in her *Plummer* dissent that hearings on alleged sexual

---

[11] Commentators have noted that applying the civil preponderance standard to quasi criminal charges seriously weakens due process for accused students. See, e.g., Ryan D. Ellis, *Mandating Injustice: The Preponderance of the Evidence Mandate Creates a New Threat to Due Process on Campus*, 32 Rev. Litig. 65 (2013); Barclay Sutton Hendrix, *A Feather on One Side, A Brick on the Other: Tilting the Scale Against Males Accused of Sexual Assault in Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591, 610-15 (2013); Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. Ky. L. Rev. 49, 62, 62 n.59 (2013).

misconduct are quasi-criminal and have long-lasting impacts on the accused. She advocated for a more burdensome standard of review, noting that "[e]levating the standard of proof to clear and convincing, a rung below the criminal burden, would maximize the accuracy of factfinding." *Id.* at 782 & n.11 (Jones, J., dissenting). The majority in *Plummer* avoided the issue, noting that it had not been preserved for appeal. *Id.* At 772 n.5. This Court, respectfully, should require a greater burden of proof in quasi-criminal proceedings where, unlike all other disciplinary decisions, the University and State have restricted the available discipline to only expulsion or suspension.

(5) The manner and timing of the selection of the hearing panel, and its composition and misunderstanding of training and material facts, violated Doe's right to due process.

This issue has been fully briefed above in the Statement of Facts, as well as in the Title IX section of this memorandum addressing The Disciplinary Tribunal and Flawed Disciplinary Process. For brevity, that discussion is incorporated herein, in its entirety.

E. Defendants' violations of the Equal Protection clause of the United States Constitution.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It To establish an equal protection claim, "the plaintiff must prove that similarly situated individuals were treated differently." *Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999). "The question of whether the plaintiff and the proposed comparator were similarly situated "is case-specific and requires [the Court] to consider 'the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision.'" *Lindquist v. City of Pasadena*, 669 F.3d 225, 234 (5th Cir. 2012) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1208 (11th Cir. 2007)).

Here, Defendants violated Doe's rights under the Equal Protection Clause by disciplining him for engaging in sexual intercourse with Roe while she was under the influence of alcohol but

failing to discipline Roe for instigating and engaging in sexual intercourse with him while he was also under the influence of alcohol. In *Doe v. Miami Univ.,* 882 F.2d 579 (6th Cir. 2018), the male Plaintiff raised the issue that Miami University initiated an investigation into his conduct, but not his female counterpart's, as evidence of decision making on the basis of a student's gender. The Sixth Circuit Court of Appeals found that the plaintiff had sufficiently plead circumstantial evidence of gender discrimination. *See Doe v. Miami*, 882 F.2d 579 (6th Cir. 2018), citing *Brown Univ.,* 166 F. Supp. at 189, *Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201, 1210 (S.D. Ind. 2016). The court reversed dismissal of the equal-protection claim because the decisionmaker in that case "was operating under 'the same set of operative facts' when she decided not to initiate the disciplinary process against" the female student. 882 F.3d at 596 (quoting *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1083 (S.D. Ohio 2017)).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████        Either by policy or guidance as applied by the University from July 1, 2014 to the present, the result has been either the suspension or expulsion predominantly of male students.  Further, under the Obama-era guidance that was followed by the University, male students were suspended or expelled at a much higher rate than female students. *Id.*; *See* also Exhibits 27 and 28.  On September 22, 2017, the U.S. Department of Education, Office of Civil Rights released a notice addressing the ongoing deprivation of rights for many college students who have been accused of sexual misconduct. [Doc. 9, ¶ 118] The Defendants

were aware of the Department of Education's pronouncement and concerns about what was characterized as the denial of "the most basic of due process rights", yet consciously and deliberately elected not to modify their unconstitutional policies or practices and/or rectify the erroneous determinations and disproportionate sanctions issued to Doe and other males. [Doc. 9, ¶ 119] Specifically, on October 10, 2017, the University issued a written statement advising it would not be making any changes to policy, procedure or to Title IX cases. [Doc. 9, ¶120]

F.  Declaratory and Injunctive Relief

Federal Rule of Civil Procedure 65 governs injunctions. In order for the Court to grant an injunction, a party must demonstrate the following: (1) A substantial likelihood that he will prevail on the merits, (2) a substantial threat that [he] will suffer irreparable injury if the injunction is not granted, (3) his substantial injury outweighs the threat and harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest. *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) The decision to either grant or withhold equitable relief "rests in the sound discretion of the court." *Petrol. Expl., Inc. v. Publ. Serv. Comm'n of Ky.*, 304 U.S. 209, at 218, 58 S.Ct. 834, 82 L.Ed. 1294 (1938).  "[I]t is beyond dispute that federal courts have jurisdiction over suits who enjoin state officials from interfering with federal rights." *See Shaw v. Delta Airlines, Inc.*, 463 U. S. 85, 96 n.14, 103 S. Ct. 2890 (1983) (*citing Ex parte Young*, 209 U. S. at 160-62) The *Ex parte Young* exception allows a federal court to issue prospective injunctive and declaratory relief compelling the state officials to comply with federal law. *See E.G. Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). In an injunctive or declaratory action grounded on federal law, a state's immunity can be overcome by naming state officials as defendants. *See Kentucky v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (*citing Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)). Furthermore, under the *Ex parte Young* doctrine, a private individual may

sue individual state officers in federal court to obtain prospective relief from an ongoing violation of federal law. The University has admitted that a court order can remove the Title IX findings from the student's transcript and the  Defendants do not dispute that Chancellor Vitter could carry out the injunctive relief requested by the Plaintiff.

In order to have suffered a constitutional injury-in-fact, a plaintiff is not required to apply to, and be rejected by, another school. Rather, he can pursue his claim for injunctive relief provided he alleges a "real and immediate threat of future injury" that is not merely conjectural. *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir.2010); *See also Hays v. LaForge,* 113 F.Supp.3d 883, 325 Ed. Law Rep. 845 (N.D.Miss. 2015) (*Ex parte Young* allows Plaintiff's Section 1983 claim for prospective injunctive relief in the form of reinstatement as division chair against Defendant in his official capacity)  Herein, Doe is entitled to the entry of a judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have violated Title IX and that the policies and practices of the University, both facially and as applied, violated both the due process and the equal protection clauses of the Fourteenth Amendment to the U.S. Constitution.  Doe moves this Court to enter an injunction enjoining Defendants from violating his Title IX and Constitutional rights, by continuing the discriminatory and unlawful disciplinary action that was issued against him, requiring the University to immediately remove any indication of a disciplinary finding against Doe from his student records and prohibiting further disciplinary proceedings against him pending resolution of this matter.  Doe is entitled to have any finding of responsibility, and the record of the entire Title IX proceeding, wholly and permanently expunged from his academic record and to a permanent seal of all such proceedings to protect against subsequent disclosure to any other person or academic institution.

RESPECTFULLY SUBMITTED, this the 24th day of June, 2020.

**ANDREW DOE,**
Plaintiff

By: ___*s/J. Lawson Hester*_____
J. Lawson Hester

J. Lawson Hester (MS Bar No. 2394)
lhester@manierherod.com
MANIER & HEROD
1201 Demonbreun Street, Suite 900
Nashville, TN  37203
Telephone: (615) 244-0030
Direct: (615) 742-9339
Cell: (601) 209-4728
Facsimile: (615) 242-4203


Michelle T. High (MS Bar No. 100663)
mhigh@bpisfirm.com
David A. Barfield (MS Bar No. 1994)
dbarfield@bpislaw.com
Biggs, Pettis, Ingram & Solop, PLLC
111 East Capitol Street, Suite 101
Jackson, MS  39201
Mailing Address:
Post Office Box 14028
Jackson, MS  39236-4028
Direct and Facsimile: (601) 987-5313