**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**ANDREW DOE**                                                                          **PLAINTIFF**

**V.**                                                          **CIVIL ACTION NO: 3:18cv138 DPJ -FKB**

**STATE OF MISSISSIPPI, ET. AL.**                                     **DEFENDANTS**

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff Andrew Doe, by and through undersigned counsel, and submits this Memorandum in support of his Response in Opposition to Defendants' Motion for Summary Judgment. Contrary to the Defendants' claims, the record is replete with evidence of violations of Title IX, the Equal Protection Clause and the Due Process Clause by the Defendants. At a minimum, the factual matters set forth within the Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, the supporting exhibits and this memorandum, establish the existence of genuine issues of material fact sufficient to preclude summary judgment in favor of the Defendants with respect to each of the Plaintiff's claims. However, it is the Plaintiff's belief that the record evidence is so abundant as to warrant summary judgment in his favor as a matter of law. In this regard, the Plaintiff has filed his own Motion for Partial Summary Judgment as to Liability with the Court. That motion, as well as the supporting exhibits and memorandum [Doc. 173, 174] are incorporated herein by reference, in their entirety.

## CLARIFICATION OF FACTS ESTABLISHED BY THE RECORD

This case centers around a sexual encounter between Plaintiff Andrew Doe and Bethany Roe, two intoxicated undergraduate students at the University of Mississippi, in December 2016. Doe maintains that the encounter was consensual, but Roe's friends called law enforcement and reported the incident as a sexual assault. *See* Ex. "12-1". In response to the call, an officer

1

separately awakened both Doe and Roe from sleep later that night/early the next morning, in order to question them.   Roe was taken for a medical examination at the hospital.   During the examination, Roe *twice* advised law enforcement officers, as well as her physician,  that she did not believe that she was sexually assaulted, that they were both drunk and that the sexual encounter "… was a mutual decision…".   *See* Ex. "12-1", pp. UM000006.   Roe also told her physician, in the presence of law enforcement, ███████████████████████████████████████████

████████████████████████████.   *See* Ex. "12-1"; *Id.*   These undisputed facts were contemporaneously recorded within an official police report. *Id.* Although Defendants' state that Roe filed a Title IX complaint to start the investigation, the record indicates that a representative of the University's Title IX Office was already at the hospital on the night in issue.   *See* Ex. "5".

As set forth in the Defendants' statement of facts, Ussery investigated the allegations, prepared a report, and sent her report to the University's Office of Student Conduct and Conflict Resolution.   [Doc. 167, pg. 2]   Ussery first emailed Doe to advise that he had been named in a Title IX investigation approximately two months after the night in issue.   *See* Ex. "5".   Ussery and Doe never met in person, nor did Ussery provide Doe with any specifics regarding the allegations against him.   Furthermore, Ussery did not ask Doe or his attorney about potential witnesses or evidence.   *See* Ex. "4", pp. 110-114; Ex. "5".   Following the investigation, Doe was asked to attend an "intake meeting" with Tracy Murry, the University's Director of Student Affairs and Conflict Resolution.   *Id.*   At the meeting, Murry advised Doe that he had received an investigative report relating to Doe's alleged sexual misconduct.   *Id.*   Murry did not give Doe a copy of the report, any witness statements or other documentation during the meeting.   *Id.*   However, Doe had already seen a police report regarding the incident and knew that Roe had told her physician and law enforcement that ███████████████████████████████████████."   *See* Ex.

"12-1", pp. UM000006. When Doe asked why the Title IX proceedings were going forward despite Roe's admissions, Murry acknowledged that, "things seem pretty black and white." *See* Ex. "5".

After Doe's meeting with Murry, a disciplinary hearing was set for ███████████. When Doe arrived for the hearing, the University did not yet have a full panel. *See* Ex "12-3"; "Ex. 5". The third panel member was found after Doe's arrival and sent the case file materials *one minute* before the hearing was scheduled to begin. *See* Ex. "12-3"; Ex. "5"; Ex. "7", pp. 73-76; Ex. "12-10"; Ex. "12-12"; Ex. "12-13". Immediately before the hearing, Murry informed Doe that ████ ███████████████████████████████████████████████████ *See* Ex. "5". The disciplinary hearing still went forward. *See* Ex. "5"; Ex. "12-3"; Ex. "7", p. 71. ███████████████████ ███████████████████████████████████████████████████████ ███████████████████ *See* Ex. "8", pp. 17 - 18. At the start of the hearing, Murry told the panel that ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ *See* Ex. "3". ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████ *Id.* The Title IX Report prepared by Ussery and the included paraphrased summaries were provided to the panel and taken at face value, even though there was no way to verify their completeness, veracity, credibility, or accuracy. *See* Ex."5"; Ex. "8", pp. 39-40; Ex."7", p. 100; Ex."9", pp. 56-59.

The Defendants state that Roe reported to Ussery that █████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████. *See* Ex. "4", pp. 168:9-20; Ex. "12-1". The Plaintiff disputes that the record reflects Roe reporting ███████ ███████████████████████████████████████████████████ Within Ussery's

Title IX report, it is reported that ████████████████████████████████████

████.[1]  *See* Ex. "12-1"  At that point, ████████████████████.  *Id.* ████████████

████████████████████████████████████████████████████████████████

████████████████████████████ *Id.* ████████████████████████████████████

████████████████████████████████████████████████ *Id.* ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

There is no statement about ██████████████████████ in the Title IX report,

nor does the record reflect that ██████████████████████.  According to the Title

IX report, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Doe

had prepared questions which might have clarified this issue, he had no opportunity to cross-

examine Roe or anyone else, as he was the only witness at the hearing.   Doe's advisor was not

allowed to speak or participate in the hearing.  *See* Ex. "5"; Ex. "12-3"; Ex. "12-13", pp. 113-14.

During the hearing, Doe testified ████████████████████████████████

████████████████████████████████ *See* Ex. "12-3".  Doe read a quote from the

police report to the panel which stated, "████████████████████████████████

---

[1] Throughout the Defendants' Statement of Facts, there is heavy reliance upon Ussery's Title IX Report. To the extent summaries of witness statements written by Ussery are cited for the truth of the matters asserted therein, they are inadmissible hearsay and constitute inappropriate summary judgment evidence.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████   *See* Ex. "3", "12-3".  Doe attempted to provide the panel

with a polygraph report and an investigative summary of statement given by the cab driver who

drove Doe and Roe to Doe's apartment on the evening in issue.  *See* Ex. "5"; Ex. "12-3"; Ex. "8",

p. 50; Ex. "7", p. 58; Ex. "9", pp. 59-60; Ex. "12-15"; Ex. "13", p. 110, line 11 -p. 11, line 6; Ex.

"10", pp. 220-25.  The polygraph examination showed that in response to questions about whether

Doe had forced Roe to have sex, Doe's answers were consistently "No" and no deception was

indicated.  *Id*.  The investigative report summarizing the cab driver's statement indicated that he

had observed ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████   The panel did not look at, receive or consider the polygraph examination or the

report during the hearing, nor did they ask any questions about either.  *Id*.  *See* Ex. "5"; Ex. "12-

14".  After the short hearing and less than fifteen minutes of deliberation, one panel member left.

*See* Ex. "5" Subsequently, the two remaining panel members announced that Doe had been found

responsible and expelled him from the University. *See* Ex. "5"; Ex. "12-3"; Ex. "12-29".  No

rationale for this decision or for the severity of the sanction was provided.  *Id.*

On appeal, the hearing panel members were never questioned by the Appellate

Consideration Board about the proceeding or the basis for their finding.  Likewise, no witnesses

were called nor was Doe permitted to be present.  When the Appellate Consideration Board sought

additional information regarding the reasons for the panel's determination and discipline issued to

Doe, Murry took it upon himself to explain and characterize the evidence considered by the hearing

panel.  *See* Ex. "10", pp. 221-222.  He informed the Appellate Board ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮  and explained ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,

evidence that was not on the transcript or audio recording of the proceedings.  *Id.*  Murry also

informed the Board that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.*,

at pp. 222-223.  According to Murry, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  *See* Ex. "10", pp 205-206, pp. 209-211.   Murry provided the information to the Board.

*Id.*, pg. 211- 212. Subsequently, the Appellate Board upheld the finding that Doe was responsible

and reduced his expulsion to a suspension until fall 2020.  *See* Ex. "5"; Ex. "12-30"; Ex. "13", p.

116 with Depo. Ex "15"; "12-16", "12-17".

## ARGUMENT

**I.**  **The Record Evidence Precludes Entry of Summary Judgment in Favor of the Defendants with Respect to the Plaintiff's Title IX Claims**

Title IX of the Education Amendments of 1972, provides, in relevant part, "No person in

the United States shall on the basis of sex, be excluded from participating in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving federal

financial assistance." Title IX of the Education Amendments of 1972, codified at 20 U.S.C. §1681,

*et seq.*

The Defendants do not question the applicability of Title IX but assert that the Plaintiff

cannot show the University engaged in intentional conduct that violated the statute or that the

school's response was clearly unreasonable in light of the known circumstances, so as to have a

private right of action.  [Doc. 167, pg. 5, citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629,

6412, 648(1999)]  Contrary to these assertions, the record is clearly sufficient to defeat any claims

for summary judgment by the Defendants with respect to an erroneous outcome claim and a

selective enforcement claim.  Furthermore, while not raised by the Defendants in their Motion, the record is sufficient to preclude summary judgment in favor of the Defendants with respect to the Plaintiff's Title IX under a theory of deliberate indifference.

### A. The record evidence not only precludes summary judgment in favor of the Defendants with respect to Plaintiff's erroneous outcome claim.

The facts, when viewed in the light most favorable to the Plaintiff as the non-movant, undeniably cast articulable doubt on the outcome of Doe's disciplinary proceedings and that the gender bias was a motivating factor behind the flawed outcome.

### 1. Exculpatory evidence was excluded

The only documentary evidence accepted by the Hearing Panel was Honey Ussery's report and several pages of police reports affixed to its back.  *See* Ex. "12-1".  Because there were no eyewitnesses to the subject sexual intercourse, presenting a he-said/she-said circumstance, Ussery's report consisted of summarized overviews of statements from the female complainant and her friends to Ussery, prepared by Ussery. *See* Ex. "4", p. 219, line 6-22, p. 223, line 1; Ex. "12-1".  Ussery did not address the affixed police reports in her own report at all, despite the fact they repeatedly referenced the fact ███████████████████████████. *See* Ex. "12-1".  Furthermore, although Ussery admitted they could contain probative information regarding consent, Ussery did not provide the hearing panel with any medical records of Roe, nor did she make any effort to obtain them. *See* Ex. "4", p. 27, line 6, p. 30, line 19; Ex. "12-1".  Ussery did not reveal to Doe or the panel the identity of Roe's medical doctor, did not obtain or provide evidence of Roe's blood alcohol content, or of the quantum or proof of alcohol which Roe (or Doe) had allegedly consumed so as to give rise to any basis for incapacitation, leaving the hearing panel to speculate about the material issues relative to intoxication level and the capacity/incapacity or ability of Roe to consent to sexual intercourse with Doe, *See* Ex. "4", p. 27, line 6, p. 30, line 19;

Ex. "12-1".  While the hearing transcript reflects Andrew Doe's attempt to introduce a statement

from the cab driver ████████████████████████████████████████████

████████████████████████████████████████, the hearing panel declined

to accept ██████████ written statement as evidence at the ██████████ hearing. *See* Ex. "8",

p. 50, line 7, p. 58, line 9, pp. 59-60, lines 12-15, p. 110, line 10, and pp. 220-25.

Hearing panelist E. J. Presley testified that ████████████████████████

████████████████████████████████████████████████████████.

See Ex. "7", p. 93, lines 19-23.  Significantly, Presley also testified he was not told that ██████

████████████████████████████████ *Id*., at pp. 88-89.  Although Ussery

had exculpatory information that explained ████████████████ in the form of a statement from

████████████ obtained by the police, she did not include it in her report even though Ussery

admitted that she did not consider this to be a case of forcible assault.[2]



### 2. The panel members did not appreciate or correctly assess the distinction between intoxication and incapacitation.

The University's policy provides an incapacitated person is not able to give consent.  *See*

Ex. "12-22", p. 10.  It states that it is a violation of policy if the initiator has sex with someone the

initiator knows, or reasonably should know, to be incapacitated by alcohol, drugs, sleep or illness.

A person who is unconscious, unaware or otherwise helpless cannot give effective consent to

sexual activity.  Someone who is incapacitated cannot understand who, what, when, where, why

or how, with respect to the sexual interaction.  *Id.*  (Sexual Misconduct Policy DSA.SC.200.075)

p.11.  The University's training provides that signs of incapacitation include vomiting, an inability

---

[2] ████████████████████████████████████████████████████████
████████████████████████ See Ex. "17", "18" ████████████████
████████████████████████████████████████████████████████
*See* Ex."13", p. 164, lines 3-11; Ex."14", p. 36, line 12 – p. 38, line 8.

to walk or stand on one's own, urinating or defecating on one's own body, being cold and clammy to touch, having slurred speech and emotional volatility.  *See* Ex. "12-2", (UM000241).  Panel members admitted that ███████████████████████████. *See* Ex. "8", p. 87, line 19; p. 89, line 6; *See* Ex. "7", pp. 80-83.

In its deposition, the University/State of Mississippi testified that ███████████



*See* Ex. "7", pp. 80-83.

Panelist █████████ also provided disturbing testimony.  ███████ did not know ████████ ████████████████████████████████████████████████████ *See* Ex. "8", p. 55; p. 65, line 25; p. 66, line 5.  In her deposition, ████████ confirmed that ██████████████████████ ████████████████████████████████████████████████████ ██████████████████ *Id*. p. 87, line 19; p. 89, line 6.

Despite confirming that Doe's hearing was about alcohol and consent/capacity to consent, the third panel member, ██████████, like ████████ and ████████, did not have specific information regarding ████████████████████████████████████████████████ █████████████████████████████████. *See* Ex. "9", pp. 112-14.

In its 30(b)(6) deposition, the University of Mississippi /State of Mississippi testified that █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████████████████. *See* Ex. "11", p. 158, lines 12-21. ████████████ ████████████████████████████████████████████. *Id*., at p. 159, lines 11-18.  Furthermore, if █████████████████████████████████████████████████████████ █████████████████████████. *Id.*, p. 161, lines 4-16.  Thus, ████████████████ ██████████████████████, the hearing panel's finding that Roe was incapacitated and not capable of giving effective consent is ***erroneous***.

In *Doe v. Oberlin*, a disciplinary hearing a panel found Doe, a male student, responsible for sexual assault on the basis that "the preponderance of the evidence established that effective consent was not maintained for the entire sexual encounter…". *See Doe v. Oberlin*, No. 19-3342, pg. 8 (6th Cir. June 29, 2020).  The panel found because the female complainant was incapacitated, there could not have been consent.  Following a denied appeal, Doe filed suit asserting an

"egregious misapplication of the …definition of 'incapacitation'"  which was the result of sex discrimination in violation of Title IX.  The District Court dismissed the claim, but on appeal the Sixth Circuit held that the "clear procedural irregularities" in response to the allegations of sexual misconduct, inclusive of not providing the male accused with specifics of the allegations against him at the beginning of the investigation, delaying the length of the investigation and having an advisor leave early, were indicia of gender bias.  Additionally, the Court found it "remarkable" that " in a proceeding in which the credibility of accuser and accused were paramount" the hearing panel failed to even comment on contradictions and possible impeachment evidence.  *Id*., pg. 11.  Furthermore, the Court held "when the degree of doubt passed from 'articulable" to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias." *Id*., referencing *Doe v Purdue Univ*., 928 F.3d 652, 669 (7th Cir.2019)(*reasoning that a "perplexing" basis of decision can support an inference of sex bias).

Herein, Doe was the only witness at the disciplinary proceeding, and he testified that the sexual interaction between himself and Roe was consensual.  Police records attached to Ussery's report (i.e., the records that were not "summarized" by Ussery) indicate that in the hours after the sexual activity, Roe repeatedly ███████████████████████████████████. The cab driver's statement indicated ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████Perhaps most significantly, the panel members *believed* Doe. Tracy Murry has testified that ███████████████████████. See Ex. "10", p. 314.  E.J. Presley stated that ██████████████████████████████████████████████

█████████████████████████*See* Ex. "7", at pp. 97, lines 23-25; 102, lines 5-11.

### 3.  Burden of proof

In addition to the foregoing, the fact that the majority of the panel members did not know what the standard of proof was, is alarming.  Panelist E. J. Presley has testified that ███████████  ███████████. *See* Ex. "7", p. 108, lines 2-10.  Presley further confirmed under oath that ███████████ ███████████. *Id.* at pp. 19, line 19  - 21, line 4. Similarly, panelist ███████████ ███████████ ███████████. *See* Ex. "8", p. 101, lines 8, p. 102, line 4.)

### 4.  Gender bias was a motivating factor behind the flawed outcome.

Contrary to the Defendants' assertions, the record in this case is replete with evidence that gender bias was a motivating factor behind the flawed outcome.  Circumstances suggesting that gender bias was a motivating factor behind the erroneous finding may include, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.  *See Yusuf v. Vassar College*, 35 F.3d 709, 714-15 (2d Cir. 1994); *see also Klocke v. Univ. of Tex.*, 938 F. 3d 204, 210, (5th Cir. 2019).  The gender bias element of an erroneous outcome claim can also be established through circumstantial evidence, such as dissimilar treatment of male and female respondents or a pattern in which men who are accused of sexual assault are "invariably found guilty." *See Univ. of Cincinnati*, 2015 WL 728309, at *14.

As alluded to in the Defendants' briefing, in an interview with Mississippi Public Broadcasting, Ussery *stated she had never encountered false allegations of sexual assault or "regret sex" during her time at the University*.  *See* Ex. "15".  Defendants contend that this should

not be considered evidence of gender bias because Doe did not hear the statement himself. Regardless of whether Doe or anyone involved with the case heard the statement, it remains *indicia* of a bias by the Title IX Coordinator that overwhelmingly favors  female complainants. Additionally, Defendants argue that an article citing one of the panelists comments mocking defenses raised by men accused of sexual assault does not mention gender and therefore is not evidence of a gender bias.  In the article, the panelist stated, ████████████████████

████████████████████████████████████████████

████████████████████████" *See* Ex. "16". ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████e…".  *Id.*  The statements reflect a clear belief that complainants are victims.

While the Defendants suggest that specific language does not exist evidencing the gender of the complainants, the very fact that complainants are overwhelming female is critical. In *Doe v. Univ. of Colorado, Boulder*, the court held, "if enforcement officials are regularly presented with a scenario involving the same two classifications –nurse and female…sexual assault suspect and male ---there must come a point where one may plausibly infer that stereotypes about the protected classification (such as gender or ethnicity) have begun to infect the enforcement process generally."  *Doe v. Univ. of Colo., Boulder*, 255 F.Supp. 3d 1064, 1076 (D.Colo. 2017).

While not specifically mentioned in the Defendants' Motion for Summary Judgment, additional evidence of gender bias was unveiled during the discovery process in this case.  E. J. Presley, the panelist who ████████████████████████████████████

████████████████████, testified  that ████████████████████████████

████████████████████████████████. See Ex. "7", p. 126, line  23- p. 127, line 14.

Presley testified that █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. *Id.*, p. 128, lines 5-12.

The Title IX Department at the University of Mississippi has tailored its policies so as to have an unwritten and pervasive practice of causing males to be expelled or suspended.  Ussery controlled discovery, the scope of the investigation, the decision to forward Doe's case (and any others) to Student Conduct for discipline, and the Title IX training provided by the University.   In the last five years, 93% of the sexual assault cases that Ussery has determined merit disciplinary proceedings and has forwarded for disciplinary action, have resulted in the male student being suspended or expelled.  This statistically lopsided figure is the result of intentional discriminatory selection of cases for "prosecution" and the development and issuance of training policies that encourage female complainants to be believed over the male accused.  These statistics exist because of the underlying intentional, discriminatory actions of the University in conducting gender biased investigations and gender biased disciplinary proceedings.

The panel members who had been trained by Ussery, had inadequate training and understanding to reach anything other than an erroneous result.  The Title IX training afforded to prospective hearing members, promotes both gender bias against a male respondent and materially contributes to a fundamental denial of due process to an accused male in the context of a sexual misconduct/sexual assault with penetration case.  Starting with the premises admitted and agreed to by Honey Ussery and Defendants that 92 %  of sexual assault allegations are true. *See* Ex. "12-7"; Ex. "4", p. 306, and that the female student is most likely to be the "victim" and at the "highest risk" for a penetrative sexual assault, *See* Ex. "4", p. 305, the Title IX training slides follow suit.

The training itself is embodied in a PowerPoint slide presentation prepared, through Defendants' delegated authority, by Honey Ussery. The materials favor the female complainant over the male respondent in material ways.  *Even the Title IX coordinator* ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████.  *See* Ex. "4", p. 42, lines 6-17.  Training given to the University Judicial Council (from whose ranks the hearing panel that decided Doe's case were drawn) and Appellate Consideration Board members provides that just because an individual does not protest or resist sexual activity, their silence and lack of resistance does not constitute consent. *See* Ex. "12-2".

Within these training materials complainants are referred to as "survivors" and sexual assault cases are identified as "different" inasmuch as there is a desire to protect student when they are most often subject to these "crimes" and are at the highest risk and there is limited access to the justice system for these "crimes".  *See* Ex. "12-2".  The training materials indicate that the Title IX report will be thorough and complete, when in reality it did not include all exculpatory evidence for Doe, as the accused male respondent.  *Id.*  In Doe's case, the only party making inconsistent statements was Roe.  The training indicates that such inconsistencies should not equate to being untruthful.  *Id.*  Furthermore, the training inappropriately refers to complainants as "victims," thereby implying the veracity of the allegations, while referring to respondents in the context of potentially not fitting a rapist stereotype.  *Id.*  The training also inappropriately advises that *only in the case of a penetrative sexual assault*, either suspension or expulsion is to be imposed if there is a finding of responsibility; lesser sanctions are not an option in such cases. [3] *Id.*  Finally, the

---

[3] Thus, the Defendants by policy purposefully and deliberately treat sexual assault penetration cases differently in terms of enhanced punishment but do not afford minimum much less enhanced forms of due process.  *See* Ex. "11", p. 115, line 13 - p. 116, line 3; Ex. "4", pp. 125-29

training emphasizes that the hearing panel members should use their Title IX report, thereby underscoring the prejudice to Doe and other males if the report does not contain all exculpatory evidence.  *Id.*  Contrary to the standard espoused by the Defendants,  "Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning." *Doe v. Brandeis*, 177 F.Supp.3d 561 (D.Mass. March 2016).

The University of Pennsylvania had training materials similar to those used by the University of Mississippi, which were brought under judicial scrutiny following a male student's discipline for sexual misconduct.  *See Doe v. The Trustees of the University of Pennsylvania*, U.S.D.C. for the E.D. of Penn., Case No.: 2:16-cv-05088-JP, [Doc. No. 59] (Sept. 13, 2017).  The materials instructed that "the fact that a complainant recounts a sexual assault somewhat differently from one retelling to the next may reflect memory processes rather than inattentiveness or deceit." In assessing the training materials, the District Court found the training was "so biased that it may violate Title IX by discriminating against males."  *Id.*  Such is the case here as well.

**B.** **The record evidence not only discredits Defendants' argument in support of summary judgment against Plaintiff with respect to his selective enforcement claim but supports summary judgment in Doe's favor.**

Utilizing the selective enforcement theory, Doe can also show he was singled out for punishment because of his sex.  (i.e., that regardless of his culpability, the severity of the penalty and/or the university's decision to initiate proceedings was affected by the charged student's gender) *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994).

The University intentionally tailored the Title IX policies and disciplinary process in such a way that it resulted in the unwritten, pervasive practice of causing males to be suspended or expelled in higher numbers because of their gender.  The practices regarding the handling of sexual assault cases involving penetration claims are, by design, discriminatorily applied so as to almost

16

invariably result in a finding of responsibility on the part of the respondent male students. *See* Ex. "12-26"; Ex. "12-27"; Ex. "12-28"; Ex. "11", pp. 48-86. Furthermore, as the epitome of selective enforcement, when heterosexual couples engage in sexual activity while [both are] under the influence of alcohol at the University of Mississippi, males will be found [r]esponsible for sexual misconduct and females will be considered "victims". *Id.*; *See also* Ex. "12-2"; Ex. "12-7"; Ex. "4", pp. 305-306. At the time of Doe's hearing, the University required heightened discipline of either suspension or expulsion in cases where a student was found responsible for engaging in sexual assault with penetration. *See* Ex. "11", p. 29, lines 7-17; p. 30, lines 3-13. While the University made a distinction between sexual assault cases involving penetration and other Title IX cases, and required any student found responsible for sexual assault with penetration to be expelled or suspended, the University did not differentiate between the standard of care or the amount of due process protections (if any) it applied in those cases. *Id.,* p. 31, lines 7 - 19.

Evidence of the effect of the practices intentionally employed by the Defendants is shocking. From July 1, 2014 until March 16, 2020, under the University's Title IX program, ██ males were suspended or expelled from the University as a result of finding of sexual misconduct in the form of sexual assault with or without penetration. ██████ was suspended or expelled for the same reason. *See* Ex. "11", pp. 99-100; Ex. "12-26"; Ex. "12-27"; Ex. "12-28"; and Ex. "12-16". Out of a total of ██ males who were referred by the Title IX office for disciplinary hearings, a stunning ████████ were found responsible and either expelled or suspended from the University. *See* Ex. "11", pp. 48-86, 99-100, 103-04; Ex. "12-26"; Ex. "12-27"; Ex. "12-28"; and Ex. "12-16".

Defendants argue that Doe and Roe were not similarly situated because "Roe alleged she was incapable of consenting to sex "and "Doe did not allege he was incapacitated…(but that) he

consented to sex." [Doc. 167, p .13] This argument belies the entire issue because if Roe was unable to consent because she had been drinking, then Doe must have also been unable to consent because he, too, had been drinking. Yet, only Doe was charged with a Title IX violation. Doe testified to the Judicial Council that ████████████████████████████████████ ████████████████████ *See* Ex. "3". Furthermore, the University's statement that it did not investigate Roe's behavior because Doe did not report her for a violation and, since Doe said he consented to sex, "any such report would have been frivolous." However, the University opened an investigation of Doe at the very time Roe was maintaining she had consensual sex with him. It was the *University* that took the position Roe could not consent because of her alcohol consumption yet continued to refuse to take the same position with respect to Doe. This blatant continued, sex-based differentiation between students harmed Doe and defies Title IX. *See* e.g. *Doe v. Syracuse Univ.*, 341 F.Supp. 3d 125, 139 (N.D.N.Y. 2018) (a University's *sua sponte* initiation of sexual assault proceedings against only a male student but not against a female student, with respect to an incident in which both parties were intoxicated, sets forth a plausible selective enforcement claim).

The University acknowledged that while it could have modified its policies so as to allow for lesser sanctions when findings of sexual assault with penetration sanctions are made, and still be acting within parameters of existing guidelines, it continues to distinguish sexual assault cases that include allegations of penetration from all others, without affording heightened due process protections. *See* Ex. "11", p. 115, line 14, p. 116, line 3; Ex. "4", pp. 125-29. Just as the Sixth Circuit has recognized that statistical evidence showing that nearly 90% of students found responsible for sexual misconduct during the years in issue had male first names was relevant to establishing a pattern of gender-based decision making, *Doe v. Miami University*, 882 F.3d 579,

592-593 (6th Cir. 2018), this Court should recognize that statistical evidence shows the University intentionally has tailored its Title IX policies in such a way as to have created an unwritten practice of gender-based decision making in violation of Title IX.

### C. The record evidence precludes summary judgment in favor of the Defendants with respect to the Plaintiff's Title IX claim based on a theory of deliberate indifference.

As a recipient of federal funding, the University can be held liable for intentional discrimination on the basis of sex or for its deliberate indifference to discrimination against or harassment of a student on the basis of sex. *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173 (2005). Defendants did not address deliberate indifference with respect to Title IX within their motion for summary judgment against the Plaintiff. However, this third alternative bars summary judgment in favor of the Defendants with respect to Plaintiff's Title IX claim. To establish a Title IX claim based upon a theory of deliberate indifference, Doe would need to "…demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *See Gebser v. Lagovista Independent School District*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1988). Under the deliberate indifference standard, a plaintiff must demonstrate that the educational institutions challenged misconduct was motivated by sex-based discrimination.

Deliberate indifference has been recognized in the context of official refusal to conduct a thorough investigation in *Columbia Univ.*, 831 F.3d at 49–50, 52–53, 56–57. As discussed in more detail above and below, this is precisely what occurred with Andrew Doe. It is critical to discuss the role of the U.S. Department of Education's 2011 Dear Colleague letter and the impact that the threat of loss of federal funding played on the decision-making process at the University of

Mississippi.  In its deposition, the University expressly acknowledged that its Title IX policy was adopted in order to prevent the loss of federal funding.  See Ex. "11", pp.32-35.

As acknowledged by the Second Circuit in *Doe v. Columbia University*:

> A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practices sex discrimination, notwithstanding that the motive for the discrimination didn't outcome from ingrained or permanent bias against that particular sex.

*Id*., at 58 n.11.

Either by policy or guidance as applied by the University from July 1, 2014 to the present, the result has been either the suspension or expulsion almost invariably -- of *male* students.  *See* Ex. "12-27" and Ex. "12-28".  On September 22, 2017, the U.S. Department of Education, Office of Civil Rights released a notice addressing the ongoing deprivation of rights for many college students who have been accused of sexual misconduct. [Doc. 9, ¶ 118] The Defendants were aware of the Department of Education's pronouncement and concerns about what was characterized as the denial of "the most basic of due process rights", yet consciously and deliberately elected not to modify their unconstitutional policies or practices and/or rectify the erroneous determinations and disproportionate sanctions issued to Doe and other males. [Doc. 9, ¶ 119] Specifically, on October 10, 2017, the University issued a written statement advising it would not be making any changes to policy, procedure or to Title IX cases. [Doc. 9, ¶120]

In *Doe v. Marymount*, the court identified a failure to consider exculpatory evidence, the refusal to give an accused student a copy of the final investigative report and a disciplinary panelist who asserted that most complainants were truthful, could all serve to show structural elements of

gender bias.  *See Doe v. Marymount Univ.*, 297 F.Supp. 3d 573, 584 (E.D. Va. 2018).  Although

Ussery admitted that 

*See* Ex. "4", p. 27, line 6, p. 30, line 19; Ex. "12-14".  In fact, Ussery wholly

failed to address Bethany Roe's statements that ████████████████████. *See*

Ex. "12-14".  Likewise, Ussery did not interview ██████████████. *See* Ex.

"12-14"; Ex. "12-8"; Ex. "4", p. 219, line 6, p. 223, line 1.  Additionally, Ussery did not include

any ██████████████ within her report and failed to develop vital

exculpatory evidence for inclusion in the report.  *See* Ex. "12-14"; Ex. "12-8"; Ex. "4", p. 219, line

6, p. 223, line 1.  Given such unbridled discretion to discriminate against male respondents such

that exculpatory evidence was/is not fully developed and presented for consideration, it is not

surprising that men such as Doe are almost invariably found responsible in cases of sexual assault

with penetration at the University. *See* Ex. "12-26"; Ex. "12-27"; Ex. "12-28".

## II.   The Record Evidence Precludes Summary Judgment in favor of the Defendants' with Respect to Plaintiff's Equal Protection Claim.

Defendants' Motion for Summary Judgment does not mention the Plaintiff's Equal

Protection Claim.  [Doc. 166]  However, it is briefly touched upon within the Defendants'

Memorandum Brief.  Specifically, the Defendants indicate that in order to maintain an Equal

Protection Claim, a plaintiff such as Andrew Doe must show that similarly situated persons were

treated dissimilarly.  According to the Defendants, "Doe and Roe are not similarly situated because

Roe lacked the capacity to consent to sex and Doe did not.  Doe never pursued a Title IX complaint

against Roe." [Doc. 167, p. 13]  At a minimum, the record evidence precludes summary judgment in favor of the Defendants on this claim and warrants summary judgment in favor of the Plaintiff.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In order to establish an equal protection claim, "the plaintiff must prove that similarly situated individuals were treated differently." *Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999). "The question of whether the plaintiff and the proposed comparator were similarly situated "is case-specific and requires [the Court] to consider 'the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision.'" *Lindquist v. City of Pasadena*, 669 F.3d 225, 234 (5th Cir. 2012) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1208 (11th Cir. 2007)).  Title IX on its face is intended to be applied in a gender-neutral fashion to males and females alike.  There is no legally relevant distinction between Doe and Roe either with regard to the facial application of Title IX or with regard to their rights and privileges under University policy or Mississippi law as students at a public university receiving federal funds."

Herein, the evidence establishes that Doe and Roe, two undergraduate students at the University, both drank the evening in issue; Roe went to Doe's apartment together;  Roe climbed on top of Doe and physically guided Doe's penis into her; Roe reported to her doctor that she and Doe "were both drunk and that she felt it was a mutual decision between both of them" to have sex; and that Doe passed out on his couch once Roe left his apartment. Neither Roe nor Doe contacted the police on the evening in question.  However, the University elected to pursue an investigation against Doe and not against Roe.  As the investigation continued and evidence was brought forth that both individuals were intoxicated, the University never inquired into whether or

not Andrew Doe was incapacitated.  In fact, as ███████ testified, the standards for Doe and Roe were not the same.  If the complainant had been male, the existence of any alcohol consumption would not have been the sole factor for determining responsibility.  The totality of the circumstances would have been considered. *See* Ex. "7", pp. 126-128.  Both Doe and Roe were undergraduate, Caucasian students at the University. Both were required to be afforded the same rights and privileges and for Fourteenth Amendment analysis purposes, were similarly situated in all respects prior to the institution of the Title IX charges. Their only distinction was that Doe was male and Roe was female.

In *Doe v. Miami Univ.,* 882 F.2d 579 (6th Cir. 2018), the Sixth Circuit Court of Appeals held that the fact a University initiated an investigation into a male's conduct, but not his female counterpart's similar conduct which, if proven, could constitute circumstantial evidence of gender discrimination.  *See Doe v. Miami*, 882 F.2d 579 (6th Cir. 2018), citing *Brown Univ.,* 166 F. Supp. at 189, *Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201, 1210 (S.D. Ind. 2016).  The court held that because the decisionmaker in that case "was operating under 'the same set of operative facts' when she decided not to initiate the disciplinary process against" the female student, there could be a viable equal protection claim.  *See Miami*, 882 F.3d at 596 (quoting *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1083 (S.D. Ohio 2017)).

## III.  The Record Evidence Precludes Summary Judgment in Favor of the Defendants' with Respect to Plaintiff's Substantive and Procedural Due Process Claims.

### A.  Andrew Doe has standing to seek prospective injunctive relief.

Defendants contend that Doe lacks standing to pursue the expungement of his finding of responsibility because there is no proof that the finding is mentioned on his transcript and because he does not intend to return to the University.  Furthermore, the Defendants have argued that there is no record proof that the finding of responsibility for sexual misconduct is mentioned on Doe's

academic transcript or other document the University might disclose to a third party.   On the contrary, Murry testified that ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████   *See* Ex. "10", p. 311, lines 3-16.  The University testified that ██████

███████████████████████████████████████████████████████████████████████████

████████████████████████████   *See* Ex. "11", p. 103, line 25, p. 104, line 14.

In order to have suffered a constitutional injury-in-fact, Doe is not required to apply to, and be rejected by, another school.  Rather, he can pursue his claim for injunctive relief provided he alleges a "real and immediate threat of future injury" that is not merely conjectural.  *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir.2010); *See also Hays v. LaForge,* 113 F.Supp.3d 883, 325 Ed. Law Rep. 845 (N.D.Miss. 2015) (*Ex parte Young* allows plaintiff's Section 1983 claim for prospective injunctive relief)   Herein, Doe has articulated his real concern that a finding of responsibility on his transcript will continue to injure his reputation, education and job opportunities.  The finding of responsibility for sexual assault on his reputation, honor and integrity is itself actionable.  *See Doe v. Miami University*, 882 F.3d 579, 600 (6th Cir. 2018); *See also Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573 (D.Mass. 2016)(Title IX proceedings leave students "marked for life as a sexual predator")[4].

---

[4] As noted by Edith Jones in her dissenting opinion in *Plummer v. University of Houston,* 860 F.3d 767, 344 Ed. Law Rep. 710 (5th Cir. 2017)(E. Jones, dissenting), "Put in terms of the *Mathews* balancing test, *Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976), the students' interests in preserving their educational status and reputations in the face of serious sexual misconduct charges were compelling. See *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp.3d at 622 ("[P]laintiff's lost opportunity to continue with his post-secondary education, coupled with the possibility that he may be unable to pursue meaningful educational opportunities elsewhere while his name remains associated with sexual misconduct, inevitably affects plaintiff's professional prospects. . . . an adjudication of responsibility for sexual misconduct carries a . . . powerful stigma," such that robust due process is required.); *Brandeis Univ.*, 177 F. Supp.3d at 602 ("Certainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings.")  Plaintiff Doe has suffered these adverse consequences to his higher educational status and

To the extent Defendants assert the position that if Doe succeeds on his procedural due process claim his remedy would be a new hearing with different procedures, they rely upon *Doe v. Purdue*.  Unlike the *Purdue* case, Doe isn't challenging the conditions of his reentry.  Doe's suspension has *already been served* and he has been irreparably damaged.  The University has no continuing jurisdiction over him.  Requiring him to be subjected to yet another disciplinary hearing *after having already served a suspension* would be tantamount to double jeopardy. A subsequent hearing cannot undue the irreparable past constitutional wrongs as a result of which Doe has already been sentenced and punished. A finding that a right merits substantive due process protection means that the right is protected against government actions regardless of the procedures the government employs. Substantive due process rights also differ from procedural due process rights in the manner in which the violation of the right occurs. A violation of a substantive due process right is complete when it occurs. Hence, the availability of an adequate post-deprivation state remedy is irrelevant. *See McKinney v. Pate*, 20 F.3d 1550, 1556-57 (11th Cir. 1994); *Planned Parenthood v. Casey*, 505 U.S. 833, 851 (1992); *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). In Doe's case, the violation of his substantive due process rights underscores the incredulity of Defendants' arguments that all Doe is entitled to is another hearing.  In a substantive due process deprivation, the government has deprived a person of a property or liberty interest and must compensate the interest's owner (here, Doe) for the value of the interest taken.

### B.    Procedural Due Process Rights

The Fourteenth Amendment of the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV, §1.4.  42 U.S.C. §1983 creates a private cause of action for persons who are denied a federal

---

opportunities, and with the corresponding stigma of being labeled in effect a sex offender, has been stigmatized in a manner which materially affect his future employment opportunities and earnings ability.

constitutional or statutory right by a "person" acting under color of state law.  The Defendants are state actors who owe Doe protections consistent with the Fourteenth Amendment.

The concept of procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "To be entitled to the procedural protections of the Fourteenth Amendment, a Plaintiff must demonstrate that his dismissal from the University deprived him of either a liberty or a property interest. *See Bd. of Curators of Univ. of Mo. v. Harrowitz,* 435 U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *See also* fn. 4 above.  Doe's continued enrollment in a public university is a protected property interest. *Rendell-Baker v. Cohn*, 457 U.S. 830, 837, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982).  Furthermore, where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, a liberty interest is implicated.  *See Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).  Through the Defendants' use of flawed investigative, hearing and appellate processes, Doe was deprived of his property and liberty interests.

"Generally, the amount of process due in university disciplinary proceedings is based on a sliding scale that considers three factors: (a) the student's interests that will be affected; (b) the risk of an erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (c) the university's interests, including the burden that additional procedures would entail."  *Plummer v. Univ. of Hous.*, 860 F.3d 767, 773 (5th Cir. 2017),  citing *Mathews*, 424 U.S. at 335).  In *Plummer*, the Fifth Circuit examined whether two students received due process during a university disciplinary proceeding regarding alleged sexual misconduct, 860 F.3d at 773, and applied the *Mathews* factors.

As in *Plummer*, "the first and third *Mathews* factors are easily identified" in this case.  On the one hand, Doe has a liberty interest in his higher education and the sanctions imposed by the University could have a "substantial lasting impact on [his] personal li[f]e[], educational and employment opportunities, and reputation[] in the community."  *See Plummer,* at 773 (quoting *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016)) (additional citations omitted).  "On the other hand, the University has a strong interest in the educational process, including maintaining a safe learning environment for all its students, while preserving its limited administrative resources." *Id.*  Here, Doe's due-process claim turns on "the second *Mathews* factor—the risk of erroneously depriving [his] interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Id.* at 774.

Under the second *Mathews* factor, the "amount of process constitutionally required in state university disciplinary proceedings will vary in accordance with the particular facts of each case." *Plummer* at 774 n.8. Restated.  In her dissenting opinion in *Plummer*, Edith Jones stated, "Put in terms of the *Mathews* balancing test, *Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976), the students' interests in preserving their educational status and reputations in the face of serious sexual misconduct charges were compelling.  *See Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp.3d at 622 ("[P]laintiff's lost opportunity to continue with his post-secondary education, coupled with the possibility that he may be unable to pursue meaningful educational opportunities elsewhere while his name remains associated with sexual misconduct, inevitably affects plaintiff's professional prospects. . . . an adjudication of responsibility for sexual misconduct carries a . . . powerful stigma," such that robust due process is required.); *Brandeis Univ.*, 177 F. Supp.3d at 602 ("Certainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded

the procedural protections of criminal proceedings.").  At a minimum, a student facing suspension is entitled to "the opportunity to be 'heard at a meaningful time and in a meaningful manner.'" *Cummins*, at 446, quoting *Mathews,* at 333.  Here, the Defendants did not afford Doe meaningful or constitutionally adequate due process.[5]  Unlike *Plummer*, this case is distinguished as a he-said/she-said matter that lacks indisputable guilt memorialized by a video recording.

### 1.    Cross examination

In almost every proceeding "where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).  "The ability to cross-examine is most critical when the issue is the credibility of the accuser."  *See Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 605 (D. Mass. 2016).  A cross-examiner may "delve into the witness' story to test the witness' perceptions and memory." *Id*, citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L. Ed. 2d 347 (1974).  He may "expose testimonial infirmities such as forgetfulness, confusion, or evasion . . . thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Id*., *Craig*, 497 U.S. at 847 (citation and brackets omitted). He may "reveal [] possible biases, prejudices, or ulterior motives" that color the witness's testimony. *Davis*, at 316.

---

[5] By way of example in discussion of additional procedural safeguards (in addition to the obvious -- requiring gender-neutral training, investigations, and discipline) on May 19, 2020, new regulations relating to Title IX were published in the Federal Register.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026-01, 2020 WL 2525707 (May 19, 2020) (to be codified at 34 C.F.R. § 106, effective Aug. 14, 2020).    The regulations are intended to set forth clear legal obligations and procedural due process protections that must be incorporated into federal funding recipient's grievance processes to ensure fair and reliable factual determinations when a recipient investigates and adjudicates a formal complaint of sexual harassment. *Id.*, at 30030. For brevity, these regulations are referenced and incorporated here in full. While not effective until August 2020, the Department of Education's regulations set forth a framework from which the Court can rely in assessing whether or not the Defendants violated the rights of Andrew Doe and whether or not additional procedural safeguards would have lessened such constitutional violations and violation of *his* Title IX rights.

In *Doe v. Baum*, the Sixth Circuit held that "if a public University has to choose between competing narrative to resolve a case, the University must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact finder." *See Doe v. Baum*, 903 F.3d. 575, 578 (6th Cir. 2018). Furthermore, the Court held that the opportunity to cross-examine is not satisfied by allowing an accused student to point out inconsistencies in his accuser's statement. *Id.*, at 582. It is the adversarial questioning that allows for probing of a witness's story and testing of memory, intelligence and potential ulterior motives, and which provides an opportunity for the fact finder to observe the witness's demeanor. *Id.*; *See also Doe v. Ohio State Univ.*, 311 F.Supp. 3d 881, 889-93 (S.D.Ohio 2018) and *Nokes v. Miami Univ.*, No. 1:17cv 00482, 2017 U.S. Dist. LEXIS 136880, at *37 (S.D.Ohio Aug. 25,2017) (due process requires opportunity to cross-examine witnesses and have access to exculpatory evidence).

This court has found the reasoning in *Baum* persuasive. *See Doe v. Univ. of Southern Miss.*, Civil Action No. 2:18 cv 153, Doc.  35 (S.D. Miss. Sept. 26, 2018). In *Univ. of Southern Miss.*, this Court acknowledged that, "The court in *Baum*, although deciding a Motion to Dismiss, does an excellent job of explaining the unique aspects of this type of case where credibility is at issue and the consequences are grave if a party is found "responsible." *Id.*, at p. 6. The Court explained that "… [w]hile the majority of the Fifth Circuit panel in *Plummer* admonishes that "[a] university is not a court of law, and it is neither practical nor desirable it be one," [it also provides] that "[t]he nature of the hearing should vary depending upon the circumstances of the particular case. So as the court stated in *Baum*, "when it comes to due process, the 'opportunity to be heard' is the constitutional minimum . . . [b]ut determining what being "heard" looks like in each particular case is a harder question." *See Doe v. Univ. of Southern Miss.*, Civil Action No. 2:18 cv 153, Doc. 35, pg. 6 (S.D. Miss. Sept. 26, 2018)(internal citations omitted).

In *Plummer,* the need for confrontation was not the same as it was in the Andrew Doe matter.  In *Plummer,* the finder of fact had pictures and a video recording of the incident to look to.  This case does not.  Andrew Doe's case involves a classic he-said/she-said credibility assessment.  "The value of the additional safeguards is immense in a he said/she said situation." *See Doe v. Univ. of Southern Miss.*, Civil Action No. 2:18 cv 153 -KS-MTP, Doc. 35, pg. 6 (S.D. Miss. Sept. 26, 2018)  "When credibility is at issue, it is crucial to be able to attempt to draw out the truth and should be required in circumstances like these because it is 'the greatest legal engine ever invented' for uncovering the truth." *Id.*, citing *Baum*, 2018 WL 426534 at *3 (citing *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399-402 (6th Cir. 2017)).  As recognized by this Court in *Doe v. Univ. of Southern Miss.*, "Although cross examination is required in the Sixth Circuit, it has not yet been the pronouncement of the Fifth Circuit.  That having been said, the right set of circumstances has not yet been before the Fifth Circuit.  The Court finds that this is such a case where the Fifth Circuit is likely to follow the lead of its sister circuit." *Id.*, at pg. 7.  Andrew Doe's case embodies the right set of circumstances.

To assess the possible impact of cross-examination, in Doe's case it is important to understand the factual context.  Doe was found responsible under the University's Policy which requires consent for all sexual activity and states that "an incapacitated person is not able to give consent."  Sexual Misconduct Policy [42-14] at 4.  The policy defines incapacitation as follows: "Someone is incapacitated when he or she cannot understand who, what, when, where, why, or how, with respect to the sexual interaction." *Id.*, at 5.  The parties agree that Doe and Roe were intoxicated on the night of their encounter, but Roe's level of intoxication doesn't indicate that she did not know the "who, what, when, where, why, or how" of the encounter.  Starting with the police reports from the night of the fraternity party, Roe seemed to have the ability to understand

what was happening.  *See* Ex. "12-1".  She informed her treating physician that ████████

█████████████████████.  *Id.*  If Doe or the panel members could have questioned Roe about

throwing out her champagne, making out with Doe on the way to his apartment, initiating sex or

the differences between her statements to the treating physician and officers verses what she told

Ussery days later with her parents sitting next to her, the panel may have found her less credible

and would have been able to have had answers to the multitude of inconsistencies in the record.

The Court can consider the Sixth Circuit's reasoning on the value of cross-examination

under the second *Mathews* factor—i.e., "the risk of erroneously depriving" Doe's interests by

conducting the hearing without cross-examination, and the "probable value, if any" of providing

cross-examination.  *Plummer*, 860 F.3d at 774.  Cross-examination would have allowed the

inconsistencies set forth above to have been addressed.

## 2.     Training and Investigation

While Defendants argue that Doe has failed to establish that the University training

violated Doe's due process rights, the record evidence is replete with examples of such bias

training.  E*ven the Title IX coordinator admits* ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*See* Ex. "4", p. 42, lines 6-17.  Her training materials emphasize the gender disparity and its effect

upon due process afforded to Doe and other males.  In a non-exhaustive summary, the training

materials: (a) complainants are referred to as "survivors"; (b) these case are identified as

"different" inasmuch as there is a desire to protect student when they are most often subject to

these "crimes" and are at the highest risk and there is limited access to the justice system for these

"crimes"; (c) the training indicates that the Title IX report will be thorough and complete, when in

reality it does not include all exculpatory evidence for Doe as the accused male respondent; (d) in Doe's case, the only party making inconsistent statements was Roe, and the training indicates that such inconsistencies should not equate to being untruthful; and (e) the training inappropriately refers to complainants as "victims," thereby implying the veracity of the allegations, while referring to respondents in the context of potentially not fitting a rapist stereotype.  The training advises that in the case of a penetrative sexual assault only, either suspension or expulsion is to be imposed if there is a finding of responsibility; lesser sanctions are not an option.  Finally, the training emphasizes that the hearing panel members should use their Title IX report, thereby underscoring the prejudice to Doe and other males if the report does not contain all exculpatory evidence.  *See* Ex. "12-2".  As testified to by E. J. Presley, ███████████████████ ████████████████████████████████████████████████████  *See* Ex. "7", p. 99, line 22, p. 100, line 1.  Presley believed ████████████████████████████████████████ ████████████████████████  *Id.* at p. 105, line 21, p. 106, line 3.  In reality, it did not.

Additionally, Tracy Murry takes it upon himself to provide information to the hearing panels regarding University "precedent" in imposing sanctions and he serves as an advisor to these boards, in order to "guide" them in the deliberative process.  In Doe's case, Murry even ███████████ ████████████████████████████████████████████████████ ████████████████████  *See* Ex. "10", p. 210-215, 225-226; Ex. "12-18"; and Ex. "12-19".  Murry admitted that ████████████████████████████ . *See* Ex. "10", p. 263, lines 2-25.  Additionally, ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████  *See* Ex. "10", p. 264-65.

### 3. Panel selection

"[A] biased decisionmaker [is] constitutionally unacceptable." *Withrow v. Larkin,* 421 U.S. 35, 47 (1975). As discussed in the Title IX section regarding gender bias above, the record evidence indicates the bias of the panel members sufficient to preclude summary judgment in favor of the Defendants. Those arguments set forth above are incorporated herein in their entirety.

### 4. Standard of proof

In Doe's case, just as in all other Title IX matters inclusive of sexual assault with penetration, the Defendants relied on the lowest standard of proof in law, the preponderance of the evidence. The University's Sexual Misconduct Policy in effect at the time of Doe's hearing explains that "[t]he standard of proof for all cases involving sexual misconduct will be based upon the University's established standard of preponderance of the evidence." Sexual Misconduct Policy [42-14] at 8; Ex. "12-14". This preponderance standard violates due process. *See Doe v. DiStefano*, No. 16-CV-1789-WJM-KLM, 2018 WL 2096347, at *6 (D. Colo. May 7, 2018) (noting unsettled nature of the law). The only circuit that appears to have addressed the issue did so in an unpublished opinion that found no due-process violation when a university used the preponderance standard in a school disciplinary proceeding. *See Cummins*, 662 F. App'x at 449. However, Judge Edith Jones made a forceful argument in her *Plummer* dissent that hearings on alleged sexual misconduct are quasi-criminal and have long-lasting impacts on the accused. She advocated for a more burdensome standard of review, noting that "[e]levating the standard of proof to clear and convincing, a rung below the criminal burden, would maximize the accuracy of factfinding." *Id.* at 782 & n.11 (Jones, J., dissenting). The majority in *Plummer* avoided the issue, noting that it had not been preserved for appeal. *Id.* at 772 n.5. This Court, respectfully, should require a greater burden of proof in quasi-criminal proceedings where, unlike all other disciplinary decisions, the University and State have restricted the available discipline to only expulsion or suspension.

The University's policies and procedures derive directly from the Dear Colleague Letter, not from inherently educational decisions. Elevating the standard of proof to clear and convincing, a rung below the criminal burden, would maximize the accuracy of factfinding.[6] Permitting counsel to represent the students would have resulted in more efficient hearings. Adopting some or all of the foregoing safeguards would not significantly impede the disciplinary process. The Defendants' interests should lie in impartially adjudicating these quasi-criminal sexual misconduct allegations that can have life-long implications equivalent to criminal adjudications of guilt. To the extent that Defendants' eliminate confrontation, cross-examination and counsel participation, due process denials result. By using the lowest standard of proof and limiting the other procedural protections to which Doe was entitled, the University violated Doe's due process rights.

## B.    Substantive Due Process

The substantive component of due process bars certain governmental actions regardless of the fairness of the procedures that were sued to implement them. *See County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (discussing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The bad faith dismissal of a student following adjudication by a biased disciplinary panel or other failure to exercise professional judgment may be sufficient to state a due process claim. *See Clemons v. Eastern Kentucky University*, 2006 WL 1464617 (E.D. Ky. 2006) and *Alcorn v. Vaksman*, 877 S.W.2d 390, 91 Ed. Law Rep. 1201 (Tex. App. Houston 1994) (*writ denied* June 29, 1995); Additionally, "[f]ormalistic acceptance or ratification of [a] request or recommendation

---

[6] Commentators have noted that applying the civil preponderance standard to quasi criminal charges seriously weakens due process for accused students. See, e.g., Ryan D. Ellis, *Mandating Injustice: The Preponderance of the Evidence Mandate Creates a New Threat to Due Process on Campus*, 32 Rev. Litig. 65 (2013); Barclay Sutton Hendrix, *A Feather on One Side, A Brick on the Other: Tilting the Scale Against Males Accused of Sexual Assault in Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591, 610-15 (2013); Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. Ky. L. Rev. 49, 62, 62 n.59 (2013).

as to the scope of punishment, without independent [] Board consideration of what, under all the circumstances, the penalty should be, is less than full due process." *See Lee v. Macon Cnty. Bd. of Educ.*, 490 F.2d 458, 460 (5th Cir. 1974).   The academic dismissal of a state university student has been found to constitute a potential violation of the student's substantive due process rights where there was evidence that an insufficient investigation was conducted prior to the student's dismissal. *See Guse v. University of South Dakota*, 2011 WL 1256727 (D.S.D. 2011).   A dismissed student can succeed on a substantive-due-process claim if he shows "that the university's decision was not careful and deliberate." *Guse v. Univ. of S.D.*, No. 08-4119, 2011 WL 1256727, at *13 (D.S.D. Mar. 30, 2011) (citing *Schuler v. Univ. of Minn.*, 788 F.2d 510, 516 (8th Cir. 1986)).

The record contains admissions by the panel that they did not look at all evidence presented to them and that they did not follow their training.   Panelist E. J. Presley testified ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████ *See* Ex. "7", p. 20, line 23, p. 21, line 4.   Presley also testified ███████████████████████████████████████████████████████████████ *Id.*, p.111, line 22, p. 112, line 5.   Perhaps most shockingly, however, is the fact that the panelists saw no need for _any_ of the witnesses identified in Ussery's report, inclusive of Bethany Roe, the alleged student witnesses, medical personnel and police, to be called to testify prior to deciding Doe was responsible for sexual assault.   *Id.*, p. 119, line 7; p. 120, line 19.   That, and the record evidence that the Appellate Consideration Board also felt it could uphold a finding of Responsibility on such flimsy and incomplete investigation and disciplinary proceedings, does not merely raise a genuine issue of material fact sufficient to preclude summary judgment in favor of the Defendants, but rather warrants summary judgment in favor of the Plaintiff.

RESPECTFULLY SUBMITTED, this the 8th day of July, 2020.

**ANDREW DOE,**
Plaintiff

By:   *s/Michelle T. High*
               Michelle T. High

J. Lawson Hester (MS Bar No. 2394)
lhester@manierherod.com
MANIER & HEROD
1201 Demonbreun Street, Suite 900
Nashville, TN  37203
Telephone: (615) 244-0030
Direct: (615) 742-9339
Cell: (601) 209-4728
Facsimile: (615) 242-4203


Michelle T. High (MS Bar No. 100663)
mhigh@bpisfirm.com
David A. Barfield (MS Bar No. 1994)
dbarfield@bpislaw.com
Biggs, Pettis, Ingram & Solop, PLLC
111 East Capitol Street, Suite 101
Jackson, MS  39201
Mailing Address:
Post Office Box 14028
Jackson, MS  39236-4028
Direct and Facsimile: (601) 987-5313