**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

ANDREW DOE                                                                            PLAINTIFF

V.                                              CIVIL ACTION NO. 3:18-cv-138-DPJ-FKB

STATE OF MISSISSIPPI; THE UNIVERSITY OF
MISSISSIPPI; STATE INSTITUTIONS OF HIGHER
LEARNING ("IHL"), ET AL.                                                DEFENDANTS

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Andrew Doe has asked the Court to enter judgment as a matter of law in his favor on all

his surviving claims – his Motion apparently seeks "partial" summary judgment only in the sense

that it does not ask the Court to assess a particular amount of damages. If a movant for summary

judgment bears the burden of proof on an issue, as does Doe for each of his claims, he "must

establish beyond peradventure *all* of the essential elements of the claim or defense to warrant

judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis

in original); *see also DAK Ams. Miss., Inc. v. Jedson Eng'g, Inc.*, No. 1:18cv31-HSO-JCG, 2019

U.S. Dist. LEXIS 94836, at *9 (S.D. Miss. June 6, 2019) (holding counter-claimant pursuing an

"offensive" summary judgment motion had not met its "high burden" of establishing all elements

of claim). Not only has Doe failed to do so, he ignores key material facts, misconstrues others,

and fails to cite record proof to support his conclusory arguments. The Court should deny Doe's

Motion in its entirety.

*1.*    ***Doe is not entitled to summary judgment on his Title IX claim***

*a.*    *No "deliberate indifference" claim available.*

As Defendants discussed in their Brief in support of their own Motion for Summary

Judgment, Title IX prohibits sex discrimination in education programs receiving federal funds. Defs.' Brf., at 5-6 [Doc. 167]. In addition to the "erroneous outcome" and "selective enforcement" theories Defendants have already briefed, Doe also purports to advance a "deliberate indifference" claim, which typically seeks to hold a school liable for its inaction in the face of harassment by students or teachers. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Doe argues the Second Circuit has recognized a deliberate indifference claim in the context of a challenge to a student disciplinary action, but the only case he cites deals with a claim of *intentional* sex discrimination by the defendant school. *See Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016). Likewise, Doe's lawsuit does not claim the University was indifferent to sex discrimination he faced at the hands of a third party – it alleges the University itself discriminated against him when it found him responsible for violating its sexual misconduct policy. Doe cites no authority allowing him to claim the University was "deliberately indifferent" to its own conduct.

### b.    *No evidence of gender bias.*

Regardless of how Doe characterizes his Title IX claims, they all require proof of the same essential element – sex discrimination. Defendants have already discussed Doe's failure to come forward with any such proof at some length. Defs.' Brf., at 5-13 [Doc. 167]. For the same reasons Defendants are entitled to summary judgment, Doe is not. Doe's brief raises a laundry list of complaints about the University's policies and procedures, but the only purported proof of *gender bias* to which Doe now points is (1) his incorrect assertion that "men who are accused of

2

sexual assault are almost invariably found guilty or responsible when accused of sexual misconduct/sexual assault with penetration," (2) a tortured argument that one of the Judicial Council panel members harbored a "clear and undisclosed pro-female bias in the context of campus violence/sexual assault against females," and (3) a baseless allegation that the University's training materials "favor the female complainant over the male respondent." Pl.'s Brf., at 15, 20, 24 [Doc. 186]. These alleged "facts" fall far short of establishing "beyond peradventure" that the University suspended Doe because of his gender.

<em>i.      Discipline statistics do not demonstrate gender bias.</em>

First, Doe's characterization of the University's discipline statistics is misleading – the pertinent numbers do not establish "dissimilar treatment of male and female respondents." Pl.'s Brf., at 15. Since Honey Ussery became its Title IX Coordinator in 2015, the University has received between forty and forty-five complaints of sexual assault per year. Ex. "R" to Defs.' Mot. for Summ. J. (Ussery Declaration). Of those reports, only *four* accused female students of sexual assault. *Id*. In light of these numbers, the fact that more male students than female students have been found responsible for sexual assault is not at all "shocking" as Plaintiff claims. *See* Defs.' Brf., at 11-12 [Doc. 167]. Moreover, as Defendants argued in their summary judgment briefing, such statistics are not evidence of gender bias. Defs.' Brf., at 11 [Doc. 167]; *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1201 (10th Cir. 2020) ("As we have explained, neither the statistical disparity in the gender makeup of respondents nor evidence of an anti-respondent bias can create a reasonable inference of bias on account of gender.").

Doe is also incorrect that "men who are accused of sexual assault are almost invariably

3

found guilty" through the Student Conduct disciplinary process. By Doe's count, fifteen male students were referred to Student Conduct for a disciplinary hearing over a period of almost six years. Pl.'s Brf., at 15 [Doc. 186]. Since the Title IX office received between forty and forty-five complaints of sexual assault during each of those years and only four of those cases involved allegations against female students, then the truth is the vast majority of male students accused of sexual assault never even face a disciplinary hearing, much less a finding of responsibility.

A Title IX complaint is only referred for a disciplinary hearing once the Title IX Coordinator reviews the allegations, determines whether the alleged conduct would actually constitute a violation of the University's policies, and investigates the allegations to determine whether any proof exists to substantiate them. See Ex. "B" to Defs.' Mot. for Summ. J. (Ussery Depo.), at 11:15-16:4; 18:10-20:14; 50:2-51:8 [Doc. 179]. Two of the Title IX reports accusing females of sexual assault did not lead to investigations or hearings because the potential complainants did not cooperate. The other two cases against female respondents were referred to Student Conduct for a hearing. One female respondent was found responsible and expelled, and the other female respondent was found not responsible. Ex. "R" to Defs.' Mot. for Summ. J. (Ussery Declaration) [Doc. 180-3]. *Id*.; Ex. "B" to Defs.' Motion (Ussery Depo.), at 45:4-46:6 [Doc. 179]. In other words, the Title IX Coordinator referred *one hundred percent* of her investigations of female respondents to Student Conduct for a hearing.

Doe essentially argues the University's disciplinary process works a disparate impact on male students, since he offers no proof as to the University's actual treatment of the other male students whose cases he references. However, Title IX prohibits intentional discrimination, and

4

Doe cites no authority that would allow a disparate impact claim. *Poloceno v. Dall. Indep. Sch. Dist.*, No. 3:18-CV-01284-E, 2019 U.S. Dist. LEXIS 222160, at *6 (N.D. Tex. Dec. 30, 2019) (holding that "Title IX does not provide a remedy for a disparate impact claim"); *Doe v. Univ. of Tex. at Austin*, No. 1:19-CV-398-LY, 2019 U.S. Dist. LEXIS 231751, at *8 (W.D. Tex. Nov. 8, 2019) ("A disparate-impact claim cannot be brought under Title IX, because the Title IX private right of action extends only to intentional discrimination."); *Doe v. Baylor Univ.*, 336 F. Supp. 3d 763, 774 n.3 (W.D. Tex. 2018) ("Most courts that have considered whether Title IX allows a disparate impact claim have held that it does not."); *Manley v. Tex. S. Univ.*, 107 F. Supp. 3d 712, 726 (S.D. Tex. 2015) (rejecting Title IX disparate impact claim because, like Title VI, Title IX precludes intentional discrimination).

Doe also argues the University discriminates against male students because (in accordance with the U.S. Department of Education guidance in effect at the time), its practice was to suspend or expel students found responsible for sexual misconduct "with penetration" while allowing lesser sanctions for other forms of sexual misconduct. According to Doe, this practice "effectively differentiated between the sanctions imposed for manual stimulation of a penis versus manual stimulation of a vagina." Pl.'s Brf., at 16 [Doc. 186]. Doe has identified no provision of the University's policies, though, that differentiates between male and female genitalia (there is no such provision), does not account for the anatomical fact that male and female bodies can both be penetrated, and offers no rational reason the University cannot determine that sexual assault involving non-consensual penetration, even one involving the "slightest insertion," *id*. at 16, should not be punished more harshly than other types of sexual

misconduct.[1]

Even more to the point, though, the distinction Doe attempts to create here has nothing to do with this case. There is no dispute that Doe had penetrative sex with Roe on the night in question. Doe has not identified any comparators who received different treatment because they had a different type of genitalia than him. In fact, the University expelled a female student for penetrative sexual assault just two months after Doe's disciplinary hearing. *See* Ex. "12-27" to Pl.'s Mot. for Summ. J. (Chart of Disciplinary Outcomes), at 3-4, line 31 [Doc. 190].

> ii.   *No evidence of biased panel members.*

Doe further alleges one of the panel members harbored a "pro-female bias" because, ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Doe omits any mention of the fact that the same panel member, ████████████████████████████████████████████████████

---

[1] Mississippi's sexual battery law, which carries a penalty of as much as forty years' imprisonment, defines "sexual penetration" as "cunnilingus, fellatio, buggery or pederasty, any penetration of the genital or anal openings of another person's body by any part of a person's body, and insertion of any object into the genital or anal openings of another person's body." MISS. CODE ANN. § 97-3-97.



The contention that the panel member was biased against Doe as a matter of law because she ████████████████████████████████████████████████████████, is specious.[2]

Doe also claims the panel member was biased because she "held the belief that women were more likely to be the victims of sexual assault than men." Pl.'s Brf., at 20 [Doc. 186]. That argument comes from this deposition exchange:



Ex. "X" to Defs.' Mot. for Summ. J. (Panel member deposition), at 77:4-13 [Doc. 181-1]. Doe does not explain how the panel member's recollection of this general statistic is evidence of gender bias, or even make any attempt to argue the statistic is untrue. As noted above, it is certainly true that more female students than male students report sexual assaults to the University of Mississippi's Title IX office. *See Doe v. Univ. of St. Thomas*, No. 16-1127, 2018 U.S. Dist. LEXIS 236502, at *6-7 (D. Minn. Aug. 6, 2018) (holding that "[t]raining documents that reference statistics on the frequency of sexual assaults perpetrated on women and on men,

---

[2] Even if Doe's characterization was factually correct, he cites no authority establishing that a person's opposition to the sexual assault of women (which is in no way exclusive of sexual violence against men) is evidence of gender bias.

and the frequency of such assaults that are perpetrated by men … merely reflect reality – that women are more likely to be victims of sexual assault than are men (but not to the exclusion of men), and that men are more likely than women to perpetrate sexual assault (but again, not to the exclusion of women.)"). It is unclear whether Doe contends that each of his panel members must actually have "believed" that males are more likely than females to be sexually assaulted (regardless of whether that belief is based in fact) or that they must be totally ignorant on the topic. It is worth noting that Doe apparently only thinks this is a disqualifying belief for the lone female panel member, since he fails to mention the fact that one of the male panel members also stated that women report more instances of sexual assault than men. Ex. "M" to Defs.' Mot. for Summ. J. (Edney Depo.) at 133:3-7; 134:10-135:2 [Doc. 179-11].[3]

> iii.     *Training slides do not demonstrate gender bias.*

Neither do the training slides the University used to train constitute indisputable proof of gender bias. Doe implies the training materials tell panel members that "92 percent (%) of sexual assault allegations are true" and that "the female student is most likely to be the 'victim' and at the 'highest risk' for a penetrative sexual assault." Pl.'s Brf., at 24 [Doc. 186]. However, none of these statements appear in the University's training materials. The first statement is a statistic that was published on the web site of a different University department. Exhibit to Pl.'s Mot.

---

[3] Doe also argues that another panel member would have applied a discriminatory standard to a hypothetical male complainant in a sexual assault hearing because he said he would consider "all the facts in the case" to determine whether that male complainant was capable of giving effective consent to sex. Pl.'s Brf., at 20 [Doc. 186]; Ex. "7" to Pl.'s Mot. for Summ. J. (Presley Depo.), at 128:5-12 [Doc. 187-3]. Leaving aside the fact that Doe did not claim he was unable to give consent in this case, it is unclear how a panel member's commitment to consider "all the facts in the case" could be evidence of discrimination.

(Web Page), at 95, P000191 [Doc. 173-12]; Ex. "B" to Defs.' Motion (Ussery Depo.), at 306:5-307:6 [Doc. 179].

The other statements come from the following exchange at Ussery's deposition:

Q.      All right. Would you agree with me that, based on that statistical type data, that what you're seeing in terms of complaints, whether founded or not, that the female student is considered to be the most likely to be the, I guess, purported victim, if you will, of penetrative nonconsensual sex?

**A.      Talking about statistically speaking?**

Q.      Yes.

**A.      Yes. Uh-huh (affirmative response).**

Q.      Okay. So they would -- the female would be -- based on the statistical information, the female student would be at the highest risk for being subjected to nonconsensual penetrative sex?

**A.      Based on the statistics, yes.**

Ex. "B" to Defs.' Motion (Ussery Depo.), at 305:9-23 [Doc. 179]. Neither do these statements constitute evidence of gender bias. Again, Doe makes no attempt to argue, much less prove, these statistics and statements are not actually true. Ussery's testimony reflects the undisputed fact that more women than men report sexual assaults at the University of Mississippi. The fact that Ussery did not disagree with Doe's counsel's characterization of a hypothetical person subjected to "penetrative nonconsensual sex" as a "victim" does not establish that the University's training materials are biased.[4]

---

[4] With no further discussion, Doe states in a footnote that "Ussery is a formal criminal prosecutor who handled crimes against women." Pl.'s Brf., at 24 [Doc. 186]. It is unclear how this affects Ussery's fitness to serve as a Title IX investigator. *See, e.g., Doe v. Miami Univ.*, 882 F.3d 579, 593 n.6 (6th Cir. 2018) (rejecting claim of bias because plaintiff claimed panel member studied

9

Doe also claims Ussery admitted there was a "difference in training" between what panel members are told about respondents and complainants, but he provides no context for that statement. Ussery actually said panel members were trained about how to ask questions without retraumatizing complainants and *also* how respondents might react to being accused of sexual misconduct. Ex. "B" to Defs.' Motion (Ussery Depo.), at 40:5-42:17 [Doc. 179] Ussery Depo., at 40:5-42:17 [Doc. 187, at 34-36]. There is a "difference in training" because Doe is referring to two different portions of the training which reflect different participants' potential reactions to different events. Doe has not proven the training favored complainants over respondents, much less women over men.

Doe claims the "anti-male respondent gender bias implicit in these training materials could not be more self-evident," Pl.'s Brf., at 24 [Doc. 186], but he does not cite any portion of the training materials that refers to the gender of any participant in the disciplinary process. In fact, aside from a few single-word snippets, Doe does not discuss the actual language of any of the training slides, referring the Court instead to his own "non-exhaustive summary" that contains no record cites. Even if Doe had proven a "pro-complainant" bias, which he has not, such evidence would does not translate to proof of gender bias. *See Doe v. Univ. of Denver*, 952 F.3d 1182, 1197 (10th Cir. 2020) (holding that "evidence of anti-respondent bias does not raise an inference of discrimination based on gender").

Doe has come forward with no proof of gender bias in the University's disciplinary

---

"feminist criminological theory" or had focused research on "student alcohol consumption and sexual assault from the perspective of protecting females from males").

process, much less conclusive proof that entitles him to judgment as a matter of law. As Defendants have argued in their primary brief, his Title IX claims should be dismissed.

### c.   No evidence of an erroneous outcome.

Defendants have already addressed Doe's claim that the outcome of his disciplinary proceedings was erroneous. Defs.' Brf., at 2-4; 6-12 [Doc. 167]. Doe's brief criticizes the University's staff and decision-makers at length, but it ignores key facts before the panel at the time of their decision and offers very little legal analysis of his claims. As Defendants have already noted, the Judicial Council panel had ample evidence before it to determine Bethany Roe was unable to give effective consent to sex. ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████ The Appellate Consideration Board had all this information before it, as well as ███████████████████████████████████

████████████████████████████████████████ *Id*. at 2-4; 12.

Doe now summarily argues that the University's finding of responsibility was erroneous, as a matter of law, by questioning the thoroughness of Ussery's investigation (in which he declined to participate), by accusing Ussery of withholding allegedly exculpatory proof (to which he already had access through ███████████████████████), by alleging the panelists did not consider the results of █████████████████████████████████████,

and by arguing the panel did not "accept" his taxi driver's statement into "evidence" (█████

███████████████████████████████████████████████). *Id*. at 8-10; Ex. "D" to Defs.'

Mot. for Summ. J., at 8:5-13 [Doc. 179-2].

      Doe also argues the panel members misunderstood the applicable facts and guidance and

therefore reached an erroneous outcome. These arguments overlook the proof in the hearing

record and do not establish that the outcome was erroneous. For example, Doe claims the panel

members had "inadequate training and understanding to reach anything other than an erroneous

result" in part because one of the panel members did not recall many details about the hearing

when he was deposed more than two years later. Pl.'s Brf., at 18-20 [Doc. 186].  However, there

is no dispute as to the facts that were before the panel *at the time of the hearing*. Doe argues the

same panel member incorrectly believed that small amounts of alcohol could lead to

incapacitation, *id*. at 18-19, but Roe did not drink a small amount of alcohol – she drank ██████

███████████████████████████████████████████. *See* Defs.' Brf., at 2-3 [Doc.

167].

      Doe complains that another panel member "didn't know the volume of alcohol consumed

by Roe," but he ignores the fact that the same panel member ███████████████████████

███████████████████████████████████████████████. Ex. "D" to

Defs.' Mot. for Summ. J. (Hearing Transcript), at 10:4-11:4 [Doc. 179:2]. He implies the same

panel member was unqualified to hear his case because it was the panel member's "first Title IX

sexual assault hearing," but he cites no law requiring decision-makers to have prior experience

with the same type of offense (a requirement that likewise does not apply to criminal jurors).

Pl.'s Brf., at 21 [Doc. 186]. Doe's characterizations of the panel members' deposition testimony – almost all of which are devoid of context or quotations – cannot erase the record before the Judicial Council.

Doe also relies on factual statements he made for the first time in an affidavit executed a year after his disciplinary hearing, despite the Fifth Circuit's admonition that an erroneous outcome claim is to be based on "*the record before the disciplinary tribunal*…." *Klocke v. Univ. of Texas*, 938 F.3d 204, 210 (5th Cir. 2019) (*citing Yusuf*, 35 F.3d at 715) (emphasis in original). *See* Pl.'s Brf., at 2-3 (*citing* Ex "5" to Pl.'s Mot. for Summ. J (Doe Affidavit)). Doe had failed to establish the University's decision was erroneous.

### d.      No evidence of selective enforcement.

Doe's selective enforcement claim also fails. There is no proof he was "singled out for punishment because of his sex." Pl.'s Brf., at 13 [Doc. 186]. As Defendants have already argued, the University did not investigate Roe for sexual misconduct because Doe did not accuse her of sexual misconduct, not because of her gender. Defs.' Brf., at 12-13 [Doc. 167]. Doe's *entire lawsuit* is premised on his contention that he had consensual sex with Roe – he cannot have it both ways.

### 2.    Doe is not entitled to summary judgment on his substantive due process claim.

Doe contends that he is entitled to summary judgment on his substantive due process claim because "the Defendants' use of a flawed investigative, hearing and appellate process" "deprived [him] of his property and liberty interests." Pl.'s Brf. p. 29. He further claims that his "wrongful expulsion … cannot logically be said to be reasonably related to a legitimate

governmental interest." *Id*.  As set forth in Defendants' own Motion for Summary Judgment, however, Doe cannot overcome the fact that "[e]xpelling a student after a hearing, a supplemental hearing, and an appeals process is not the type of conduct which shocks the conscience as a matter of law." *Pham v. Univ. of La. at Monroe*, 194 F. Supp. 3d 534, 548 (W.D. La. 2016).

While *Doe* cites *Lee v. Macon County Board of Education* for the proposition that a "formalistic acceptance or ratification of a request or recommendation as to the scope of punishment, without independent Board consideration of what, under all the circumstances, the penalty should be" is sufficient to maintain a substantive due process claim, Doe overlooks the facts of his own case to make that argument. *See* Pl.'s Brf., at 28-29 [Doc. 186]. In *Lee*, the Fifth Circuit relied heavily on undisputed evidence that the school board had a practice of adopting the principal's recommendations for expulsion regardless of the underlying facts. 490 F.2d 458, 459 (5th Cir. 1974).

Accordingly, the Fifth Circuit held that "rather than bringing to bear its independent judgment on the question of what penalty to assess, the Board made a practice of confirming the principal's judgment." *Id*. at 460. Here, Doe's reliance on *Lee* is misplaced because 1) no University administrator made any recommendation about whether Doe should even be found responsible, much less how he should be sanctioned,  2) the University Judicial Council found Doe responsible and decided to expel him after its own independent review of the record, and 3) rather than "rubber-stamping" the Judicial Council's earlier imposed findings, as Doe contends, the appellate panel actually *reduced* Doe's sanction from an expulsion to a suspension. Ex. "J" to

14

Defs.' Mot. for Summ, J. (Doe Depo.), at 120:4-23 [Doc. 179-8].

Doe cites no evidence to support his contention that the Judicial Council's determination, or the Appellate Consideration Board's review of that determination, was constitutionally arbitrary. Doe misconstrues both the law and the factual record before the Court, and he is not entitled to summary judgment on his substantive due process claim.

**3.**     ***Doe is not entitled to summary judgment on his procedural due process claim.***

Without putting a finger on any specific procedural protections that he was denied, Doe generically argues that "[t]he manner in which the Judicial Council and Appellate Consideration Board members are trained, conducted hearings, and adjudicated responsibility and discipline violated Doe's due-process rights." Pl.'s Mem. Brf. at p. 31 [Doc. 186]. Doe further contends that "[s]uch training, coupled with the alleged deficiencies in the investigation, the scales were tipped against Doe to such a degree that further procedural safeguards may have lessened the risk of an erroneous deprivation." *Id*.

The Due Process Clause requires "notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." *Plummer v. Univ. of Hous.*, 860 F.3d 767, 773 (5th Cir. 2017) (*citing Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961)). The amount of process due in university disciplinary proceedings is based on a sliding scale that considers three factors: (a) the student's interests; (b) the risk of an erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (c) the university's interests, including the burden that additional procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

15

Doe's failure to specifically identify any such additional procedural safeguards that "may have lessened the risk of an erroneous deprivation" prevents the Court from fully analyzing his claims under *Matthews*, and his conclusory argument is insufficient to carry his burden at the summary judgment stage. After all, *Matthews* requires the Court to "consider the private interest involved, the risk of erroneous deprivation resulting from the procedures used, the probable value of additional safeguards, and the government's interest in efficient procedures." *See Clark v. City of Draper*, 168 F.3d 1185, 1189 (10th Cir. 1999). Doe cannot carry his summary judgment burden where he has not even identified such safeguards, much less offered specific arguments regarding how and why each such procedure was constitutionally required for him to be adequately heard.

But even if the Court were to comb through his brief and complaint for passing references to all of the additional safeguards that Doe could hypothetically have been provided, his arguments would still fail because Doe offers no cogent analysis as to how he was not provided sufficient notice and opportunity to be heard during his extensive student conduct process. Moreover, during both his disciplinary hearing and the current litigation, Doe has continued to focus on whether Roe expressed consent, either "verbally or non-verbally" or through alleged "lascivious advances," rather than the actual question of whether Roe had the capacity to consent. *See* Pl.'s Brf., at 34 [Doc. 186]. Doe's insistence on framing the issue as whether Roe "was the instigator and aggressor with regard to the sexual intercourse," rather than whether she lacked capacity to consent, continues to miss the crucial issue for purposes of the University's code of conduct. *See id.* at 27. On the actual issue before the Judicial Council, Doe

16

has remained resolute that Roe had been drinking heavily, that she was intoxicated, and that Roe

gave conflicting and undiscernible statements while still intoxicated at the hospital. Ex. "D" to

Defs.' Mot. for Summ. J. (Responsibility Hearing Transcript), at 6-7, 11 [Doc. 179-2].

   Now belatedly attempting to create some sort of fact issue regarding Roe's capacity, Doe

claims that his "honest statement that Roe was intoxicated when they had intercourse ***does not***

***necessarily*** indicate that Roe was incapacitated under the policy." Pl.'s Brf., at 35 [Doc. 186]

(emphasis added). At the hearing, however, Doe confirmed ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. *Id.* In his appeal of the

Judicial Council's finding, Doe again underscored ████████████████████████

████████████████████████████████████████████████████

████████████████████████████. Ex. "E" (Andrew Doe's Appeal

Documents), at pp. 1-3 [Doc. 179-3].

   On those facts, where Doe repeatedly underscored the level of Roe's intoxication and

now claims only that those comments did not *necessarily* mean that she was also incapacitated,

Doe has failed to establish that additional un-identified safeguards would have decreased the

likelihood of an erroneous deprivation of his rights. Doe's own statements confirmed the facts

central to the Judicial Council's findings, and he has not shown how additional procedures would

have altered that result.

   Doe also contends his procedural due process rights were violated because he did not

have an opportunity to cross-examine Roe. Doe relents, however, that this claim is based more

on the University's failure to guarantee him the right of direct confrontation, rather than merely the right of cross-examination. As he admits, the Judicial Council did not pose questions to Roe because she elected not to participate, not because University policy denied him a right to cross-examination.

Again, the Fifth Circuit has never held the Fourteenth Amendment requires an opportunity for direct confrontation and cross-examination in student disciplinary hearings. In *Plummer*, the Fifth Circuit found no procedural deficiency where a sexual misconduct complainant did not appear or testify at either respondent's hearing. 860 F.3d at 775-76. Likewise, numerous other federal courts have recognized that school disciplinary hearings need not take on the trappings of a full-blown criminal trial. *See*, e.g. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 640 (6th Cir. 2005) ("Full-scale adversarial hearings in school disciplinary proceedings have never been required by the Due Process Clause[.]"); *Gorman v. Univ. of R. I.*, 837 F.2d 7, 16 (1st Cir. 1988) ("[O]n review, the courts ought not to extol form over substance, and impose on educational institutions all the procedural requirements of a common law civil trial."); *Osei v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, 2011 U.S. Dist. LEXIS 113431, *23 (E.D. Pa. Sept. 30, 2011), *aff'd sub nom. Osei v. Temple Univ.*, 518 F. App'x 86 (3d Cir. 2013) ("In the university disciplinary context, the right to counsel, the right to confront witnesses, and the right to cross-examine witnesses generally have not been deemed necessary elements of due process of law."). Thus, Doe was not constitutionally entitled to a right of direct confrontation or cross-examination.

But even beyond those shortcomings, Doe's claim for additional process fails here

because he declined to take advantage of the procedural safeguards he was provided. As the court has consistently recognized, a plaintiff cannot plausibly allege a procedural due process denial where he fails to take advantage of the process available. *See AFGE Local 2741 v. Distr. of Columbia*, 689 F. Supp. 2d 30, 35 (D.D.C. 2009) ("Plaintiffs cannot plausibly claim to have been deprived of due process, particularly where they have failed to fully take advantage of the process afforded to them . . ."); *Dimino v. New York City Transit Auth.*, 64 F. Supp. 2d 136, 160 (E.D.N.Y. 1999) ("[H]aving chosen to ignore [procedures available to her], she cannot then rely on her choice to allege a lack of due process."); *cf. Tsuruta v. Augustana Univ.*, 2015 U.S. Dist. LEXIS 136796, *19 (D. S.D. Oct. 7, 2015) ("[H]e can, if he wishes, stay out of the stream and watch the proceedings from dry land. But, if he does so, he forfeits any opportunity to control the direction of the current."); *see also Miles v. Baruch College*, 2008 U.S. Dist. LEXIS  5534, *24 (E.D.N.Y. Jan. 25, 2008) ("Since plaintiff herself chose not to take advantage of the process available to her, she cannot plausibly allege a denial of due process."); *Harrell v. S. Oreg. Univ.*, 2010 U.S. Dist. LEXIS 57162, *6 (D. Oreg. Mar. 24, 2010) (finding that plaintiff who refused to participate in a disciplinary conference or board hearing because he contended there was no regulation requiring him to "participate in any kangaroo court or other administrative procedure at the school" could not "attack due process.").

Here, Doe refused to participate in the University's Title IX investigation process, refused to identify persons with relevant information, refused to provide relevant documentation in his possession, and declined to request or bring any witnesses to his hearing, but he now claims that cross-examination could have lowered "the risk of erroneously depriving" his

interests. Pl.'s Mem. Brf. p. 35 [Doc. 186]. Doe cannot grasp at such a deprivation now, though, when his own refusal to participate in the process more profoundly shaped the current of the disciplinary proceedings than the abstract right to cross-examination, especially where Doe's arguments to the Judicial Council had nothing to do with Roe's capacity to consent. Doe's argument for summary judgment based on additional process fails.

Doe also claims that "[t]he process deployed" against him was "fundamentally flawed because of "(a) the absence of evidence from Bethany Roe; (b) the conflicting roles played by Ussery and Murry; (c) the preponderance standard for adjudicating quasi-criminal conduct (for which no actual criminal charges were brought), compounded by (d) the deference that Ussery and Murry insisted was due by the hearing panels to his/her position." *Id*. at p. 35. Doe's arguments are conclusory and unsupported by any factual or legal analysis, but the alleged "facts" upon which those arguments are based are also contradicted by the record.

First, although Roe did not attend Doe's disciplinary hearing, she actively participated in the Title IX investigation and provided both a statement and relevant information regarding her allegations. Ex. "B" to Defs.' Mot. for Summ. J. (Deposition of H. Ussery), at pp. 157-162 [Doc. 179]. Second, there is no evidence that Ussery or Murry played any "conflicting" roles in the disciplinary process, beyond Doe's own subjective characterizations, nor is there even any evidence that either attempted to influence the outcome of Doe's student conduct proceedings.[5]

---

[5] Confusingly, Doe also claims that Murry viewed Doe as not responsible for violating the University's sexual misconduct policy, and told him that things seemed "pretty black and white." It is unclear how Doe contends both that Murry thought he was not responsible yet also violated his due process rights by playing conflicting roles in the process.

Third, █████████████████████████████████████████████████████

████████████████████████. Ex. "J" to Defs.' Mot. for Summ. J. (Doe Depo.), at 75, 78,

134, 136, 137 [Doc. 179-8]. Finally, there is no proof in the record that Ussery and Murry

insisted any deference was due them, nor is there even any evidence that Murry or Ussery

advocated or recommended that Doe should or should not be found responsible for violating the

University's sexual misconduct policy. These arguments are contradicted by the record, and do

not support Doe's arguments for summary judgment.

     Doe also claims in a heading that "the manner and timing of the section of the hearing

panel, and its composition and misunderstanding of training and material facts, violated Doe's

right to due process." Pl.'s Brf., at 37 [Doc. 186]. Doe fails offer any analysis in support of his

claim that those (panel members' uncertain recollections of their deliberations or the standard of

proof years later, a panel member that had not previously served in a hearing, a panel member

who was opposed to violence and sexual assault, a panel member who believed females were

statistically more likely to be victims' of sexual assault, a panel member's receipt of the case file

and materials immediately prior to the hearing, and the appointment of one panel member

immediately prior to the hearing) infringe or even implicate his right to notice of the allegations

against him, an explanation of the evidence, and an opportunity to be heard. For the reasons

discussed above and in Defendants' briefing, those alleged deficiencies did not violate Doe's

constitutional rights.

     As the Fifth Circuit has long recognized, due process does not require perfection, even in

the criminal context. *See Thibodeaux v. Bordelon*, 740 F.2d 329, 338 (5th Cir. 1984) ("Due

process does not require perfect process."); *Smith v. Smith*, 454 F.2d 572, 579 (5th Cir. 1971) ("a criminal defendant is not entitled to a perfect trial under our constitution."); *Bonner v. Texas City Ind. Sch. Dist.*, 305 F. Supp. 600, 619 (S.D. Tex. 1969) ("The Board members and administrative officials who testified at trial candidly admitted that the evaluative process was not perfect. But due process not require perfection . . ."). Instead, the question is whether Doe was given "notice of the charges against him, an explanation of what evidence exists against him, and an opportunity to present his side of the story.") *Esfeller v. O'Keefe*, 391 F. App'x 337, 342 (5th Cir. 2010) (citing *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). Doe received that, and his passing references to various perceived slights (his contention that one of the Judicial Council members scowled at him, for instance) or his subjective complaints regarding his student conduct proceedings (his dissatisfaction with the timing of the selection of Judicial Council members, the timing of their receipt of the Title IX report, or the timing of their deliberations) are insufficient to establish a due process violation.

Doe also harps on one of the Judicial Council member's recollection that Honey Ussery was available prior to the start of the hearing, and that she answered basic questions about the case file. That Judicial Council member testified that Ussery had provided background information such as "[t]he general relationship between all the witnesses that had given statements in the report, who actually knew the individuals at play, and who just happened to be there." *See* Ex. "X" to Def.'s Mot. for Summ. J. (Deposition of Panel Member), at 18-19 [Doc. 181-1]. Again, Doe provides no evidence that he was not provided notice of the charges against him, an explanation of the evidence against him, or an opportunity to present his side of the

22

story. Doe's cold assertion regarding "the Title IX equivalent to jury tampering," without any actual facts or legal argument in support, is insufficient to establish a due process violation.

Though scattered throughout his brief, with varying detail and analysis, the heart of Doe's procedural due process argument is that his student conduct process resembled more an informal administrative hearing than a full-blown criminal trial. But the due process clause does not require that the University hold a full criminal trial before it suspends one of its students for violating its student conduct code, and a number of Doe's articulated objections (such as insufficient training for panel members, panel members who have life experience that might in some way bear on the issues before them, or imprecise recollections from panel members regarding their deliberations years earlier) would not be objectionable even in the criminal context. Doe received the process he was due, and he has failed to establish a procedural due process violation.

**4.     *A preponderance of the evidence standard is constitutionally sufficient.***

According to Doe, because the University applied a preponderance of evidence standard in its student conduct proceedings, which he characterizes as the "lowest standard of proof in law," "the integrity of the resulting decisions may be questioned and discredited." Pl.'s Mem. Brf. p. 35 [Doc. 186]. Doe concludes that the "preponderance standard violates due process," though he is unable to cite a single holding in support of such contention and concedes that law at best (for him) remains "unsettled." *See id*. at p. 36.

Doe is mistaken that the preponderance of the evidence standard is the lowest standard of proof in law, and other courts have specifically noted that the preponderance standard is

appropriate where student disciplinary proceedings involve allegations that would amount to "an extremely serious attack upon a person's good name and reputation," and might well be among the most serious of cases "ever likely to arise in a college context." *See Marentette v. City of Canandaigua*, 351 F. Supp. 3d 410, 430 (W.D.N.Y. 2019) (quoting *Smyth v. Lubbers*, 398 F. Supp. 777, 797 (W.D. Mich. 1975)). Defendants have found no case in any jurisdiction holding that a preponderance of the evidence standard in student conduct proceedings violates due process, nor has Doe apparently. Doe was not constitutionally entitled to a higher standard of proof.

Moreover, while Doe fails to address it in his standard of evidence argument, Doe's earlier fact recitation asserts that "[d]isturbingly, [panel member] *did not understand who had the burden of proof in the disciplinary hearing . . .*" Pl.'s. Brf., at 21 [Doc. 186]. As observed by other federal courts, however, "outside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." *See Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 603 (S.D. Ohio 2016) (quoting *Lavine v. Milne*, 424 U.S. 577, 585 (1976)). Regardless of where the Judicial Council placed the locus of the burden of proof, if anywhere, it does not affect the constitutionality of the University's standard.

### 5. *Doe is not entitled to summary judgment on his equal protection claim.*

To maintain an equal protection claim, a plaintiff must show that similarly situated persons were treated dissimilarly. *E.g.*, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Doe contends that both he and Roe were drunk when they had sex, yet "the University pursued disciplinary action against him but not Roe." See Pl.'s Brf., at 38 [Doc. 186].

24

According to Doe, "these allegations"[6] establish that "Doe and Roe were similarly situated, het [sic] only Doe was subjected to investigation, responsibility and discipline despite the female student being on the same legal footing." *Id*. Doe's argument entirely overlooks or ignores his fundamental contention throughout the student disciplinary process and this litigation that the sexual encounter was mutually consensual. Unlike Roe, Doe has never claimed that he lacked capacity to consent; in fact, he has done just the opposite. Accordingly, they were not "similarly situated," and he has failed to establish his equal protection claim.

**6.      *Doe is not entitled to declaratory or injunctive relief.***

Doe argues that he does not need to "apply to, and by rejected by, another school" to sustain his claims for injunctive relief, but that he only need "allege[]"[7] a "real and immediate threat of future injury that is not merely conjectural." *See* Pl.'s Brf., at 40 [Doc. 186]. Doe's "allegations" of injury, though are entirely conjectural and are not supported by any proof in the record.

Doe has come forward with no proof that the finding of responsibility for sexual misconduct is mentioned on his academic transcript or any other document the University might disclose to a third party. *See id*. at 39-40 (failing to include a single record citation). Even if his records did mention he had been found responsible for a violation of the sexual misconduct policy, Doe produced no evidence that his suspension from the University hindered his ability to enroll at another school – he has never even applied to another school. The fact that the

---

[6] At the summary judgment stage, Doe's allegations are no longer sufficient to carry his claims.

[7] Again, Doe's allegations alone are insufficient to carry his claims at this stage of the litigation.

University *possesses* some record of the disciplinary proceeding is not in and of itself a "concrete and particularized" injury. *See Doe v. Purdue Univ.*, No. 2:17-CV-33, 2020 U.S. Dist. LEXIS 87781, at *30 (N.D. Ind. May 19, 2020) (holding plaintiff had standing to pursue claim for expungement only because he alleged such relief would remove the ineligibility for Navy service where finding of responsibility had made him ineligible).

Nor has Doe produced any evidence that a reference to his suspension harmed or will harm his job prospects. Other than performing odd jobs for family members, Doe has not worked or even *applied* for a job since his suspension more than three years ago, and his father indicated that Doe had refused to apply for any jobs because of ███████████████████ ██████████████████████████████████████████████████. Ex. "J" to Defs.' Mot. for Summ. J. (Andrew Doe Depo.) at 28:2-30:20 [Doc. 179-8]; Ex. "U" to Def.'s Mot. for Summ. J. (Depo. of Andrew Doe's Father), at 19:1-25, 20:1-17 [Doc. 181].  According to his experts, Doe wants to work for his father's business after graduating from college and ultimately to take his father's place as the CEO of the business. Ex. "T" to Defs.' Mot. for Summ. J. (Expert Report of Nancy Favaloro), at 2 [Doc. 180-5]. However, Doe's father testified no college degree was necessary for many entry-level positions at the business. In fact, Doe's father himself does not have a four-year degree. Ex. "U" to Defs.' Mot. for Summ. J. (Deposition of Andrew Doe's Father), at 8:8-12; 43:15-44:9; 45:11-46:5 [Doc. 181]. Doe has produced no other evidence that the University's actions have kept him from entering any field or profession, and his allegations of injury are conjectural. Doe has not established his claim for declaratory or injunctive relief.

## CONCLUSION

Doe has failed to demonstrate why his claims should not be dismissed, much less established all the elements of each claim beyond peradventure. His Motion should be denied, and Defendants' Motion for Summary Judgment should be granted.

THIS, the 8th day of July, 2020.

Respectfully submitted,

STATE OF MISSISSIPPI; THE UNIVERSITY OF MISSISSIPPI; STATE INSTITUTIONS OF HIGHER LEARNING ("IHL"); THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; C.D. SMITH, JR.; SHANE HOOPER; TOM DUFF; DR. FORD DYE; ANN H. LAMAR; DR. ALFRED E. MCNAIR, JR.; CHIP MORGAN; HAL PARKER; ALAN W. PERRY; CHRISTY PICKERING; DR. DOUG ROUSE; DR. J. WALT STARR; GLENN F. BOYCE; JEFFREY S. VITTER

*s/ Paul B. Watkins, Jr.*
J. CAL MAYO, JR. (MB NO. 8492)
PAUL B. WATKINS, JR. (MB NO. 102348)
J. ANDREW MAULDIN (MB NO. 104227)
ATTORNEYS FOR DEFENDANTS

OF COUNSEL:
MAYO MALLETTE PLLC
5 University Office Park
2094 Old Taylor Road
Post Office Box 1456
Oxford, Mississippi 38655
Tel: (662) 236-0055
cmayo@mayomallette.com
pwatkins@mayomallette.com
dmauldin@mayomallette.com