UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ANDREW DOE                                                                     PLAINTIFF

V.                                                    CIVIL ACTION NO. 3:18-CV-138-DPJ-FKB

THE UNIVERSITY OF                                                        DEFENDANTS
MISSISSIPPI, ET AL.

ORDER

Plaintiff Andrew Doe claims that the University of Mississippi and other Defendants

violated his rights when the University suspended him for sexual misconduct.  Doe sues

Defendants for gender discrimination under Title IX and asserts constitutional claims under 42

U.S.C. § 1983.  Both sides have moved for summary judgment.  Defendants seek judgment on

all claims; Doe seeks partial judgment on liability.  For the following reasons, Doe's motion for

partial summary judgment [173] is granted as to the procedural-due-process claim but otherwise

denied.  Defendants' summary-judgment motion [166] is denied.

I.      Facts and Procedural History

On December 2, 2016, Doe and Bethany Roe had sexual intercourse while undergraduate

students at the University.  The two were intoxicated, and Roe claimed that she never consented.

Doe was held responsible for violating the University's Sexual Misconduct Policy and eventually

suspended from school.  The investigation that led to that suspension began when Roe's friends

picked her up at Doe's apartment and called law enforcement to report a sexual assault.  A

University Police Officer notified the University's Violence Prevention office, and a

representative met with Roe at the hospital that night.

The University later opened a Title IX investigation into whether Doe violated its Sexual

Misconduct Policy.  That policy "prohibits sexual misconduct in any form, including sexual

assault or sexual abuse, sexual harassment, and other forms of nonconsensual sexual conduct."
Sexual Misconduct Policy [166-1] at 3.

The University's Title IX Coordinator, Honey Ussery, conducted the Title IX
investigation.  Ussery interviewed six witnesses, including Roe; Doe declined to participate in
the investigation.  Ussery then submitted a report to Tracy Murry, the Director of the
University's Office of Conflict Resolution and Student Conduct.  Murry notified Doe of the
charges but did not provide Doe with a copy of Ussery's report.  He then set a disciplinary
hearing before a three-member panel of the University Judicial Council:  one student and two
faculty members.

That hearing occurred on March 31, 2017.  Neither Roe nor any other witnesses attended,
so the only testimony came from Doe.  Murry opened the hearing by providing "a summation of
the allegations based on" Ussery's report.  That summary stated that Doe and Roe

> attended the Christmas party together for his fraternity.  [Roe] did not wish to
> leave the Christmas party with Doe and called friends to pick her up at the
> [fraternity] house.  Before her friends arrived, she and [Doe] left the party and her
> friends found her at the [apartment complex] where [Doe] had taken her to his
> apartment and had non-consensual sex with her.

Tr. [189-1] at 4–5.

Doe was given the opportunity to make an opening statement, during which he provided
the following account:

> While making out with [Roe] at the formal, I asked if she would like to leave the
> formal and go back to my apartment.  She said yes.  At no time did she tell me she
> didn't want to.  She had ample opportunity to tell the cab driver that she would
> like to be dropped off somewhere else.  I was unaware her friends were on the
> way until she told me, at which point she had her hand down my pants.  I asked if
> she would like to spend the night and she declined the offer.  Then she told me we
> had to make this quick since her friends were on the way.
>
> When we were in bed, she helped me to remove my underwear, and she alone,
> with no help, removed her underwear.  We then had sex and she continued to it
> [sic] just as much as I did.  She was on top of me and began to have sex.

After sex, while I was in the bathroom washing my hands, she came up behind me, grabbed my rear end. I walked out my front door and kissed her goodnight. I asked if I could call her later and she said yes. Then I went back in my apartment. While outside I never saw her friends.

Regarding [Roe's] (unintelligible), I was unaware that [she] had been drinking before I picked her up. I do not remember her leaving her drink unattended, but she did receive a sexual assault kit while at the hospital, which should have included a full tox screen. At formal, she did not pour any glasses of champagne out. There were no glasses available. She was drinking directly from the bottle.

. . . .

Regarding the Oxford police report, I would like to make some quotes. Quote, [Roe] stated [Doe] did not try to stop her from leaving, end quote. Quote, the doctor asked [Roe] if she believed she was sexually assaulted, and [Roe] stated she did not think so because they were both drunk, that she felt it was a mutual decision between both of them, end quote. Quote, the doctor asked [Roe] again if she had been sexually assaulted. [Roe] stated that personally she did not feel that she was sexually assaulted because they were both drunk and it was a mutual decision, end quote. [Roe] told authorities multiple times it was not sexual assault. She had to be convinced to even go to the hospital. She agreed to go back to my apartment. She initiated the sex just as much, if not more, than I.

. . . .

I have a statement from the cab driver that drove us from the [fraternity] house to my apartment. James Randall Lacey, driver of Randall's Taxi, has given his statement stating that myself and [Roe] were kissing in the back of his cab. This is the cab we took from the [fraternity] house to my apartment . . . . Mr. Lacey states that both myself and [Roe] were, quote, making out, or both, quote, into it. He states nothing inappropriate happened in his cab and never heard [Roe] object.

I would also like to give this polygraph that I had done and the credentials of the technician who performed the polygraph.

. . . .

. . . The polygraph exam shows that I did not—there's two questions on it. "Did you do anything on December 2, 2016, to force that woman to have sex with you, to include drugging her in any way?" I answered no. There was no deception indicated. Question two, "Did you force that woman in any way to have sex with you on December 2, 2016?" I answered no. Also, no deception indicated.

*Id.* at 6–9. Under questioning from the panel, Doe testified that Roe drank at a "pre-game" party and then drank an entire bottle of champagne at the fraternity house—as did he. *Id.* at 9–10. He

agreed that he and Roe were both intoxicated when they arrived back at his apartment but stated that Roe was not stumbling and was coherent.  *Id.* at 11.

The panel also considered Ussery's Title IX report.  That report summarized Ussery's interviews with six students and attached 13 pages from police reports prepared by the University Police Department and the Oxford Police Department.  As presented in Ussery's report, the students provided the following information:

**Roe's account.**  Roe told Ussery that at the pre-game party, she drank a couple "pulls" from a bottle of vodka and had a few sips of a mixed drink but "began feeling strange."  Ussery Report [179-1] at 1.  She said she was given a bottle of champagne at the fraternity house "but poured it out on the floor."  *Id.* at 2.  She "began to black out," and later remembered calling her roommate to tell her "she did not want to go home with [Doe.]"  *Id.*  Roe told Ussery

> that the only thing she remembers after that is being in pain while someone was having sex with her and blacking out again.  She woke up and a friend told her the police were there to speak with her.  [She] did not remember what she said to them and could not recall a lot of details.  She then went to the hospital.  While there, a rape kit was performed.  [Roe] said that she was sore for a while in her vaginal area after that night because she had a cut inside her.

*Id.*

**A.G.'s and B.C.'s accounts.**[1]  Roe's roommate, A.G., received Roe's call and took an Uber to Doe's apartment with another friend, B.C.  Ussery reported that A.G. said

> they called [Roe] about thirty times during the time in the Uber and while at the complex.  [Roe] finally answered one of [B.C.'s] calls and did not know where she was.  [A.G.] said that [B.C.] asked to speak to [Doe,] who initially refused to talk to her.  He then got on the phone and gave an apartment number.  The two women began banging on the door . . . .  Then, [Roe] walked out the front door.
>
> [A.G.] said that [Roe] was the most intoxicated that she has ever seen her. . . . [A.G.] went inside . . . to get [Roe's] things.  Her phone was under pillows, her

---

[1] The Court will refer to student witnesses and participants by their initials.

shoes were in the corner and her purse and contents were scattered.  She noticed
blood on the sheets, a good amount of it, in different areas.

*Id.*

B.C.'s account is similar.  She added that when they arrived at Doe's apartment complex
and Roe emerged from the apartment, Roe was "crying" and "very distraught."  *Id.* at 3.  B.C.
called a male friend, A.T., to pick them up.  He arrived with another male, H.B., and on the ride
back to Roe's dorm, A.T. asked Roe what happened.  She responded, "[Doe] put his dick inside
me.  He raped me."  *Id.*  B.C. said Roe "was hysterically crying at that point."  *Id.*  B.C. told
Ussery that, after they had been to the hospital, Roe "did not remember anything that happened,
so they told her."  *Id.* at 4.

**A.T.'s and H.B.'s accounts.**  A.T. told Ussery that when he first encountered Roe that
evening, she

seemed like she could not talk about it and was intoxicated.  They kept talking to
her, but it was clear she was not in a good place.  They decided to take her to her
dorm.  During the ride, [he] asked her if the guy raped her.  She said he had raped
her.  He "stuck it in and it hurt really bad."

*Id.*  A.T. called the police, and he and H.B. took Roe to the hospital.  H.B. gave a similar version
of the events, saying that when they first saw Roe, she "was outside [the apartment complex] and
was hysterically crying and could not control her emotions. . . .  They decided to take her back to
[her dorm.]  While in the car she said that the guy stuck his penis in her vagina."  *Id.* at 4–5.

**P.L.'s account.**  Ussery also spoke with P.L., one of Doe's fraternity brothers.  P.L.
stated that he saw Doe and Roe at the formal and both "seemed fine when he spoke to them."  *Id.*
at 5.[2]

---

[2] A sixth witness, M.J., did not have any firsthand knowledge of the events on December 2.

**Police Reports.**  Though Ussery did not summarize them in her report, she attached several police reports.  Officer Franks, who encountered Roe in her dorm before she was taken to the hospital, noted that she

> could tell [Roe] was intoxicated. . . .  [She] stated that at the [pre-game] party all they did was drink.  [She] stated she drank some vodka and some champagne. [She] stated she had no clue on how much she drank, she just knew she had drank a lot.
>
> . . . .
>
> [Roe] stated that once she got to [Doe's apartment,] they went upstairs to a bedroom.  She said she really didn't want to be there, but she was so intoxicated that she just went with the flow.  [Roe] stated [Doe] moved her panties to the side and inserted his penis in her vagina. . . .  [She] said that she thinks she asked [him] to stop but she wasn't really sure if she said it or not. . . .
>
> [Roe] stated [Doe] finally got off her when she told him her friends were outside to get her.  [She] stated she got up and went outside crying and that is when she saw her friend, [A.G.,] running towards her.  [Roe] stated she told [A.G.] that he raped her and put his penis in her vagina.

*Id.* at 16–17.

Detective Wilson's account was different from all others.  He reported that, at the hospital,

> [t]he doctor asked [Roe] if she believed she was sexually assaulted and [she] stated she did not think so because they were both drunk and that she felt it was a mutual decision between both of them.  [She] stated she was also not sure about what happened.  [Roe] stated that she and [Doe] had intercourse. . . .  The doctor asked [her] again if she had been sexually assault[ed].  [She] stated that personally she did not feel that she was sexually assaulted because they were both drunk and it was a mutual decision.  [She] stated that at the same time she was drunk and didn't know what was really going on.

*Id.* at 11.

Detective Wilson visited Doe's apartment after leaving the hospital.  While there, he "went upstairs to [Doe's] room and took pictures.  [He] noticed on the bed that there were several spots with blood on the bed sheets."  *Id.* at 12.  Finally, Wilson reported on his December

6, 2016, interview of Roe at the police department.  Roe "stated she did not remember arriving at [Doe's] residence and did not remember having sex with him.  [She] stated she did not remember her friends picking her up from [Doe's] residence as well."  *Id.* at 13.

There was no other evidence before the panel, and when the hearing finished, the panel found Doe had violated the University's Sexual Misconduct Policy and expelled him from school.  Doe appealed and presented additional facts that were not included in Ussery's report. Though the Appellate Consideration Board upheld the finding that Doe was responsible, it changed the sanction from expulsion to suspension until fall 2020.  Doe did not, however, re-enroll.

On March 5, 2018, Doe filed this lawsuit alleging claims under Title IX and 42 U.S.C. § 1983.  Defendants moved to dismiss, and the Court granted some of that motion.  The following claims remained:  (1) Doe's Title IX claim against the University; the State Institutions of Higher Learning; its Board of Trustees; the State of Mississippi; the University's then Chancellor; the IHL Commissioner; and the IHL Board Members in their official capacities, and (2) § 1983 claims against the Chancellor in his official capacity for procedural-due-process, substantive-due-process, and equal-protection violations.

After discovery closed, the parties filed their summary-judgment motions.  Defendants sought judgment on all remaining claims; Doe sought judgment on liability.  The Court fully considered those motions and then held a status conference to encourage settlement.  An agreed order followed four days later staying the case while the parties negotiated.  Those negotiations—which included the magistrate judge—lasted two years but ultimately failed.  So, on February 15, 2023, Doe moved to lift the stay.  Given the passage of time, the Court ordered supplemental briefing, which has now closed.  Federal-question jurisdiction exists.

II.     Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

III.    Analysis

 A.    Title IX Claims

"Title IX provides that no person 'shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 209 (5th Cir. 2019) (quoting 20 U.S.C. § 1681(a)).  There is no dispute that Title IX covers institutions like the University of Mississippi.  *See Plummer v. Univ. of Hous.*, 860 F.3d 767, 777 (5th Cir. 2017) (noting that Title IX applies to universities receiving federal funds).  The statute "is 'enforceable through an implied private right of action'" for money damages.  *Klocke*, 938 F.3d at 209 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998)).

In *Plummer*, the Fifth Circuit took its first hard look at Title IX in the student-discipline context.  That case relied heavily on the Second Circuit's leading opinion in *Yusuf v. Vassar College*, which noted two general theories for proving Title IX discrimination—erroneous outcome and "selective enforcement."  *Plummer*, 860 F.3d at 777 (citing 35 F.3d 709, 715 (2d Cir. 1994)).

The Fifth Circuit revisited these liability theories in *Van Overdam v. Texas A&M University*, concluding that those categories, and others that developed later, simply "describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student."  43 F.4th 522, 527 (5th Cir. 2022) (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (Coney Barrett, J.)).  The court therefore "joined a growing number of Circuits to recognize that, while sometimes helpful, these tests do not abrogate Title

IX's basic analytical framework." *Doe v. William Marsh Rice Univ.*, 67 F.4th 702, 709 (5th Cir. 2023) (citing *Van Overdam*, 43 F.4th at 527).

Thus, "the operative question for summary judgment [is whether] a reasonable jury—presented with the facts alleged—[could] find that sex was a motivating factor in the University's disciplinary decision." *Id.* (quoting *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021)). Doe hopes to meet that standard through three theories: erroneous outcome, selective enforcement, and deliberate indifference.

This Order focuses on the first—erroneous outcome—because it presents a question of fact that precludes summary judgment for either party. Having created that question under the erroneous-outcome theory, Doe need not establish the others to present his Title IX case to the jury. By the same token, his other theories would not entitle him to judgment as a matter of law because there remains a fact question whether "sex was a motivating factor in the University's disciplinary decision." *Rice Univ.*, 67 F.4th at 709.

"To prevail on [an erroneous-outcome] claim, a plaintiff must show (1) an erroneous outcome and (2) that 'gender bias was the motivating force behind it.'" *Rice Univ.*, 67 F.4th at 709 (quoting *Klocke*, 938 F.3d at 210). "A plaintiff alleging an erroneous outcome must point to 'particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding'—for instance, 'a motive to lie on the part of a complainant or witnesses, [or] particularized strengths of the [disciplined student's] defense.'" *Klocke*, 938 F.3d at 210 (quoting *Yusuf*, 35 F.3d at 715) (alteration in *Klocke*). "If no such doubt exists based *on the record before the disciplinary tribunal*, the claim must fail." *Id.* (quoting *Yusuf*, 35 F.3d at 715) (emphasis in *Klocke*). Additionally, a plaintiff alleging an erroneous-outcome claim "must also

demonstrate a 'causal connection between the flawed outcome and gender bias.'" *Id.* (quoting

*Yusuf*, 35 F.3d at 715).

          1.          Erroneous-Outcome Prong[3]

The panel concluded that Doe violated the University's Sexual Misconduct Policy

because Roe lacked capacity to consent. Under the policy,

> [s]exual intimacy requires that all participants consent to the activity. Consent between two or more people is defined as an affirmative agreement—through clear actions or words—to engage in sexual activity. The person giving the consent must act freely, voluntarily, and with an understanding of his or her actions when giving the consent.
>
> Lack of protest or resistance does not constitute consent, nor does silence mean consent has been given. Relying solely on non-verbal communication can lead to misunderstanding. Persons who want to engage in sexual activity are responsible for obtaining consent—it should never be assumed.
>
> . . . .
>
> . . . [A]n incapacitated person is not able to give consent. . . .
>
> . . . .
>
> . . . It is a violation of this policy if the initiator has sex with someone the initiator knows, or reasonably should know, to be incapacitated by alcohol, drugs, sleep or illness. . . . Someone is incapacitated when he or she cannot understand who, what, when, where, why, or how, with respect to the sexual interaction.

Sexual Misconduct Policy [166-1] at 4–5.

There was evidence supporting the panel's conclusion that Roe lacked capacity—like her

statement that she blacked out and the statements from witnesses who saw her distraught and

badly intoxicated after she left Doe's apartment. But the question is whether Doe has presented

---

[3] The parties briefed this issue before the Fifth Circuit clarified the applicable standards and without the benefit of cases like *Rice University* that applied those standards. The Court has tailored its analysis to the current law, as addressed in the parties' supplemental briefs. Thus, some of Doe's arguments on the erroneous-outcome prong will be addressed in the causation prong. In any event, the facts relevant to these issues tend to overlap. *See Rice Univ.*, 67 F. 4th at 710–11 (addressing erroneous outcome).

enough evidence "to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Klocke*, 938 F.3d at 210 (quoting *Yusef*, 35 F.3d at 715).  And when considering that question, the Court must view the evidence in the light most favorable to the non-movant without weighing it.  *See Rice Univ.*, 67 F.4th at 711 (reversing and remanding because district court weighed evidence when granting summary judgment for failure to show erroneous outcome).

Doe has shown enough to avoid summary judgment on this element but not enough to receive summary judgment.  As noted, Roe said at times she was raped, but she also told one doctor that the decision to have intercourse was "mutual."  Ussery Report [179-1] at 6.  That divergent account finds some support from the cab driver who supposedly said that the two were "making out" and "into it" and that he saw nothing inappropriate and "never heard [Roe] object." Tr. [189-1] at 8.

Also, Doe passed a lie-detector test indicating that the encounter was consensual (at least from his perspective).  And he stated that Roe:  (1) removed her own underwear; (2) helped Doe remove his; (3) was on top of him when they began intercourse; (4) patted his bottom in the bathroom when they finished; (5) kissed him goodnight; and (5) told him he could call her.  Tr. [189-1] at 6.  Doe also claimed that Roe was "coherent" and that she was not "stumbling around" at the fraternity house.  *Id.* at 11.

One panel member who found Doe responsible for initiating non-consensual sex testified that he did not know whether or not Roe was capable of giving consent.  Presley Dep. [202-3] at 81.  Another panelist testified that Roe did not exhibit the specific signs of incapacitation listed in the University's training materials.  B.T. Dep. [187-4] at 87–89.  In addition, the panel's conclusion that the encounter was non-consensual was influenced by the evidence about the

12

bloody sheets, Presley Dep. [202-3] at 93, but the Title IX investigation failed to discover evidence that Roe was vaginally bleeding earlier in the day, *see* Doe Dep. [188-2] Ex. 15.2 (J.B. Statement to University Police Department).

Many of these points are hotly disputed with contrary evidence. But viewed in the light most favorable to Doe, he has created "articulable doubt" whether Roe was incapacitated—as defined in the policy—or otherwise failed to consent. *Klocke*, 938 F.3d at 210 (quoting *Yusef*, 35 F.3d at 715). Doe has therefore met his burden of creating a question of fact on the first prong of the erroneous-outcome theory. But, as stated, there is record evidence supporting the panel's decision when viewed in the light most favorable to Defendants. Doe's motion for summary judgment on this claim is therefore denied.[4]

2.      Gender-Bias Prong

Though the Court finds Doe offered enough to survive summary judgment on the first prong of the erroneous-outcome theory, he must still identify "evidence that . . . gender bias affected [the] investigation and [the panel's] conclusion." *Klocke*, 938 F.3d at 211. Doe offers a litany of facts to demonstrate bias and problems with the investigation and hearing. Both reflect potentially viable approaches, because "at some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding." *Rice*

---

[4] In *Klocke*, the court concluded that the plaintiff had failed to meet this prong because the decisionmaker "made a finding of responsibility after developing a meaningful record." 938 F.3d at 211. Defendants say Doe's claim fails too because the panel found him responsible on a "meaningful record." Defs.' Mem. [167] at 6 (quoting *Klocke*, 938 F.3d at 211). It is not apparent that the Fifth Circuit intended to establish a separate meaningful-record test when it found the *Klocke* plaintiff failed to establish an erroneous outcome. As noted, the test is whether the plaintiff offered "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Klocke*, 938 F.3d at 210 (quoting *Yusef*, 35 F.3d at 715)). And neither *Rice University* nor *Van Overdam* mention the term "meaningful record." If, however, this Court should consider it, Doe has created a fact question on the meaningful-record issue based on the issues addressed in the next section.

13

*Univ.*, 67 F.4th at 711 (quoting *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022)).

Not everything Doe says is supported with record evidence, so the Court has excluded some of his arguments.  As for the others, some points seem weak when standing alone, but the Court must look at them collectively.  *Rice*, 67 F.4th at 711.  When it does, Doe has not established a basis for summary judgment in his favor, but he has created a question of fact as to Defendants' motion.

**Panel member B.T.'s alleged bias.**  Doe says quotes from panelist B.T. in a student newspaper show her gender bias.  That article, which focused on B.T.'s involvement in student government, quotes her as follows:  "We decide on the punishment based on the crime . . . .  We are really just here to make sure that all Ole Miss students feel safe.  In a sexual assault case, we do everything that we can to make sure that the victim feels comfortable around campus."  Article [202-11] at 4.  This quote is a little troubling.  B.T. does not say the disciplinary panel exists to determine what happened, she says it's there to make "students feel safe," and at least suggests a motive to protect complainants (whom B.T. describes as "victim[s]").  *Id.*  According to Ussery, those have always been women in this context.  Ussery Dep. [187] at 44.

**Panel member Presley's alleged bias.**  The issues with panelist Presley are more serious.  Doe says Presley injected gender bias into the proceedings because he applies different standards for men and women.  Presley testified that "any consumption of alcohol impairs your judgment.  Therefore, I can't say specifically she can give effective consent."  Presley Dep. [202-3] at 80–81.  When pressed, he agreed that "[a]ny alcohol consumption" could lead to impairment that would impact capacity to consent—"[w]hether it's 2 ounces of wine or 200 ounces of wine."  *Id.* at 81–82.  But when asked whether "a male complainant drinking alcohol

[is] sufficient in and of itself in the context of a sexual allegation of a female . . . for a finding of responsibility," Presley testified he "would have to review the entire case file to make that decision." *Id.* [202-3] at 127.  These responses suggest that Presley has different standards for men and women.

The bigger issue is whether Presley's views affected his vote.  Presley held Doe "responsible" even though he "did not know whether or not Bethany Roe was actually capable of giving consent to sexual intercourse." *Id.* at 81.  In other words, he found that the University met its burden of proving Doe engaged in non-consensual sex without knowing whether Roe lacked capacity to consent.  Presley also testified that he did not know whether Doe "could properly receive consent *or give consent* that he wanted to have sex during this situation." *Id.* (emphasis added).  That suggests that he found Doe responsible while not knowing whether Doe did anything different from Roe.[5]

**Training materials.**  Doe says the training materials Ussery prepared for prospective panel members are peppered with gender bias.  Some of what he says is not compelling, and most of the slides seem innocuous.  But there are a few—when viewed in the light most favorable to Doe—that could suggest a thumb on the scale.  For example, when addressing credibility determinations, the training materials state:

- There are no "perfect["] complainants (or witnesses) (who say all the right things, know all the right answers, and fulfill the stereotype of what a "victim" should be)

- There are no "perfect" respondents (who fulfill every stereotype of what a rapist/respondent is)

---

[5] The Court acknowledges that Doe never claimed that he lacked capacity, and he was the respondent, not a complainant.  Still, Presley's testimony could suggest gender bias.

Training Slides [173-12] at 36.  Both comments instruct the panelist to avoid stereotypes that might weigh against finding the respondent responsible but not the other way around.  The second could have, for example, said the respondent may not fulfill every stereotype of someone who would *or would not* violate the policy.  Instead, the note suggests that respondents could be guilty even if they don't look it.  And comparing respondents—who have always been men—to stereotypical "rapists" could be viewed as invoking gender.

**Misleading Title IX report.**  Doe faults Ussery and her Title IX report for not highlighting Roe's statement to the doctor that the encounter was "mutual."  Ussery Report [179-1] at 11.  Ussery did attach that record (and others) to her report, and the report itself merely summarizes the charges and the interviews Ussery conducted.  But the training slides state that "Title IX's Role" includes providing "a thorough investigative report, including witnesses and inconsistent statements."  Training Slides [173-12] at 24.  The report itself did not contain the inconsistencies, and a reasonable jury could conclude that they were buried in the 13 pages of attachments.

**Exculpatory evidence.**  Doe complains that Ussery had "exculpatory information that explained" the blood found on his sheets after his encounter with Roe but "did not include [that information] in her report."  Pl.'s Mem. [203] at 8.  According to Doe, Roe told a friend, J.B., that she had unexplained vaginal bleeding earlier that day.  *See* Doe Dep. [188-2] Ex. 15.2 (J.B. Statement to University Police Department).  And Doe says the omission mattered:  panel member Presley testified that, in addition to Roe's and Doe's alcohol consumption, one thing "that led to the finding of responsibility" was "[t]he blood on the sheets."  Presley Dep. [202-3] at 93.

16

Doe fails to cite the particular parts of the record showing that Ussery obtained J.B.'s statement and excluded it from her report. *See* Pl.'s Mem. [203] at 8 (citing Ussery's 300-plus page deposition). J.B.'s name was apparently in records Ussery obtained, but Ussery testified that she never acquired the actual statement. Ussery Dep. [187] at 237. That said, Ussery thought the blood evidence was irrelevant because this was not a "forcible" claim. *Id.* Yet her report could have left that impression because it indicated that Roe was "cut" inside and that a witness saw "a good amount" of "blood on the sheets." Ussery Report [179-1] at 2. As noted, those facts influenced the decision. Presley Dep. [202-3] at 93.

In sum, the record does not support the assertion that Ussery hid the evidence, but a jury could reasonably question why Ussery did not investigate the blood when it could create a serious misunderstanding by the panel. Along those same lines, Doe says Ussery rushed to judgment and failed to interview witnesses, like J.B. and the cab driver, who had potentially helpful information for Doe.

**Cross-Examination.** As explained below, Doe was denied his due-process right to meaningfully cross-examine Roe, which may have adversely affected the proceedings. He also never had the chance to cross-examine Ussery about the statements she collected and the summaries she provided (which were the only evidence the panel heard other than Doe's account). And Ussery met with the panel to answer questions outside Doe's presence and then left before he could ask her any questions. B.T. Dep. [187-4] at 17–18.

To be clear, this Order recounts only Doe's facts and presents them in the light most favorable to him. Even then, some of his points are weak, but viewing his evidence collectively under Rule 56 creates a jury question on gender bias. *Rice Univ.*, 67 F.4th at 711 (cumulatively looking at evidence offered to show gender bias). On the other hand, Defendants have offered

their own compelling evidence which, when viewed in the light most favorable to them,

precludes summary judgment in Doe's favor.  In short, there is a fact question whether "sex was

a motivating factor in the University's disciplinary decision." *Id.* at 709 (quoting *Univ. of

Denver*, 1 F.4th at 830).  Neither party is entitled to summary judgment on the Title XI claim.[6]

> B.      Section 1983 Claims

Doe says the University violated his constitutional rights to due process and equal

protection.  He therefore sued under 42 U.S.C. § 1983, which prohibits the deprivation of "any

rights, privileges, or immunities secured by the Constitution and laws" by a person acting under

color of law.  Doe originally asserted these claims against all Defendants, but the Court

dismissed the claims against the individual defendants based on qualified immunity.  *See* Order

[60] at 4.  So, the only remaining claims are those against the Chancellor in his official capacity.

As to them, the Court must address the remedies Doe pursues, his standing to pursue them, and

the merits of his § 1983 claims.

> 1.      Remedies

Doe says the University violated his constitutional rights and "must compensate [him] for

the value of the interest taken."  Pl.'s Mem. [203] at 25.  That seems to suggest that he seeks

monetary damages under § 1983.  But Doe has already conceded that such claims are neither

legally recognized nor sought.  Pl.'s Mem. [50] at 13.  That concession was correct, and the

Court has already dismissed the claims for monetary damages under § 1983.  *See* Order [60] at 4.

---

[6] Though the Court has found a question of fact, the Fifth Circuit has repeatedly recognized that "[e]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'"  *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

So, the only remaining § 1983 claims are "those portions of the claim against [the] Chancellor . . . under *Ex parte Young* [209 U.S. 123 (1908)]." *Id.* at 25. The *Ex parte Young* "exception is a legal fiction that allows private parties to bring 'suits for injunctive or declaratory relief against individual state officials acting in violation of federal law.'" *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013)). Doe may seek those remedies but not compensation.

2.     Standing

Defendants say Doe lacks standing to pursue injunctive and declaratory relief under *Ex parte Young*. "To have Article III standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements." *Id.* An injury-in-fact must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations omitted). Injunctions for future injuries require "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Church v. City of Huntsville*, 30 F.3d 1333, 1337 (11th Cir. 1994) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

In the Second Amended Complaint, Doe describes the equitable relief he seeks, asking the Court to

> enter an injunction enjoining Defendants from violating Andrew Doe's
> Constitutional rights and rights established under Title IX, by continuing the
> discriminatory and unlawful disciplinary action that was issued against him,
> requiring the University [to] immediately remove any indication of a disciplinary

> finding against Doe from his student records and prohibiting further disciplinary
> proceedings against him pending resolution of this matter.  Doe is entitled to have
> any finding of responsibility, and the record of the entire Title IX proceeding
> itself, wholly and permanently expunged from his academic record and to a
> permanent seal of all such proceeding[s] to protect against subsequent disclosure
> to any other person or academic institution.

2d Am. Compl. [9] at 44.  Doe has standing for some, but not all, of these requests.

To begin, Defendants say Doe lacks standing generally "because he does not intend to return to the University of Mississippi or to apply to or to seek to attend any other college or university."  Defs.' Mem. [167] at 14.  Doe agrees to some extent, acknowledging that he "isn't challenging the conditions of his reentry."  Pl.'s Mem. [203] at 25.  And because he does not intend to reapply to the University, he lacks standing to seek prospective relief about (1) the University's disciplinary proceedings or (2) future discipline he might face.

But standing exist for the rest.  The Fifth Circuit addressed a similar issue in *Van Overdam*, when the defendants argued that the plaintiff had no standing to pursue due-process claims because he had already graduated.  43 F.4th at 529.  The court rejected the argument, noting that the plaintiff alleged "a cognizable liberty interest in seeking to restore his reputation and clear his student disciplinary record."  *Id.*  As the Fifth Circuit has noted, "a charge of sexual harassment inevitably tarnishes [the accused's] reputation."  *Walsh v. Hodge*, 975 F.3d 475, 483 (5th Cir. 2020); *see also Plummer*, 860 F.3d at 773 (noting that sanctions from disciplinary hearings involving sexual misconduct "could have 'substantial lasting impact on appellants' personal lives, educational and employment opportunities, and reputations in the community'" (quoting *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016))).

In sum, if the University's decision was unconstitutional, it can be redressed, and the alleged injury is "real and immediate—as opposed to [] merely conjectural or hypothetical."

*City of Huntsville*, 30 F.3d at 1337.  The Court will thus turn to the merits, starting with the procedural-due-process claim based on the lack of cross-examination.

### 3.     Procedural Due Process

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  At bottom, "due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct."  *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961).

Federal courts "evaluate due process using a sliding scale the Supreme Court first introduced in *Mathews*," under which courts

> balance (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards": and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Walsh*, 975 F.3d at 482 (quoting *Mathews*, 424 U.S. at 335).

According to the Fifth Circuit, "the first and third *Mathews* factors are easily identified" when the parties dispute a university disciplinary proceeding regarding alleged sexual misconduct.  *Plummer*, 860 F.3d at 773.  So too here.  The issue, therefore, turns on "the second *Mathews* factor—the risk of erroneously depriving [Doe's] interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."  *Id.* at 774.  On this point, "[a] university is not a court of law, and it is neither practical nor desirable it be one."  *Id.* at 773 (quoting *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 n.1 (6th Cir. 2005)).  Both parties say the second *Mathews* factor entitles them to judgement as a matter of law.

The facts supporting this claim are simple and undisputed—Roe never appeared at the hearing, so Doe lost the opportunity to question her verbally or in writing.  Instead, the panel received Ussery's summary of what Roe—and the others—supposedly told her.  The same thing happened in *Walsh*, when a medical-school professor was fired for sexually harassing a student. 975 F.3d at 480.  As with the hearing here, the *Walsh* accuser never appeared at the disciplinary hearing, and the panel heard "snippets of quotes from Student #1, relayed by the University's investigator." *Id.* at 485.  Noting that credibility mattered in that case, the Fifth Circuit held that the student's account "was too filtered to allow Walsh to test the testimony of his accuser and to allow the Committee to evaluate her credibility." *Id.*  While the court concluded that direct verbal cross-examination is not always required in the university disciplinary setting, due process did require, in that case, "some opportunity for real-time cross-examination, even if only through a hearing panel.'" *Id.* (quoting *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019)).

Defendants try to distinguish *Walsh* in two ways.  First, they say the University would have allowed written cross-examination had Roe appeared, but she chose not to.  Defs.' Suppl. Mem. [230] at 3.  That's essentially the same thing that happened in *Walsh*—the panel heard written accounts of the accuser's earlier statements because she failed to appear at the hearing. 975 F.3d at 483.  Defendants next suggest that this is not the typical he-said/she-said credibility battle because "[t]here were no such competing narratives[:]  Roe became extremely intoxicated, blacked out, and had very little memory of the evening after arriving at the fraternity party." Defs.' Rebuttal [222] at 8.  Thus, Defendants say "[t]he 'probable value' of questioning Roe about events about [which] she already said she had no memory would have been low." *Id.* at 9.

Perhaps questioning Roe would lead nowhere, but competing narratives do exist.  Doe says Roe consented; Roe told others she didn't (as reported by Ussery).  Plus Doe had the right to test whether Roe lacked any relevant memories, especially when her account was "filtered" through Ussery.  *Walsh*, 975 F.3d at 485.  And even if Roe could not remember what happened in Doe's apartment, the cross-examination may have uncovered other helpful information.  As just one example, the panel was influenced by the blood found on Doe's sheets.  *See* Presley Dep. [202-3] at 93.  It is easy to see why.  Finding blood could suggest non-consensual sex, especially when Ussery reported that Roe "had a cut inside her."  Ussery Report [179-1] at 2.  Cross-examination may have confirmed J.B.'s statement that Roe experienced bleeding earlier that day.  Doe Dep. [188-2] Ex. 15.2 (J.B. Statement to University Police Department).  While the Court acknowledges the burdens cross-examination might have created for Roe, the omission is too significant in this case to deny Doe the right to confront his accuser.

That might not always be the case.  As noted, these are fact-dependent inquiries, and in *Plummer*, the Fifth Circuit rejected the argument that due process required cross-examination there.  *Plummer*, 860 F.3d at 775–76.  *Walsh* summarized that holding:

> two students were expelled after sexually assaulting a third student.  Video and photos corroborated the allegations, but the third student (too inebriated to recall the events) was neither deposed nor asked to testify at the hearings.  [The Fifth Circuit] held that cross-examining the amnesiac third student "could [not] have otherwise altered the impact of the videos and photos."  [*Plummer*, 860 F.3d] at 775–76.  Neither the third student's testimony nor cross-examination "would have suggested that she consented to the degrading and humiliating depictions of her in the videos and photos, and the testimony "could [not] have otherwise altered the impact of the videos and photos."  *Id.* at 776.

975 F.3d at 484 n.30 (additional citations omitted).  The court noted that the facts in *Walsh* "pose[d] a stark contrast to *Plummer*" given the lack of objective evidence and the credibility dispute.  *Id.*

While no two cases are identical, the present case is like *Walsh*, not *Plummer*.  There is

no objective evidence; Roe's account was filtered through Ussery; Roe gave conflicting

statements about what happened; and her credibility was never tested by her live testimony,

cross-examination, or even her own written statement.  At a minimum, Doe should have been

allowed to submit written questions, a procedure that would reduce some burdens on Roe.  And

because there are no factual disputes, the Court finds as a matter of law that Doe is entitled to

judgment on his procedural-due-process claim.

Having found a viable claim for injunctive relief, there is no need to address Doe's other

§ 1983 theories.  The Court grants Doe's request and orders "the University to immediately

remove any indication of a disciplinary finding against Doe from his student records," to "wholly

and permanently expunge[]" the "finding of responsibility and the record of the entire Title IX

proceeding . . . from his academic record," and to "permanent[ly] seal . . . all such proceedings to

protect against subsequent disclosure to any other person or academic institution."  Pl.'s Mem.

[186] at 40.

IV.    Conclusion

The Court has considered all arguments, those not addressed would not have changed the

outcome.  For the foregoing reasons, Plaintiff's motion for partial summary judgment [173] is

granted as to the procedural-due-process claim but otherwise denied.  Defendants' motion for

summary judgment [166] is denied.

**SO ORDERED AND ADJUDGED** this the 5th day of September, 2023.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE